UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TAMPA BAY STUDENTS FOR A                    CASE NO.:
DEMOCRATIC SOCIETY,                          FLA BAR NO.: 1031486
VICTORIA HINCKLEY, SABA
INDAWALA, and VICKY TONG,

      Plaintiffs,

v.

UNIVERSITY OF SOUTH FLORIDA
BOARD OF TRUSTEES, RHEA LAW,
MELISSA GRAHAM, and DANIELLE
MCDONALD

      Defendants.

_____/

## COMPLAINT

Plaintiffs, TAMPA BAY STUDENTS FOR A DEMOCRATIC SOCIETY ("TBSDS", "TAMPA BAY SDS", or "SDS"), VICTORIA HINCKLEY, SABA INDAWALA, and VICKY TONG hereby sue Defendants, UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES ("USF"), including the USF Police Department ("USF PD"), RHEA LAW, MELISSA GRAHAM, and DANIELLE MCDONALD, and allege:

## NATURE OF THE ACTION

1.    This is a civil action seeking monetary damages, declaratory judgment, legal, equitable, and injunctive relief against the UNIVERSITY OF SOUTH FLORIDA, the UNIVERSITY OF SOUTH FLORIDA POLICE DEPARTMENT ("USF PD"), (collectively the UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES or "USF") RHEA LAW, MELISSA GRAHAM, and DANIELLE MCDONALD (Collectively "Defendants").

2.    Plaintiffs are the former student organization TAMPA BAY SDS, as well as three individual members of the organization.

3.    Since at least October of 2023, Defendants have conspired to violate Plaintiffs' constitutional and statutory rights by suppressing their speech and advocacy, stigmatizing their organization, and subjecting them to baseless and discriminatory conduct sanctions, all due to their protected speech and activity in support of Palestinians, and in defense of Diversity, Equity, and Inclusion programs that benefit minority students.

4.    These violations have been carried out through the following specific acts, among others:

- The expulsion of TAMPA BAY SDS and individual Plaintiff HINCKLEY;

- The suspension and other conduct sanctions imposed against Plaintiffs INDAWALA and TONG;

- The complete prohibition of speech and advocacy by specific students on specific topics on campus;

- The publication of false light and defamatory materials including TAMPA BAY SDS's negative conduct history and allegations that the organization started a riot;

- The use of sham conduct proceedings that fail to provide basic due process protections;

- The creation of arbitrary and capricious policies contemporaneous with or immediately after pro-Palestine events, without notice or due process;

- The selective and discriminatory enforcement of those new and arbitrary policies against TAMPA BAY SDS and its members;

- Requiring that students attending a Palestine-related event cease discussing Palestine or advocacy issues as a condition of being permitted to sit in public and eat pizza that had been ordered;

- The direction, supervision, and encouragement of excessive use of force by USF PD against Plaintiffs;

- Increasing surveillance of public spaces on campus in direct and targeted response to a planned pro-Palestinian event;

- Forbidding Plaintiffs from speaking in outdoor areas of campus;

- Interfering with Plaintiffs use and enjoyment of the school's facilities including classes, graduation, and alumni benefits through

discriminatory treatment, the toleration of a hostile environment, and retaliation against Plaintiffs' protected oppositional activity;

- Implementing content specific policies and practices banning speech regarding Palestine, the ongoing genocide in Gaza, and DEI programs.

5.      This action is brought under the common law of the State of Florida, §1000.05 Fla. Stat (2024) (Florida Educational Equity Act) directly and through §760.07 Fla. Stat. (2024) (which incorporates damages outlined in 760.11(5) Fla. Stat. (2024)), 42 U.S.C. § 2000d et seq. (Title VI of the Civil Rights Act), § 1004.097(3)(a) Fla. Stat. (2018) (Florida Free Expression on Campus Act "the CAFE Act"), 42 U.S.C. §1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to the Plaintiff by the Constitution and laws of the United States, and by 42 U.S.C. §1988 which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. §1983.

6.      This is an action involving claims which are, individually and collectively, in excess of seventy-five thousand dollars ($75,000).

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over Plaintiffs' federal claims because Plaintiffs seek to recover for violations of their civil rights that "aris[e] under the Constitution [and the] laws… of the United States." *See* 28 U.S.C. §§ 1331, 1343 (granting district courts original jurisdiction over § 1985 claims), 1367.

8. The Court has supplemental jurisdiction over Plaintiffs' state-law claims because they arise out of the same events and thus "form part of the same case or controversy." *Id.* § 1367(a).

9. Venue is proper under 28 U.S.C. § 1391(b)(1) because: (1) all Defendants reside in Florida, (2) the University of South Florida and other Defendants, upon information and belief, reside in the Middle District of Florida, and (3) under 28 U.S.C. § 1391(b)(2), "a substantial part of the events or omissions giving rise to [Plaintiffs' claims] occurred" in the Middle District of Florida. *See e.g. McGrew v. Morgan*, 2021 WL 7451894, *10 (M.D. Fla. May 3, 2021).

10. All of the events giving rise to Plaintiffs' claims occurred in and around the City of Tampa Bay and on the University of South Florida Campus.

## PARTIES

11. At all relevant times, Plaintiff TAMPA BAY STUDENTS FOR A DEMOCRATIC SOCIETY has been an association of collectively organized, like-minded students and recent graduates, advocating for improvements in campus conditions for themselves and their communities.

12. TAMPA BAY SDS was formerly registered as an official student organization at USF and was expelled by Defendants.

13. At all relevant times, Plaintiff VICTORIA HINCKLEY ("HINCKLEY") has been a resident of Hillsborough, County, FL and a member of TBSDS.

14.     HINCKLEY attended USF but was expelled by USF in June 2024 for alleged involvement with TBSDS.

15.     At all relevant times, Plaintiff SABA INDAWALA ("INDAWALA") has been a resident of Hillsborough, County, FL, a member of TBSDS, and a current USF student.

16.     INDAWALA was issued conduct charges and sanctioned for her involvement with TBSDS.

17.     At all relevant times, Plaintiff VICKY TONG (a.k.a. "Vincky Tong" or "TONG") has been a resident of Hillsborough, County, FL and a member of TBSDS.

18.     TONG is a USF alumna who was issued conduct charges, sanctions, and a trespass order for alleged involvement with TBSDS.

19.     HINCKLEY, TONG, and INDAWALA all seek to continue exercising their constitutional rights to speak, advocate, and assemble in association with TBSDS on and around the USF campus.

20.     At all relevant times, Defendant USF has been organized and existing under the laws of the State of Florida.

21.     At all relevant times, Defendant USF has been a public research University (a part of the "k-20 public education system"), recipient of federal funding, member of the State University System of Florida, public forum, and Place of Public Accommodation, as those terms are used under the applicable laws identified above.

22.     Defendant USF was Plaintiffs' educational provider and university.

23.     At all relevant times, USF PD has been organized and existing under the laws of Florida as a full-service law enforcement agency responsible for policing all areas within 1,000 feet of any property or facilities under the guidance, supervision, regulation, or control of Defendant USF in Hillsborough County, Florida.

24.     At all relevant times, Defendant RHEA LAW ("LAW") was a resident of Florida and was employed by USF as President of the University of South Florida.

25.     At all relevant times, Defendant DANIELLE MCDONALD ("MCDONALD") was a resident of the State of Florida and was employed by USF as Associate Vice President of Student Affairs and Dean of Students.

26.     At all relevant times, Defendant MELISSA GRAHAM ("GRAHAM") was a resident of the State of Florida and was employed by Defendant USF.

27.     GRAHAM has been employed by USF as an Assistant Dean and Director Student Conduct and Ethical Development.

## CONDITIONS PRECEDENT

28.     Written notice of intent to initiate litigation on Plaintiff's state law claims asserted herein, were submitted to Defendant pursuant to 768.28(6), Florida Statutes, on July 8, 2025 and again on August 8, 2025.

## STATEMENT OF FACTS

29.     TBSDS is a student organization based in Tampa Bay, Florida.

30.     TBSDS was founded to advocate for improved conditions for minority and working-class communities on campus.

31.     TBSDS is a chapter of the National Students for a Democratic Society, a nonprofit organization that promotes and supports student speech, advocacy, and assembly on the pressing issues that affect them and their associates on campus.

32.     Since its founding, TBSDS has been devoted to supporting Palestinians and other minority students on campus.[1]

33.     Tampa Bay SDS has also led an ongoing campaign to reverse budget cuts to Diversity, Equity, and Inclusion ("DEI") programs on campus that provide crucial support for Arab, Muslim, Palestinian, and other minority students.

34.     USF and USF PD have acted in concert and conspired with the Tampa Jewish Community Centers & Federation ("Tampa JCC")—including the Tampa Jewish Community Relations Council ("JCRC")—among other unidentified co-conspirators, to deprive students associated with TBSDS of their constitutional rights because of their association with and speech in support of Palestinians and minorities.

35.     Plaintiffs have been directly harmed by these acts.

36.     Plaintiff HINCKLEY was expelled due to her association with TBSDS.

37.     Plaintiff TONG was suspended due to her association with TBSDS.

38.     Plaintiff INDAWALA faced disciplinary charges due to her association with TBSDS.

---

[1] As early as 2014, for example, Tampa Bay SDS was centrally involved in a petition drive that gathered more than 10,000 student signatures in support of divesting USF's endowment from Israel's illegal occupation of Palestine.

39.     Plaintiffs seek to exercise their First Amendment rights on the USF campus by identifying as members of TBSDS and promoting TBSDS's activism in support of Palestine and DEI programs.

40.     All three individual Plaintiffs have been hindered, thwarted, and persecuted for attempting to exercise those freedoms.

41.     Plaintiffs have suffered a deprivation of their constitutional and statutory rights as a result of Defendants' actions.

42.     Plaintiffs have suffered physical, mental, emotional, economic, and non-economic damages as a result of Defendants actions.

43.     Defendants' actions have been pervasive, systematic, willful, intentional, and malicious.

### Defendants Reactions to October 7, 2023

44.     On October 7, 2023, Palestinian militants attacked Israeli military facilities and settlements near the Gaza border.

45.     Almost immediately, Israel began a genocidal retaliation campaign, conducting mass slaughter of Palestinians on a scale not seen since the Nakba of 1948.

46.     Palestinian students at USF, along with their allies and supporters, began campus advocacy in support of Palestinians in Gaza.

47.     On October 11, 2023, President RHEA LAW published a statement to the student body supporting Israel and denouncing Palestinian activity as "terrorism".

48.     LAW declared that "[t]he events we are witnessing in the Middle East are deeply disturbing and frightening. Senseless, deadly acts of violence and terrorism

are abhorrent and have no place in our society. USF stands with those locally, across the country and around the world in condemning the Hamas attacks in Israel."[2]

49.     LAW stated that "[t]eams across the university have been reaching out directly to individuals and groups who may be impacted in some way to provide support and ensure they have access to the appropriate resources."

50.     Upon information and belief, no representative from the University reached out to TBSDS nor to any TBSDS members, including Palestinian students, despite the organization's long-standing association with Palestinians on campus.

51.     By the time LAW published this email, Israel had already begun its genocide, and deliberately bombed civilian infrastructure and population centers.

52.     USF's email made no mention of the immense Palestinian death toll as a result of Israel's attacks.

53.     At the same time, USF officials have continuously denied the existence of Palestine and refused to acknowledge the ongoing genocide.

54.     TBSDS members continued to exercise their assembly and speech rights by participating in protests in support of Palestinians over the following weeks.

55.     On October 21, 2023, Tampa Bay SDS published a statement expressing "full solidarity with all Palestinian students on campus who have been forced into

---

[2] University of South Florida, "Working Together to Maintain a Safe and Healthy Environment On Our Campuses," October 11, 2023 <https://www.usf.edu/news/2023/10-11-law-message.aspx>.

defending their people's right to exist, who have faced attacks from all fronts, and who are valiantly standing up for the people of Gaza."

56.    Tampa Bay SDS continued regularly calling for and attending protests on campus throughout the remainder of the semester.

57.    Palestinian students are among the members of TBSDS who seek to exercise their First Amendment rights in support of their families abroad and in opposition to Israel's genocide.

### *Conduct Charges Initiated*

58.    On February 12, 2024, USF and individual Defendants summoned TBSDS for a conduct hearing due to the organization's fliering around campus.

59.    TBSDS was informed that a non-student member of a local anti-Palestinian organization had taken pictures of TBSDS's pro-Palestine flyers on campus and sent them to USF and Hillel, demanding that TBSDS be penalized.

60.    USF administration caved to this external anti-Palestinian pressure and complied with the demand by scheduling a disciplinary meeting—itself a significant disincentive for students to continue their advocacy in support of Palestinians.

61.    Posting flyers on the public campus was standard practice for student organizations at USF at the time.[3]

---

[3] Tampa Bay SDS had regularly posted non-Palestine-related fliers and informational posters around campus announcing their events prior to October 7, 2023, without facing conduct charges. Outdoor spaces on Florida's public university campuses are public fora under Florida law, and First Amendment activity in those spaces is not subject to content regulation. See Florida Statutes § 1004.097(3)(a) ("Campus Free Expression Act").

62.    As a result of the hearing and in retaliation for the political posters installed around campus, Defendants placed TBSDS on conduct probation, prohibiting its members' speech and assembly and endangering its status as a registered student organization for the remainder of the semester.[4]



*Figure 1: The flier which formed the basis for SDS' conduct probation.*

63.    Since that time, Defendants have continued to act individually and in concert to target Tampa Bay SDS and its members and punish them with various sanctions for their pro-Palestinian speech and activism.

64.    On April 22, 2024, TBSDS held a protest as part of its ongoing campaign against budget cuts to Diversity, Equity, and Inclusion ("DEI") programs at USF.

65.    TBSDS called for a meeting with Dean of Students DANIELLE MCDONALD to discuss the DEI cuts, and ways USF can support minority students.[5]

---

[4] *See* Exhibit A, Letter Informing Tampa Bay SDS Of Conduct Probation.
[5] Tampa Bay Students for a Democratic Society, "Petition for USF to Reject DeSantis and Defend Diversity," last accessed December 3, 2024.
<https://docs.google.com/forms/d/e/1FAIpQLSd1hB6ZhUEGtkU1FF3IqI3uqlqrjL7Ic9TMEhs8

66.    TBSDS members marched to the 3rd floor of the Student Center, met with Defendant Dean MCDONALD, and handed her a petition with hundreds of signatures.

67.    Multiple TBSDS members wore keffiyehs during the petition delivery—a visible expression of solidarity with Palestinian culture and history.

68.    In retaliation for this petition delivery action, Defendants issued TBSDS four conduct charges and put the organization on interim suspension.[6]



QgoWXmBpsQ/viewform>.
    [6] See Exhibit B, Letter Informing Tampa Bay SDS Of Interim Suspension ("During the period of interim suspension, the organization is not allowed to hold or participate in any formal or informal meetings regarding the organization or the alleged violations; host/co-host/attend any programs, functions, or activities; utilize any services/resources offered to the student organization through any University office/department (e.g. Intramurals, center for Student Involvement, Center for Leadership and Civic Engagement, Fraternity and Sorority Life, Events and Meeting Services), participate in or hold leadership positions; or conduct any recruitment/new member/pledge activities or have contact with any potential new members/new members/pledges. This interim suspension is to include any activity or events sponsored/co-sponsored by the organization or any other entity.").

*Figure 2: SDS Members Delivering DEI Petition to Dean of Students Office*

69.     Interim suspension meant that TBSDS was barred from holding or even co-hosting meetings or events on campus, or accessing campus resources.

70.     Tampa Bay SDS is an organization made up of many individual students, united in their commitment to support Palestinians and other minority communities, especially on campus.

71.     USF's suspension meant that these same students, even ones who had not been involved with fliering efforts—including Palestinians—were prohibited from assembling to discuss and advocate around issues directly affecting them on campus.

72.     These students were prohibited from engaging in that speech and advocacy because of the content of their speech, and because of the ethnicity, religion, and race of those with whom SDS demonstrated solidarity.

73.     This baseless and discriminatory suspension—motivated by USF's anti-Palestinian bias and in retaliation for SDS's advocacy in support of Palestinians and other minorities including Muslims—clearly infringed on these students' First Amendment rights to assemble in community and advocate for their right to access educational resources on an equal basis (the DEI campaign), and in support of their families and their own safety (the Palestine solidarity campaign).

74.     This retaliation by Defendants was in direct violation of Title VI.

75.     Tampa Bay SDS was summoned for a conduct hearing with the USF administration and received an outcome letter on April 26, 2024.[7]

76.     The letter stated that the interim suspension would hold, and that TBSDS would remain forbidden from meeting or holding any events or assembling on campus.

77.     Throughout the 2024 Spring semester, any time TBSDS members attempted to engage their fellow students through tabling on campus, USF, USF PD, and Dean MCDONALD would shut them down.[8]

78.     The Tampa Bay SDS table always included flyers in support of Palestinian students and their families, and statements supporting DEI programs.

### *USF Prohibits Nakba Day Commemoration Event, Brutalizes and Punishes Students*

79.     One of the most significant and commemorated historical events among the Palestinian community is the Nakba—"catastrophe" in Arabic.

80.     During the Nakba, more than 75,000 Palestinians were ethnically cleansed from Palestine to make way for what would later become the state of Israel, essentially a Palestinian Trail of Tears with Zionism replacing Manifest Destiny.

81.     Every year, Palestinians commemorate Nakba Day—both as a memorial to the Palestinians ethnically cleansed in 1948, as well as a recognition of the enduring

---

[7] *See* Exhibit C, Outcome Letter (April 26, 2024).
[8] "Tabling" is one of the most common methods of student organization outreach, and involves setting up a foldable table in a popular location on campus and speaking with other members of the community as they walk by—usually discussing the organization's goals, announcing upcoming meetings and events, and providing educational materials. Other popular methods of outreach include "fliering" and "postering" on campus.

role played by the Nakba in condemning Palestinians to 75 years of colonization, occupation, illegal settlements, apartheid, terrorism, and genocide.[9]

82.    As one of the student organizations most directly connected to the Palestinian community on campus, TBSDS planned a Nakba Day commemoration event for April 29, 2024.

83.    On April 28, three TBSDS members received an email stating that TBSDS's suspension meant that the Nakba Day event would not be permitted.[10]

84.    The University did not offer an alternative location or accommodate the memorial event in any way but instead prohibited Palestinians in TBSDS and their allies from assembling anywhere on campus to honor the suffering of their people— disparate treatment unthinkable in the context of a Holocaust or 9/11 memorial.

85.    That same day, Defendant MCDONALD, emailed the student body attempting to impose a "time, place, and manner restriction[n]" on "all academic

---

[9] See e.g. Juwayriah Wright, "The Solemn History Behind Nakba Day," Time Magazine, May 16, 2024 <https://time.com/6978612/nakba-day-history/>.

[10] See Exhibit D, Email Ordering Cancellation of Nakba Day Event ("[D]ue to the Interim Suspension being upheld, the activity the organization has scheduled for Monday, April 29, 2024, at noon inside/outside the USF Library will not be permitted to occur. If the organization fails to follow this directive, it will result in further violations of the USF Student Code of Conduct for the organization and No Trespass Orders issued for individual participants. While on an Interim Suspension, Tampa Bay Students for a Democratic Society is not allowed to hold or participate in any formal or informal meetings regarding the organization or the alleged violations; host/co-host/attend any programs, functions, or activities; utilize any services/resources offered to the student organization through any University office/department (e.g. Intramurals, Center for Student Involvement, Center for Leadership and Civic Engagement, Fraternity and Sorority Life, Events and Meeting Services), participate in or hold leadership positions; or conduct any recruitment/new member/pledge activities or have contact with any potential new members/new members/pledges. This interim suspension is to include any activity or events sponsored/co-sponsored by the organization or any other entity").

buildings, which includes the Libraries, Information Commons (SM) the Marshall Student Center (T) and similar student centers on all three campuses."[11]

86.    The email stated that "no events without current approved reservations, protests, or demonstrations near those facilities on campus will be permitted" during the entire week of Nakba Day.[12]

87.    This week-long prohibition on space reservations or student organization activity was clearly designed to thwart TBSDS's attempt to commemorate Nakba Day.

88.    The school was on notice that the acts of one of more of the individual defendants was violative of Plaintiff's Constitutional liberties because earlier in the semester, a federal District Court in Maryland issued a preliminary injunction prohibiting the University of Maryland from imposing a similar restriction, and finding that the restriction would likely violate the First Amendment rights of the students, and that a violation of the students' First Amendment right to host a Palestine solidarity event—even for a day—would constitute irreparable harm. *University of Maryland Students for Justice in Palestine v. Board of Regents of University System of Maryland*, 2024 WL 4361863 (D. M.D. October 1, 2024).

89.    On April 29, 2024, TBSDS members attempted to hold the Nakba Day event as planned, but were prevented from doing so by USF and USF PD.

90.    TBSDS members were told they could not gather in the USF library because it was a controlled 'study zone.'

---

[11] *See* Exhibit E, Email From Dean Of Students Office (April 28, 2024).
[12] *Id.*

91.    After TBSDS members insisted on their right to assemble, the USF staff on duty told the students to hold their rally outdoors at the MLK Plaza instead.

92.    TBSDS members attempted to comply.

93.    Once the students reached the MLK Plaza, one person attempted to set up a tent but was violated and brutally arrested almost immediately by USF PD.

94.    Defendants' repeated provision of inaccurate, false, misleading or otherwise fraudulent information to TBSDS, with the knowledge that TBSDS and its members would rely upon that information to their detriment, was an intentional practice designed to thwart and deceive students affiliated with TBSDS.

95.    After the retaliatory arrest, the event continued briefly before being disrupted again.

96.    At around 1:00 pm, TBSDS members asked Defendant MCDONALD how long they would be permitted to stay in MLK Plaza.

97.    Hours later—at 4:30 pm—MCDONALD announced an unreasonable, arbitrary 5:00 pm curfew by which time students must leave the Plaza or be arrested.

98.    The curfew was created out of thin air, with no basis in USF policies or procedures, and with insufficient notice to Plaintiffs and others assembled in the Plaza.

99.    The imposition of this curfew was intentionally and maliciously designed to discourage, penalize, and otherwise compel SDS and its members against engaging in their protected speech.

100.    The lack of fair notice of the policy, coupled with the threat of arrest, both had a chilling effect on Plaintiffs' speech, association, and assembly.

101.    When students asked MCDONALD to explain this brand-new policy and pointed out that it was not codified in nor supported by the handbook, she invited them to email the administration, and said they nonetheless had to leave or be arrested.

102.    Defendant MCDONALD refused to clarify whether the policy was created that same day despite inquiries by Plaintiffs.

103.    Previously in the semester, TBSDS and other student organizations had regularly hosted events on campus which concluded later than 5:00 pm.

104.    At the time students were informed of the brand new 5:00 pm curfew policy, TBSDS members had just ordered pizza for Nakba Day event attendees.

105.    MCDONALD told students that if they sat in the Plaza and ate the pizza, without discussing Palestine or engaging in any sort of advocacy or protest, she would allow them to remain in the plaza past the curfew and would not have them arrested.

106.    The students sat in the plaza eating pizza for a brief period before dispersing for the night as ordered by MCDONALD.

107.    Upon information and belief, the 5:00 pm curfew was not an actual policy, but a targeted prohibition on these specific students gathering to discuss and advocate around these specific issues on that specific day.

108.    In the alternative, the policy was so discretionary and seldom enforced as to make its unprecedented use against Plaintiffs in this specific instance a deliberate act of discriminatory targeting that caught Plaintiffs completely without notice.

109.    Dean MCDONALD exercised unilateral and unfettered discretion to declare the conditions with which students must comply in order to avoid arrest.

110.    Dean MCDONALD used her discretion to discriminate against Plaintiffs on account of their race and ethnicity, the content of their speech, and the race and ethnicity of those they associate with and advocate in support of.

111.    Sometime that night, USF hastily installed surveillance cameras on a tree next to the MLK Plaza in furtherance of its campaign of intimidation against Plaintiffs.

112.    Upon information and belief, these cameras were not in place before, and were installed for the sole purpose of intimidating and stigmatizing TBSDS members and their associates through the threat of targeted surveillance.



*Figure 3: Cameras Installed at MLK Plaza on April 29, 2024*

113.    This targeted surveillance contributes to the militarized, hostile environment at USF, in which students who advocate for DEI programs and services to support Palestinians and other protected groups are subject to additional investigation and sanction based specifically on the content of their advocacy.

114.    The next day, TBSDS members attempted to resume use of the MLK Plaza, and again inquired about the curfew.

115.    Dean MCDONALD informed the students that the policy would remain in force, prohibiting TBSDS's activities after 5:00 pm.

116.    At around 4:50 pm, MCDONALD told assembled students they must leave by 5:00 pm.

117.    Many students chose to remain, insisting on their right to use the public forum to advocate for Palestinians and other minority communities on campus.

118.    At approximately 4:55 pm, USF and USF PD permitted riot police to enter the MLK Plaza.

119.    One officer named Sara Bringer announced, "we have chemical munitions we will use against you."

120.    The police used indiscriminate tear gas as well as rubber munitions against the assembled students, who dispersed.

121.    One of the tear gas canisters ignited a fire in a nearby bush.

122.    As students were dispersing, many attendees were arrested, including visibly pro-Palestinian Jewish and Muslim students and community members.

123.    At the same time, non-Palestinians stood nearby—in violation of the curfew—and shouted Islamophobic threats and harassing statements.

124.    Those anti-Palestinian students were not targeted for arrest and assault.

125.    Upon information and belief, this differential treatment of the anti-Palestinian students was based on the content of their speech.

126.    Many of the people arrested were seriously injured.

127.    One arrestee was run over by police bicycles and sent to the hospital with a concussion, after police violently ripped off his yarmulke.

128.    Other arrestees suffered minor injuries, and at least one more person suffered a concussion as a result of the police brutality.

129.    All of this police violence was committed against students by and at the express request and behest of USF, USF PD, and individual Defendants, with encouragement from wealthy megadonors and outside groups such as the JCRC.

130.    MCDONALD was present during the violent arrests, directing and encouraging the police, and pointing out specific students for the police to target.

131.    Upon information and belief, MCDONALD specifically ordered the police to arrest people who supported or associated with TBSDS.

132.    Upon information and belief, the number of arrests and the sheer force used against Plaintiffs and their associates is unprecedented in the history of USF.

133.    The scale of USF PD's response to the Nakba Day event is yet another example of the differential treatment of and selective enforcement against this specific content, individuals, and organization.

134.    In the moments after the tear gas was deployed, a TBSDS-associated student asked MCDONALD whether she approved of the police brutality against USF students, and MCDONALD stated she was happy to see it.

135.    Later on April 30, 2024, University President Defendant RHEA LAW and Board of Trustees Chair Will Weatherford sent an email to students about the arrests.[13]

136.    In her email, LAW falsely stated that the protest stopped being peaceful when Plaintiffs and other students attempted to stay in the MLK Plaza past 5:00 pm.

137.    This was a demonstrably false statement that misrepresented Plaintiffs and cast them in a false light as violent agitators; Plaintiffs and the other TBSDS members present were protesting peacefully, and it was Defendants who initiated the violence.

138.    This falsification by USF and LAW was designed to paper over their misconduct against Plaintiffs, and to justify the brutality USF PD used against them.

139.    This falsification was a clear attempt to prejudice the event organizers—including Plaintiffs and other TBSDS members—with a false accusation of violence.

140.    In fact, videos show that the event was peaceful at the time riot police entered the plaza threatening to use tear gas and rubber munitions.

---

[13] *See* Exhibit F, Email From Board of Trustees (April 30, 2024) ("To be clear, we will not tolerate violent, disruptive or aggressive acts by protestors… Police and university staff also observed protesters bringing in wooden shields, umbrellas, and tents. The protesters then locked arms, raised the shields and umbrellas, and communicated their intent to refuse to leave. USF Police determined that these actions were a dangerous escalation and that the protest was no longer peaceful.").

141.    USF, USF PD, MCDONALD, and others initiated and continuously engaged in violence against Plaintiffs and other students because they were protesting for Palestine and were affiliated with SDS.

142.    This harsh retaliation against Plaintiffs was an unconscionable misuse and abuse of authority in violation of Plaintiffs' constitutional liberties.

143.    On the night of April 30, USF issued conduct charges against HINCKLEY and one other TBSDS member, and placed them on interim suspension because of their membership in TBSDS and presence in the Nakba Day event.

144.    The other students arrested at the Nakba Day event were also suspended.

145.    As a result of these retaliatory charges, which held HINCKLEY and the other TBSDS member responsible for "leading" the events on April 29 and 30, HINCKLEY was expelled while the other member was suspended for an entire year.

146.    Expulsion and suspension are the single most direct means by which a University such as USF interferes with students' ability to access education.

147.    Here, that interference was motivated by retaliatory animus towards students perceived to be leaders of TBSDS and its advocacy campaigns.

148.    During HINCKLEY's conduct hearing, USF administrators specifically asked if she was planning to attend any future TBSDS events, implying that her answer would affect the outcome of the disciplinary hearing.

149.    USF insinuated that if HINCKLEY continued to protest and speak about these same issues, she would be punished more harshly, but if she agreed to remain silent and not associate or assemble with TBSDS, her punishment would be lighter.

150.    On June 27, 2024, two months after the Nakba Day events in MLK Plaza, USF issued conduct charges to another TBSDS member, alleging that they failed to disperse from the Nakba Day event after being ordered to do so by police.

151.    This information was demonstrably false and could have been corroborated by numerous eyewitnesses had a proper investigation been completed—the TBSDS member *did* in fact disperse from MLK Plaza when ordered to do so.

152.    Nonetheless, USF found the member responsible and imposed sanctions in violation of the student's Due Process rights.

153.    Upon information and belief, the TBSDS member was only issued conduct charges because of their association with TBSDS and its particular political advocacy; the allegation of violating the curfew was unsupported by any fact in the record and was motivated entirely by the student's public membership in TBSDS.

### *Defendants Conspired with Off-Campus Zionist Organizations*

154.    On May 5, 2024, the Tampa Jewish Community Centers & Federation's ("JCC") Executive Director of Combating Antisemitism, Mark Segel, published a letter commending the USF administration for its zero-tolerance approach to Palestinian and allied student organizing against Israel's ongoing genocide.[14]

155.    The JCC revealed that the USF administration had met with them on multiple occasions, had been in 'ongoing contact' (outside the sunshine) with 'several key stakeholder groups,' had met with the Deputy Consul General of Israel for Florida,

---

[14] *See* Exhibit G, Tampa JCRC Press Release.

had watched a 42-minute propaganda film about Hamas, and had even been paying for around-the-clock police presence at the Hillel building on campus.[15]

156. The letter from the JCC also falsely equates any criticism of Israel's ongoing genocide to antisemitism—a framing that specifically prevents Palestinian students and their associates from advocating around their needs and experiences.

157. The incredible record of the USF administration's outreach to, accommodation of, and even direct financial support of USF's pro-Israel students and community members contrasts sharply with USF's utter lack of any similar support for the Palestinian community on campus nor its associates.

158. Upon information and belief, USF has not met with Muslim community leaders, nor offered any additional protection to Muslim or Palestinian-associated spaces, organizations, or places of worship.

159. This is not the first time pro-Israel megadonors have attempted to improperly influence USF policy and campus politics, nor have they been afraid to leverage their resources against the speech of Palestinian students and their associates.

160. As early as February 27, 2015, the Jewish Press of Tampa Bay published a statement that "[t]he USF chapter of Students for Justice in Palestine places a

---

[15] *Id.* (stating that "USF's administration, including Rhea Law, has also met with and worked with representatives of the JCRC in addressing antisemitic and *anti-Israel activity* on campus."; quoting Tampa JCRC Chair Jonathan Ellis stating that "Rhea Law and her team at the university… have been in ongoing contact with several key stakeholder group; sat and at our request, even watched the 42-minute unedited horrific video of the October 7 Hamas terrorist attack with Mike Driquez, Deputy Consul General of Israel for Florida… [and] are covering the cost of 24/7 police protection of the Hillel Jewish Student Center at USF and we know of no other university doing the same").

billboard on Fowler Avenue near the campus, claiming that the university foundation ignored a petition by 10,000 students seeking an end to investments in Israel. With the constant vigilance of the Hillels of the Florida Suncoast, the university has repeatedly rebuffed the Boycott, Divest and Sanctions (BDS) movement."[16]

161.    The JCC and USF have conspired for over a decade to target and silence pro-Palestinian speech, the Divestment movement, and any speech critical of the Israeli government or US institutions' complicity in Israel's crimes.[17]

162.    On or around January 29, 2016, the JCC pledged $25,000 to assist USF Hillel members in opposing the Boycott, Divest and Sanction (BDS) movement on campus, led by TBSDS, Students for Justice in Palestine (SJP), and their associates.

163.    The USF Student Government approved a BDS resolution, but soon after its passage, the USF Senate President and Vice President vetoed the BDS resolution.[18]

164.    This multi-year campaign of interference by third-party donors was undertaken in furtherance of a conspiracy with USF to silence pro-Palestinian voices.

---

[16] *See* The Jewish Press of Tampa Bay TIMELINE: *Jewish Press headlines 2008- 2016*, July 15, 2016, https://www.jewishpresstampa.com/articles/timeline-jewish-press-headlines-2008-2016/ and *Hillel students keep USF invested in Israel*, Feb 27, 2015 https://www.jewishpressgulfcoast.com/articles/hillel-students-keep-usf-invested-in-israel/#

[17] According to the JCC's Annual Report from 2015-2016, the JCRC "continued to work with other organizations in efforts to combat the 'Boycott, Divestment and Sanctions' campaign against Israel" – a campaign that TBSDS actively supported and participated in by helping to gather over 10,000 signatures on a divestment petition. *See* "Annual Report 2015-16",  Tampa Jewish Community Centers & Federation. <https://fedweb-assets.s3.amazonaws.com/fed-96/2/AnnualReport2016s.pdf>.

[18] *See* The Jewish Press of Tampa Bay TIMELINE: *Jewish Press headlines 2008- 2016*, July 15, 2016, https://www.jewishpresstampa.com/articles/timeline-jewish-press-headlines-2008-2016/ and Fryer, Bob, *USF student Senate divestment vote rocks Jewish community, spurs funding pledges*, January 29, 2016 https://www.jewishpresstampa.com/articles/usf-student-senate-divestment-vote-rocks-jewish-community-spurs-funding-pledges/.

165.    In 2011, The JCC and USF joined the City of Tampa for a "Start-Up Nation" tour of Israel, with an emphasis on creating business ties between Tampa and Israel's high-tech companies, and a tour of Tampa's sister city, Ashdod, Israel.

166.    No similar tour of any Palestinian city has ever been sponsored by USF.[19]

167.    In 2019, the Jewish Federation of Florida's Gulf Coast gave USF $11 million for the construction of the Hillel building, now known as the Bryan Glazer Family Jewish Community Center's USF Hillel.

168.    In 2023, USF Hillel also raised a record breaking $157 million for USF.[20]

169.    It is no wonder the Israeli message gets parroted so much louder by USF, with so much favor; that level of funding and resources is clearly overwhelming when leveraged to target Palestinian students and their allies and associates.

170.    By donating vast sums of money while also lobbying in a cash for influence campaign USF to take steps supporting pro-Israel speech and silencing pro-Palestinian speech, JCC, Hillel, and fellow mega donors have sent a clear message: silence the pro-Palestinian students on campus or lose your funding source.

171.    USF has acquiesced to these demands in furtherance of the conspiracy to eliminate student speech in favor of Palestine.

---

[19] Fryer, Bob, the Jewish Press, ASHDOD: City, Federation & USF plan mission to Sister City, September 9, 2011. https://www.jewishpresstampa.com/articles/ashdod-city-federation-usf-plan-mission-to-sister-city/#:~:text=By%20ohtadmin,companies%20in%20the%20medical%20industry.
[20] Tierney, Tashie, WUSF, *USF is coming off a year of record donations*, Jul 28, 2023. https://www.wusf.org/university-beat/2023-07-28/usf-is-coming-off-a-year-of-record-donations

172.    As an act in furtherance of this conspiracy, USF has targeted TBSDS and its members, associates, and affiliates with extreme prejudice.

### *Fall Semester 2024 and the Hostile Environment on Campus*

173.    Upon information and belief, USF amended Policy 0-007 "Diversity and Equal Opportunity: Discrimination and Harassment" at the beginning of Fall 2024.

174.    Upon information and belief, the amendment was specifically designed to prohibit protected student speech and advocacy in support of Palestinians.

175.    The new policy criminalized and penalized protected First Amendment speech and association that is critical of Israel or its actions.[21]

176.    At the same time, USF has continuously refused to acknowledge the existence of an ongoing genocide against Palestinians nor even the presence of Palestinian students at USF.

177.    This elision further evinces the disparate treatment of Palestinians and their associates on campus, and contributes to a hostile environment that has left them vulnerable to hate crimes as well as discrimination and harassment, and is demonstrably distinct from how USF treats its pro-Israel students.

178.    On April 29, 2024, a social media page was created called "Bulls Against Antisemitism."

---

[21] *See* Exhibit H, Policy 0-007 Diversity and Equal Opportunity—Discrimination and Harassment (Amended August 20, 2024).

179.    In reality, the page is used by hate groups as a vehicle to intimidate, threaten, harass, and dox students and faculty who speak in support of Palestinians.[22]

180.    This hate group has repeatedly posted photos, names, and class information about students and faculty, and encouraged violence against them.

181.    As of December 11, 2024, an official USF student organization—Chabad—follows this page.

182.    Similar vitriol and threats have come from other third-party harassers via social media, including X.

183.    Plaintiff HINCKLEY has been relentlessly harassed and threatened by pro-Israel third parties on social media—by accounts that claim to be USF students.

184.    Some of these harassing tweets have directly 'tagged' USF, showing that USF was on notice of this severe campaign of third-party harassment and failed to take action to protect the students of TBSDS.[23]

185.    TBSDS members including TONG and INDAWALA filed multiple discrimination complaints, but never received a response or any follow-up from USF.

186.    On August 29, 2024, TBSDS attempted to conduct outreach on campus about their activities and campaigns by setting up an informational table.

187.    Defendant MCDONALD personally accompanied USF PD and directed the officer present to shut down the TBSDS table.

---

[22] *See* @bulls_against_antisemitism, Instagram Account (last accessed December 7, 2024) <https://www.instagram.com/bulls_against_antisemitism/?igsh=MXVyNXAzbTIwcnJ4MA%3D%3D>.

[23] *See, e.g.*, @johnwill382, X Account (last viewed December 10, 2024) <https://x.com/johnwill382/status/1809663004247724389>.

188.    MCDONALD stated that TBSDS was "expelled" from USF, and that any students who affiliated with TBSDS on campus would be issued conduct charges.

189.    MCDONALD told the would-be tablers that TBSDS was forbidden from even hosting a peaceful, general body meeting on campus.

190.    When the students asked MCDONALD if TBSDS members could assemble as individuals in order to discuss the "expulsion" of the organization, and their ongoing advocacy efforts, MCDONALD responded that doing so would result in conduct charges, invoking the expression 'if it walks like a duck and quacks like a duck, it is a duck'—the duck clearly being SDS and its members.

191.    TBSDS attempted to appeal the 'expulsion' and filed the required paperwork, but the appeal was summarily denied without due process or any meaningful opportunity to present their claim or for an in-person evidentiary hearing.

192.    The appeal denial failed to provide any explanation or engage with the facts of the case, and was arbitrary, capricious, and predetermined.

193.    On or before August 31, 2024, the USF Center for Leadership & Civic Engagement ("the Center") took the historically unique and unprecedented move of editing its webpage to officially denounce and defame SDS-associated students.

194.    The Center edited the "Conduct History" page of its website to specifically identify, repudiate, and threaten TBSDS and its members.

195.    The Center website now states that TBSDS "is permanently restricted from hosting any events or meetings, in-person, virtually, or by any other means."[24]

196.    On September 3, 2024, TAMPA BAY SDS attempted to hold a "Stand with Palestine: Defend Student Protests" event, calling on USF to cease its illegal repression of student organizing, disclose its investments which harm Palestinian students and their families, reinstate and support DEI initiatives that are essential for specific minority communities on campus, and divest from Israel's genocide.

197.    Students were immediately accosted by Defendants, denied their First Amendment rights, and threatened with conduct charges should they even attempt to set up for the TBSDS event.

198.    Students asked for clarification of how they as individuals could carry out the planned event without affiliating as SDS.

199.    Defendant MCDONALD replied that any Palestine-related events held that day at that time would be deemed a TBSDS-orchestrated event and would therefore be unpermitted and result in conduct charges.

200.    On October 1, 2024, TAMPA BAY SDS attempted to hold a "Defend Free Speech on Campus" rally to demand that USF stop its unlawful suppression of student speech and advocacy.

---

[24] *See* Exhibit I, USF Student Organization Conduct History Page ("Tampa Bay Students for a Democratic Society is expelled from all USF campuses. Expulsion is the permanent termination of the student organization's status. The organization is permanently restricted from hosting any events or meetings, in-person, virtually, or by any other means, and cannot utilize university space or reserve space. The organization is not allowed to participate in any official University functions, programs, intercollegiate competitions, or other student activities. The organization is not permitted to participate in member recruitment").

201. That same day, approximately four TBSDS members began to walk toward the event location but were promptly accosted by MCDONALD and USF PD.

202. Defendant MCDONALD started filming students on her personal cellphone and demanding students' IDs.

203. The students had not begun to speak before MCDONALD demanded they leave campus and declared that they would be issued student conduct charges.

204. The students asked multiple times why they were being forced to show their IDs and what provision of the code of conduct had been violated by them simply walking on campus, but MCDONALD refused to answer any questions.

205. Defendant MCDONALD refused to let students disperse and instead attempted to corral them and unlawfully held them against their will, threatening additional charges if students declined to hand over their student IDs upon demand.

206. Upon MCDONALD's request, a USF PD Officer issued a trespass warning to the small cluster of students.

207. Other students in the same vicinity at the same time, who were not attempting to attend the TBSDS event, were not detained nor given trespass warnings.

208. Later that night, INDAWALA and another TBSDS member were placed under interim suspension, effective immediately, based on their alleged involvement in the Defend Free Speech event earlier that day.

209. The students were charged with disruptive conduct and failure to comply.

210. More than three weeks later, on October 25, 2024, Defendants issued additional conduct charges against TONG and two other TBSDS-affiliated students.

211. All three students were charged based on having associated with, assembled at, and participated in a TBSDS event.

212. USF sought to send a clear message that any association with TBSDS would be grounds for discipline—even weeks after the alleged association occurred.

213. Through these actions as well as others, the USF administration has created a discriminatory, fearful, hostile, and persecutory environment on campus.

214. The three students charged on October 25th were all intimidated, and the hearing officer gave them the impression that if they would denounce SDS and disclaim any affiliation, they would be spared the punitive formal hearing process.

215. The vast majority of the questions asked by the hearing officer were not related to the individual students and their alleged conduct but were aimed at investigating their knowledge of and association with TAMPA BAY SDS.

216. On October 3, 2024, President LAW sent an email to all registered students, denouncing the "horrific Hamas terrorist attacks in Israel."[25]

217. LAW sent no emails in support of the tens of thousands of Palestinians who lost their lives since October 7, 2023, and her email was biased against Palestinians, and did not acknowledge Palestine nor the ongoing genocide by Israel.

218. Defendants' repeated, public support for Israel and elision of Palestinian students' experiences and trauma created a hostile environment and a severe chilling effect against associating with Palestinians or their allies in TBSDS.

---

[25] *See* Exhibit J, Email from Rhea Law (October 3, 2024).

219.    For example, after Israel blew up civilian pager devices in Lebanon, a Lebanese student organization attempted to host an event to raise funds for relief, but was told by USF that their event would be 'closely monitored,' and that 'any political speech or activity around the table' would result in the event being shut down.[26]

220.    This threat led the organizers to ask TBSDS members to not attend.

### *Title VI Complaint and Subsequent Enforcement*

221.    On December 11, 2024, Plaintiffs filed a complaint with the Office for Civil Rights, detailing Defendants' discriminatory practices, retaliation, and deliberate indifference to and reinforcement of a hostile learning environment.

222.    USF continues to penalize students for appearing to associate with or speak on behalf of TBSDS, even subsequent to the filing of the Title VI complaint.

223.    On February 10, 2025, TONG—an alumna by that point—and two current students were tabling in the Cooper Hall lawn area on campus, with a TBSDS banner bearing the words "Protect Immigrants" and "Defend LGBTQ Rights", alongside representations of the Palestinian flag and the queer liberation flag.

224.    All three were approached by USF PD and forced to hand over their IDs.

225.    The three individuals asked why and were told that TBSDS had been expelled and that Dean MCDONALD had asked USF PD to "get more information" about students who continued to participate in or associate with TBSDS.

---

[26] *See* Exhibit K, Message from Lebanese Student Organization (Anonymized).

226.    On March 3, 2025, all three individuals were issued conduct charges based on the SDS associated tabling.

227.    During an informational meeting on March 25, 2025, one of the students was interrogated about their knowledge of TBSDS, past interactions with TONG, and whether they had ever been involved with or interacted with TBSDS.

228.    The student was asked what topics were discussed at the TBSDS table—a clear indication that the contemplated conduct charges were not content neutral—and what the individuals did after the table was shut down.

229.    During the meeting, the USF administrator made it clear that the University will find students individually responsible for "failure to comply" if they are found to be members of or otherwise associated with TBSDS on campus, including in the outdoor area where the students had been tabling.

230.    The administrator warned: "now that you know that SDS is an expelled organization, don't be present in spaces under that umbrella if they're on campus."

231.    The student's advisor requested clarification of whether students would be penalized for merely attending a TBSDS rally on campus or congregating to listen to speeches by TBSDS members on campus.

232.    Assistant Director of Student Conduct & Ethical Development Emily Granville explained that once it became clear that a speaker was associated with TBSDS or that an event put on by TBSDS, students must "separate" from it in order to avoid "being found in that space, appearing to be supporting the organization".

233.    Despite the fact that TONG is no longer a student, but an alumna who was present in her capacity as a private citizen and TBSDS member in a public forum, Defendants issued her the same student conduct charges and ordered her to appear.

234.    TONG refused to acknowledge the charges for lack of jurisdiction.

235.    TONG was then found responsible for the conduct charges, and USF PD issued her a trespass warning, banning her from "the entire USF System" until December 12, 2025.

236.    TONG was forced to retain counsel to challenge the trespass warning, and said counsel eventually succeeded in getting a result in TONG's favor.

**Defendants' Unconstitutional Prior Restraints On Plaintiffs' Future Speech**

237.    On March 10, 2025, Plaintiff SABA INDAWALA, a student previously charged with associating with TBSDS—sent an email to Defendant MCDONALD, asking about her right to register a new student organization at USF:

> "I am reaching out for clarification regarding the process for registering a new student organization.
>
> As you know, Tampa Bay Students for a Democratic Society has been stripped of its official student organization status. Nevertheless, the substantive issues of Diversity, Equity, and Inclusion programming on campus and USF's role in the ongoing genocide in Gaza remain crucially important to students and other members of the community.
>
> Therefore, we intend to create a new student organization that can

speak, educate, and advocate around these issues. We plan to call the new organization "South Florida Students for a Democratic Society" and will associate with national Students for a Democratic Society and our sister chapters on campuses across the country. We intend to create a new constitution which includes all of the required language verbatim, based on the template constitution on the USF portal.

If we comply with all of the requirements, will our organization—South Florida Students for a Democratic Society—be allowed to register?"

238. On March 14, 2025, Defendant MCDONALD Responded:

"As Tampa Bay Students for a Democratic Society has been expelled, Policy 6.017 Student Orgs states:

Members of student organizations that are suspended or expelled may not continue to represent themselves as active members of the organization either under its original name or any new name. Efforts to suggest that a sanctions organization is still active; to recruit new members to a sanctioned organization; or to attempt to continue to function at the university under a new name but with similar members and purpose will be considered a violation of the Student Code of Conduct and the individual student(s) conduct in that regard which could include permanent restriction from campus.

What you are describing violates this policy, so you would not be able to register the new organization you described."

239.    Plaintiffs' ability to speak, assemble, and associate, in public forums and on campus have been severely infringed due specifically to the content of their speech.

240.    Plaintiffs' individual reputations in the FSU, Tampa, and online communities have been dramatically and irreparably harmed as a direct and proximate result of USF's all-out, prejudicial assault against any speech whose content is considered critical of Israel, pro-Palestinian, or associated with Palestinians and their cause or even with DEI programs on campus. Plaintiff's ability to speak, assemble, and associate, in public forums and generally have been dramatically interfered with and on campus entirely eliminated due specifically to the content of their speech, and at the behest of wealthy third party megadonors.

241.    Such blatant content-based restrictions clearly run afoul of every standard for permissible limitations on speech, and have been enforced through means including but not limited to:

- The creation of arbitrary and capricious, unsupported policies contemporaneous or immediately after Pro-Palestine events without notice or due process, and with intent to produce a disparate effect on those specific speeches and associations;

- The use of sham conduct proceedings that fail to provide basic due process protections or a meaningful opportunity for appeal;

- Selective over-enforcement of those new and arbitrary policies against TBSDS and its members to interfere with and terminate pro-Palestinian events and cripple the TBSDS organization on campus, by violating the organization or its members' ability to advocate, assemble, and speak;

- Requiring that students attending an ongoing pro-Palestinian event cease discussing Palestine or advocacy issues as a condition of being permitted to sit in public and eat pizza that had been ordered;

- The direction, supervision, and encouragement of excessive, unnecessary, violent, and unconstitutional force by USF PD against members of SDS who were nonviolent. USF PD initiated the violence, then conspired with USF and individual defendants to falsely defame the students as having started a riot by "failing to disperse";

- Increasing surveillance of public spaces on campus in direct and targeted response to a planned pro-Palestinian event;

- The University's campaign of publicly shaming and stigmatizing TBSDS and its members, including through the outrageous conduct of publishing conduct allegations and false light representations of Plaintiffs calculated to make a pariah and example of TBSDS and anyone who would dare support Palestine or DEI programs;

- Initiation of frivolous proceedings, interfering with the use and enjoyment of the school's facilities including classes, graduation, and alumni benefits;

- Implementing content-specific policies banning speech regarding the Semitic peoples of Palestine and banning discussion of their national struggle against apartheid and cultural erasure.

242. Whether or not USF agrees with Plaintiffs' speech, it should be proud of and protecting such exemplary students who are brave enough to stand up for the marginalized, especially when the content is unpopular, not colluding with foreign special interests to suppress dissent at home.

243. Instead Defendants have vilified their students, including Plaintiffs and have interfered with their ability to complete their degrees, to speak freely, to associate, and otherwise to have clean records upon graduation, which will continue to interfere with each students abilities to obtain future education, employment, or other opportunities, all because of the content of their speech and character of their association.

244. Plaintiffs have retained the undersigned to represent their interests in this cause and is obligated to pay a fee for these services, which Defendant should be made to pay under the laws referenced above.

**COUNT I**
**42 U.S.C. § 1983**
**DEPRIVATION OF CONSTITUTIONAL RIGHTS**

**First Amendment Rights to Speech, Assembly, And Association**
**(Against Individual Defendants)**

245.    Plaintiffs here re-allege and incorporate Paragraphs 1 through 244 above.

246.    This count sets forth claims by Plaintiffs against the Individual Defendants for violation of Plaintiffs' clearly established rights to exercise free and full speech, assembly, and association, under the First Amendment of the United States Constitution, through 42 U.S.C. §1983.

247.    42 U.S.C. § 1983 applies where a person acts under color of law to cause a deprivation of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

248.    Where a person causes such a deprivation, they may be held liable "to the party injured in an action at law, suit in equity, or other proper proceeding for redress." *Id.*

249.    USF, as a public university, is a traditional forum for assembly, speech, and association.

250.    The outdoor areas of USF, including the MLK Plaza, are also traditional public forums—in line with the legacy of its namesake.

251.    Plaintiffs HINCKLEY, INDAWALA, and TONG were all associated with Plaintiff TBSDS and collectively advocated in support of marginalized communities, including Palestinians on USF campus.

252.    Plaintiffs were specifically known to the Defendants for their association and speech.

253.   Plaintiffs desire to continue exercising their ability to associate with SDS, and to assemble in a public forum.

254.   Defendants have each prevented Plaintiffs from associating, assembling, and speaking through an intense, targeted, and prejudicial campaign of retaliation, discrimination, malicious prosecution, misuse of police resources, and conspiring with wealthy mega donors to shape discriminatory, antisemitic school policies including the silencing of Palestinian voices and causes and other culpable conduct.

255.   In an effort to quell, chill, or otherwise stamp out speech the school (or its donors) did not agree with, the school engaged in unprecedented, extensive persecution against Plaintiffs, including but not limited to publishing conduct records, expelling HINCKLEY from campus, punishing all who associated with SDS in any way, threats of chemical violence from USF PD, actual use of violence from the police force, increasing surveillance, policy changes which were timed with TBSDS events specifically, and many more examples of targeted discrimination by USF based on the content of SDS's speech.

256.   None of the policies were content-neutral as applied.

257.   All of the policies implemented by Defendants in direct response to TBSDS' advocacy were specifically designed to prevent any speech on campus about Palestinians' rights, and ostracize any and all who spoke on that particular subject or about the importance of DEI programs.

258.   Each Defendant has invaded Plaintiffs' rights under the First Amendment to the United States Constitution.

259. Defendants knowingly targeted content specific speech, groups who engaged in that speech, and individual students who were part of those groups, with a maximum pressure silencing campaign at the behest of their co-conspirators.

260. Defendants knew that their actions were in violation of Plaintiffs' constitutional rights of speech, assembly and association.

261. Those rights were clearly established.

262. In the alternative, Defendants acted with callous or reckless indifference the Plaintiffs' rights.

263. Private rights of action are available to Plaintiffs against Defendants for violation of their Constitutional rights through 42 U.S.C. §1983.

264. Defendants are "persons" under 42 U.S.C. §1983.

265. In their actions, described in part above, each of the Defendants was acting under color of state law as a state university, law enforcement agency, and their agents.

266. In their actions, described in part above, each of Defendants knew or should have known that their actions served to violate and deprive Plaintiffs of their rights under the First Amendment to the United States Constitution.

267. In their actions, described in part above, each of the Defendants were deliberately indifferent to Plaintiffs' constitutional rights to speech, assembly, and association.

268. The actions complained of herein were taken by or at the direction of officials and agents, who were policymakers within USF.

269.    Defendants, through their agents and employees, have engaged in a custom and practice of violating Defendants' rights specifically and without limitation under the First Amendment to the United States Constitution& Article I, Sections 4 and 5 of the Florida Constitution in unlawfully waging a maximum pressure campaign to silence, expel, destroy, or otherwise prevent Plaintiff SDS from exiting on campus, and vilifying any and all associates therewith with unlawful and retaliatory sanctions, conduct charges, expulsions, frivolous charges, excessive police violence, and by posting false information (such as who initiate the violence on MLK Plaza) and sensitive information (such as the conduct findings) around campus.

270.    Defendants are liable for their failure to train, monitor, supervise, and properly discipline their officers and employees who are improperly and unlawfully seeking to silence Plaintiffs.

271.    This pattern of failure to train, monitor, supervise, and discipline demonstrates the state of mind of these Defendants, and their deliberate indifference to the constitutional rights of Plaintiffs.

272.    On information and belief, no attempt has been made by Defendants to provide redress and assurances to persons, including Plaintiffs, whose free speech, assembly, and association rights have been wrongfully violated by Defendants or by their officers and employees.

273.    The actions of the Defendants were taken under color of state law with the intent to harm Plaintiffs.

274.    As a direct and proximate result of the acts and omissions of Defendants, described in part above, Plaintiffs have suffered irreparable physical, mental and other harm, have been prevented from graduating, and have been prevented from fully enjoying the benefits and privileges of the educational system at USF just because of the content of their speech.

275.    Plaintiffs suffered and continue to suffer harm by virtue of the ongoing interference with students' ability to study, enroll, be physically present, recruit, speak, assemble, access alumni services, the ostracization on campus, and other results of USF's overzealous and unlawful silencing campaign.

276.    Defendants each willfully and recklessly disregarded Plaintiff's constitutional rights to speech, assembly, and association.

277.    Plaintiffs are entitled to actual damages, reasonable attorneys' fees and other litigation costs reasonably incurred.

278.    Plaintiffs demand damages as well as prospective relief to remedy their ongoing damages and prevent future recurrence.

## COUNT II
## 42 U.S.C. § 1983
## DEPRIVATION OF CONSTITUTIONAL RIGHTS
### Fourteenth Amendment Right to Due Process
### (Against Individual Defendants)

272.    Paragraphs 1 through 244 above are realleged and incorporated by reference in this count.

273.    This count sets forth a claim against Individual Defendants in their personal and official capacities for abuse of power in violation of Plaintiffs' clearly established rights under the Due Process clause of the Fourteenth Amendment, brought through 42 U.S.C. §1983.

274.    42 U.S.C. § 1983 applies where a person acts under color of law to cause a deprivation of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

275.    Where a person causes such a deprivation, they may be held liable "to the party injured in an action at law, suit in equity, or other proper proceeding for redress." *Id.*

276.    Defendants, directly and through their agents, officers and employees, violated Plaintiffs' due process rights by subjecting them to excessively punitive and pre-determined conduct proceedings.

277.    Plaintiffs have a protected right to benefit from the public education provided by USF and for which they have contracted and paid.

278.    Said right was directly infringed as a result of the violations of their due process during the disciplinary process, including the police repression and intimidation of their activism as well as the student conduct charges.

279.    Because these rights and other rights and significant interests were at stake in the disciplinary process, those processes were required to include sufficient due process protections.

280.   Defendants collectively provided procedural protections that fell far below the minimum required, and as a result, Plaintiffs were injured.

281.   Defendants' abuse of the disciplinary and police powers was only possible because they were cloaked in the authority of state law, and were acting under color of state law.

282.   The violation of Plaintiff's rights, as described in part above, occurred under color of state law and is actionable under 42 U.S.C. §1983.

283.   Defendants acted with callous or reckless indifference to Plaintiffs' rights.

284.   As a direct and proximate result of the Defendants actions, set forth in part above, Plaintiffs have been injured and have suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, along with other tangible and intangible damages.

285.   These damages have occurred in the past, are occurring at present, and will likely continue into the future.

286.   Plaintiffs demand damages as well as prospective relief to remedy their ongoing damages and prevent future recurrence.

## COUNT III
### 42 U.S.C. § 1983
### DEPRIVATION OF CONSTITUTIONAL RIGHTS
### <u>First and Fourteenth Amendment Right to Privacy</u>
### (Against Individual Defendants)

287.   Plaintiffs here re-allege and incorporate Paragraphs 1 through 244 above.

288.    This count sets forth claims by Plaintiff TBSDS against Defendants for violation of their rights to privacy under the First and Fourteenth Amendments of the US Constitution which claims are brought through 42 U.S.C. §1983.

289.    The publishing of the results of the sham conduct proceedings against TAMPA BAY SDS, and the publishing of their expulsion on the Student Conduct Page.

290.    42 U.S.C. § 1983 applies where a person acts under color of law to cause a deprivation of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

291.    Where a person causes such a deprivation, they may be held liable "to the party injured in an action at law, suit in equity, or other proper proceeding for redress." *Id.*

292.    Students provide personal and private information to USF, its administrators, and USF PD, including their home address, photographs or images, social security numbers, dates of birth, states of birth, school enrollment decisions, prior and current home and mailing addresses, emergency contacts, and those contacts' personal information, and conduct hearing information, for the purposes of enrolling and participating in educational activities with USF.

293.    USF maintains Plaintiffs' conduct records, and that information is normally only accessible by the university and its administrators and agents.

294.   At no time did Plaintiff SDS provide consent for Defendant USF to obtain, disclose, or use Plaintiff's private conduct results information for any purpose other than official conduct proceeding business.

295.   Intentionally obtaining, disclosing or using conduct information without an authorized purpose is a violation of Plaintiff's rights of privacy under the Fourth and Fourteenth Amendments to the United States Constitution.

296.   Defendants and their agents, officers, and administrators have invaded Plaintiff TBSDS's privacy interests protected under the Fourth and Fourteenth Amendments to the United States Constitution.

297.   Defendants knowingly obtained conduct records through the confidential school system, disclosed and used Plaintiffs' personal information for a purpose not permitted by law in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 23 of the Florida Constitution.

298.   Defendants knew that their actions related to Plaintiff's personal information were in violation of Plaintiff's constitutional rights of privacy.

299.   Private rights of action are available to Plaintiffs against each defendant for violation of their Fourth and Fourteenth Amendment rights, which may be brought under 42 U.S.C. §1983.

300.   Individual Defendants are "persons" under 42 U.S.C. §1983.

301.   In its actions, described in part above, Defendants were acting under color of state law.

302.    In its actions, described in part above, Defendants knew or should have known that their actions served to violate and deprive Plaintiff's privacy rights under the Fourth and Fourteenth Amendments to the United States Constitution. and Article I, Section 23 of the Florida Constitution.

303.    In their actions, described in part above, Defendants were deliberately indifferent to Plaintiff's constitutional rights to privacy.

304.    The actions complained of herein were taken by or at the direction of Individual Defendants or their officials and agents.

305.    Additionally, Defendants have engaged in a custom and practice of violating private students and organizations' privacy rights under the Fourth and Fourteenth Amendments to the United States Constitution in unlawfully obtaining, disclosing or using such private citizens' conduct information for purposes other than law enforcement business without such students' and organization's consent.

306.    In addition, Defendants are liable for their failure to train, monitor, supervise, and properly discipline officers and employees who are improperly and unlawfully accessing the private conduct information of students, including Plaintiffs, without a proper, lawful, permissible, justifiable purpose for doing so.

307.    This pattern of failure to train, monitor, supervise, and discipline demonstrates the state of mind of Defendants, and their deliberate indifference to the constitutional rights of the students and others whose information has been so widely accessed and published, including Plaintiffs.

308.    Defendants completely disregarded the constitutional rights of the students—including Plaintiffs—whose information was improperly accessed and published.

309.    Defendants' lack of concern evidences a deliberate indifference to the unauthorized access to the private information of students and community members, including Plaintiffs and others often unaware of such access, in violation of their constitutional rights.

310.    On information and belief, no system has been established by Defendants to monitor the regular access of conduct information by administrators, staff, and other agents.

311.    On information and belief, no reviews have taken place of other unpermitted accesses or publications of confidential conduct information.

312.    On information and belief, no attempts have been made by Defendant USF to protect and safeguard the rights of other persons' private and highly restricted personal information that is in the possession of USF.

313.    On information and belief, no attempt has been made by Defendants to provide redress and assurances to persons, including Plaintiff, whose private conduct information has been wrongfully accessed and published or any other law enforcement database by the Individual Defendants or by other officers and employees.

314.    The actions of Defendants were taken under color of state law with the intent to harm Plaintiff.

315.    As a direct and proximate result of the acts and omissions of Defendants, described in part above, Plaintiff has suffered physical, mental and other harm because Plaintiff's private information has been obtained unlawfully.

316.    Plaintiffs suffered and continue to suffer harm by virtue of the increased risk that their protected information is in the possession of law enforcement personnel who obtained it without legitimate purpose.

317.    Plaintiffs demand damages as well as prospective relief to remedy their ongoing damages and prevent future recurrence.

318.    Defendants acted with callous and reckless disregard for Plaintiffs' constitutional rights to privacy.

319.    Plaintiffs are entitled to actual damages, punitive damages, reasonable attorneys' fees and other litigation costs reasonably incurred.

**COUNT IV**
**42 U.S.C. § 1983**
**DEPRIVATION OF CONSTITUTIONAL RIGHTS**
<u>**Fourteenth Amendment Right to Equal Protection**</u>
**(Against Individual Defendants)**

320.    Paragraphs 1 through 244 above are incorporated herein by reference.

321.    This count sets forth a claim against Individual Defendants for violations of Plaintiffs' clearly-established rights to equal protection under the Fourteenth Amendment to the United States Constitution, brought through 42 U.S.C. §1983.

322.    These violations were of the type and character as to which any reasonable person would be aware.

323.    42 U.S.C. § 1983 applies where a person acts under color of law to cause a deprivation of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

324.    Where a person causes such a deprivation, they may be held liable "to the party injured in an action at law, suit in equity, or other proper proceeding for redress." *Id.*

325.    Defendants acted to violate Plaintiff's Fourteenth Amendment right to equal protection, treating them differently from other similarly situated persons because of the Palestinian nationality, ethnicity, and alienage and association therewith of Plaintiffs and their speech.

326.    Plaintiffs have been singled out for mistreatment described in-part above, which has not been engaged in against other similarly situated persons.

327.    Such was done in conspiracy with several high profile local megadonors including but not limited to the JCC as part of a cash for influence scheme.

328.    The actions taken against Plaintiff, set forth in part above, were by Defendant USF through its officers and supervisors, identified in part above and including but not limited to USF PD, GRAHAM, LAW, and MCDONALD.

329.    Further, not only were Plaintiffs treated differently than certain other similarly situated persons, but rather, they were treated differently by Defendant USF than all other similarly situated persons.

330.   This differential treatment was due in particular to the content of Plaintiff's speech, their assembly, and advocacy for Palestine, and their Palestinian ethnicity, alienage, heritage, or affiliation.

331.   Individual Defendants are each a "person" under the laws applicable to this action.

332.   Defendants created, participated in, encouraged, and solidified customs, policies and practices of singling Plaintiffs out for the treatment set forth in part herein.

333.   Defendants were deliberately indifferent to the training received by their agents, officers, and employees, and has condoned their actions.

334.   Defendants, after notice of the constitutional violations alleged herein, officially sanctioned these actions and refused to discipline the responsible officers, employees and agents.

335.   The actions by Defendants occurred under color of state law, and is actionable under 42 U.S.C. §1983.

336.   In the alternative, Defendants acted with callous or reckless indifference to Plaintiffs' rights.

337.   As a direct and proximate result of Defendants actions, Plaintiffs have been injured and have suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, along with other tangible and intangible damages.

338.   These damages have occurred in the past, are occurring at present, and will likely continue into the future.

339.   Plaintiffs demand damages as well as prospective relief to remedy their ongoing damages and prevent future recurrence.

**COUNT V**
**42 U.S.C. § 1985(3)**
**CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS**
<u>**First and Fourteenth Amendment Rights to Freedom of Speech, Assembly,**</u>
<u>**Association, Due Process, and Equal Protection**</u>
**(Against All Defendants)**

340.   Paragraphs 1 through 244 are re-alleged and incorporated herein by reference.

341.   42 U.S.C. § 1985(3) prohibits two or more persons from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws." 42 U.S.C. § 1985(3).

342.   Where two or more people so conspire, and cause injury to the person or property of another or deprive that person of "having and exercising any right or privilege of a citizen of the United States," that person "may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." *Id.*

343.   Individual Defendants were state actors, acting under color of state law as officials of a public university.

344.    Together with their co-conspirators and megadonors, Individual Defendants and their agents, officers, employees, or administrators conspired and acted in concert to commit an unlawful act (or a lawful act by unlawful means).

345.    Each defendant took specific acts in furtherance of this conspiracy, including imposing unlawful speech and assembly restrictions, enforcement of those made up policies with excessive force (including through the unnecessary deployment of tear gas against peaceful protesters), and otherwise subjecting Plaintiffs to malicious persecution and public shaming as set forth more fully above.

346.    The agreement included to prevent pro-Palestinian and pro-DEI speech and advocacy from proliferating on campus by penalizing and stigmatizing those view points and that speech through punitive disciplinary measures, public stigma, and police response.

347.    The specific purpose of the cash for influence conspiracy between Defendants and donors was to silence voices the JCC opposed based on the content of that speech and advocacy, and to deprive, either directly or indirectly, any person associating with TAMPA BAY SDS or Palestinian students and other minorities on campus of equal protection of the laws.

348.    The conspiracy was enforced by force, intimidation, or threat, against all Plaintiffs from giving their support or advocacy on a legal and political current issue.

349.    Plaintiffs' persons and property were directly targeted by defendants and damaged with extreme prejudice specifically on account of such support or advocacy.

350.    Plaintiffs have sufficiently pled a prima facia case of deprivation of speech, assembly, association, privacy, equal protection, and due process rights, as well as several tort claims including but not limited to negligence, infliction of emotional distress, abuse of process, malicious prosecution, and other tortious conduct and thereby a prima facia case of conspiracy to commit said unlawful activity.

351.    Each Defendant who participated in the conspiracy possessed by virtue of their combination with co-conspirators, a peculiar power of coercion over Plaintiffs.

352.    Defendants were the guardians of Plaintiffs' academic future, gatekeepers to campus spaces and resources, local police forces, and representatives of the state.

353.    Defendants together with the JCC agreed or conspired, expressly or by implication, with the goal of unlawfully (or lawfully but in an unlawful manner) depriving Plaintiffs of their constitutional rights, causing false statements and truthful private statements to be published, and engaging in a vicious and targeted campaign of extreme prejudice to silence and separate SDS and its members from the remainder of campus specifically because of the content of their speech and affiliation with Palestinians and other minorities on campus.

354.    Each member of this conspiracy performed an overt act in pursuit of this goal, including the imposition of conduct charges, suspensions, and expulsion against Plaintiffs, the banishment from campus of their organization, and the improper use of police force against Plaintiffs, among other things.

355.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs' persons and property have been damaged, and they have suffered

violations of their clearly-established rights, including but not limited to equal access to speech, assembly, association, privacy, and other constitutional guarantees.

356.   Plaintiffs were injured and sustained economic damages, including lost income, lost prestige, and lost potential employment and good standing in the community.

357.   Plaintiffs have sustained severe emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience and hurt, postponed graduations among other things, and have suffered tremendous mental and emotional damages due to Defendants' conspiracy to silence and stigmatize them on campus.

358.    Plaintiffs are therefore entitled to compensatory and punitive damages pursuant to the above provisions.

359.   Plaintiff's damages are continuous; they have occurred in the past, are occurring in the present, and will continue to occur in the future.

360.   Plaintiffs demand damages as well as prospective relief to remedy their ongoing damages and prevent future recurrence.

361.   Pursuant to 42 U.S.C. § 1985(3), an aggrieved party may file an action for "recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." (emphasis added).

**COUNT VI**
**42 U.S.C. § 2000d**
**DISCRIMINATION UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964**
**National Origin: Disparate Treatment, Retaliation, and Hostile Environment**
**(Against All Defendants)**

362.    Paragraphs 1 through 244 are re-alleged and incorporated herein by reference.

363.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d protects individuals from being "excluded from participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination" on the basis of race, color, or national origin.

364.    Title VI's implementing regulation at 34 C.F.R. Part 100 prohibits discrimination on the basis of race, color, or national origin in education programs and activities that receive federal financial assistance from the U.S. Department of Education ("DOE").

365.    As an institution that receives federal financial assistance from the DOE, USF is required to comply with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 34 C.F.R. §§ 101.1-101.2

366.    A university recipient of federal funding may be found to have violated Title VI in one of two ways: if it commits a discriminatory act of its own or if it permits the existence of a hostile environment, i.e., when harassment by a third party or student is sufficiently serious to deny or limit the complainant's ability to participate in or benefit from the educational program or activity.[27]

---

[27] United States Department of Justice, Civil Rights Division, "Title VI Legal Manual", Section VI at 28 ("A recipient violates Title VI if (1) a third party (e.g., a fellow student) harasses a program participant or beneficiary based on race, color, or national origin and the harassing conduct is sufficiently serious to deny or limit the individual's ability to participate in or benefit from the program or activity (i.e., the harassment creates a hostile environment); (2) the recipient knew or reasonably should have known about the alleged harassment, i.e., actual or constructive notice; and (3) the recipient fails to take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, and address its effects, as appropriate. A recipient is liable under Title VI for its own conduct when it fails to take adequate 23 steps to address

367. The allegations in this complaint show that Defendants individually and in conspiracy, committed national-origin discrimination under Title VI against students who hold, or are perceived to hold, or who are associated or affiliated with Palestinian identity, by virtue of their skin color, dress, the ancestry of their name(s), their religious practice(s), and/or their speech and activism in support of Palestinian lives.

368. Defendants conspired among themselves to discriminate against Palestinian students and their associates and allies—including TBSDS and individual Plaintiffs—and in fact did so by punishing and stigmatizing pro-Palestinian speech and advocacy on campus, retaliating against Plaintiffs for their protected oppositional activity (charging USF with violating and ignoring minority students' rights), denying Plaintiffs of their right to be free from discrimination under a public K-20 education program or activity—namely, USF's educational programming and attendant student body activities—and failing to prevent the emergence of a hostile environment despite being on notice of its existence.

369. Defendants took additional specific actions in furtherance of this conspiracy, and in doing so actually did retaliate against and stigmatize Plaintiffs' oppositional activity and discriminate against Plaintiffs.

---

discriminatory harassment"); *See also* Davis *ex rel.* LaShonda v. Monroe Cty. Bd. Of Educ., 526 U.S. 629, 633 (1999) (hostile environment exists where harassment is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an education opportunity or benefit."). Although *Davis* is a Title IX case, the same legal standards are applied to Title VI of enforcement. *See, e.g.,* Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 258 (2009) ("Congress modeled Title IX after Title VI of the Civil Rights Act of 1964, and passed Title IX with the explicit understanding that it would be interpreted as Title VI was.").

370.    Plaintiffs demand equitable relief in the form of reinstatement of TBSDS as a registered student organization, reinstatement of VICTORIA HINCKLEY as a student, expungement of all disciplinary records relating to participation in TBSDS activities.

371.    Plaintiffs demand reasonable attorney's fees and court costs.

### COUNT VII
### Fla. Stat. § 1004.097 (2018) Campus Free Expression Act
### VIOLATION OF RIGHT TO FREE SPEECH ACTIVITIES
### <u>Banning Plaintiffs' Public Speech and Advocacy on USF Campus</u>
### (Against All Defendants)

372.    Paragraphs 1 to 245 above are hereby incorporated by reference.

373.    The Florida Free Expression on Campus Act ("the CAFE Act") provides that expressive activities on campus, including "all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; [and] circulating petitions" are protected under the First Amendment to the United States Constitution and Art. I of the State Constitution. Fla. Stat. § 1004.097(3)(a) (2018).

374.    The CAFÉ Act also provides that "[a] person who wishes to engage in an expressive activity in outdoor areas of campus may do so freely, spontaneously, and contemporaneously as long as the person's conduct is lawful and does not materially and substantially disrupt the functioning of the public institution of higher education or infringe upon the rights of other individuals or organizations to engage in expressive activities." Fla. Stat. § 1004.097(3)(b) (2018).

375.    The CAFE Act provides that "[o]utdoor areas of campus are considered traditional public forums for individuals, organizations, and guest speakers.

376.    A public institution of higher education may create and enforce restrictions that are reasonable and content-neutral on time, place, and manner of expression and that are narrowly tailored to a significant institutional interest.

377.    Restrictions must be clear and published and must provide for ample alternative means of expression." Fla. Stat. § 1004.097(3)(c) (2018).

378.    Any person injured by a violation of the CAFÉ ACT "may bring an action" "[a]gainst a public institution of higher education based on the violation of the individual's expressive rights in a court of competent jurisdiction to obtain declaratory and injunctive relief and may be entitled to damages plus court costs and reasonable attorney fees, which may only be paid from nonstate funds." Fla. Stat. § 1004.097(4)(a) (2018).

379.    Defendants USF, USF PD, GRAHAM, LAW and MCDONALD conspired to violate Plaintiffs' First Amendment rights by banning them from engaging in lawful protected expressive activity in outdoor areas of campus.

380.    Defendants placed TAMPA BAY SDS on conduct probation based on protected speech in a traditional public forum, and all subsequent abusive conduct charges were based on that initial unlawful use of conduct probation, and were therefore unlawful.

381.    These defendants prohibited HINCKLEY, INDAWALA, and TONG individually from exercising their First Amendment freedoms by forcing them to provide identification and disperse, issuing them conduct charges, threatening to issue trespass notices, and issuing trespass notices all based on attempted expressive

activity that was lawful and did not materially and substantially disrupt the functioning of the university.

382.   Defendants USF, USF PD, MCDONALD, LAW, and GRAHAM violated the rights of TBSDS and its members to engage in expressive associational activity by banning all speech and advocacy on campus that is associated with the organization.

383.   These same defendants provided no alternative means of expression for Plaintiffs and in fact even attempted to ban them from meeting and associating even virtually.

384.   Plaintiffs suffered injury to their first amendment rights and seek declaratory and injunctive relief, costs, damages, and attorney's fees.

**COUNT VIII**
**Fla. Stat. § 1000.05(2)(a), (8), & (9) (2024) and Fla. Stat. §760.07 (2024)**
**DISCRIMINATION UNDER THE FLORIDA EDUCATION EQUITY ACT**
**Violating Plaintiffs' Right to Equal Access and Enjoyment**
**(Against All Defendants)**

385.   Paragraphs 1 through 244 are re-alleged and incorporated herein by reference.

386.   The University of South Florida receives and benefits from federal and state financial assistance.

387.   The acts described above constitute discrimination on the basis of race, color, and national origin (Palestinian and by association), or religion (Muslim and Jewish).

388.    Defendants have excluded Plaintiffs with extreme prejudice from participation in, been denied the benefits of, and been subjected to discrimination under any public K-20 education program or activity conducted by a public educational institution USF.

389.    Defendants conspired among themselves to discriminate against Palestinian students and their associates and allies—including TBSDS and individual Plaintiffs—by punishing and stigmatizing pro-Palestinian speech and advocacy on campus.

390.    Defendants have denied Plaintiffs their right to be free from discrimination under a public K-20 education program or activity—namely, USF's educational programming and attendant student body activities.

391.    Such acts include but are not limited to: stigmatizing SDS and its members, tolerating hate speech of Palestinians, tolerating online bullying of Palestinian allies, silencing voices in public forums such as MLK Plaza, siccing USF PD on Plaintiffs and their associates with violence and chemical weapons, fabricating policies from whole cloth including time, place and manner restrictions which only applied to Plaintiffs, and enforcing them with extreme prejudice, placing surveillance on a traditional public forum in the wake of unpopular speech, conspiring with a megadonor to suppress particular speech opposed by that megadonor, interference with classes, suspension, imposition of frivolous conduct charges, imposition of sham proceedings with no meaningful opportunity to appeal, expulsion, banning from campus, and interference with ability to associate and advocate, all of which is in stark

contrast to how USF treats its other students, particularly those who the megadonors such as the JCC support.

392.    Defendants' acts were taken to specifically exclude Palestinians, their allies, affiliates, and supporters from full and free enjoyment of all of the rights and privileges of the educational system, including the public forum for speech and assembly.

393.    Plaintiffs demand equitable relief in the form of reinstatement of TBSDS as a registered student organization, reinstatement of VICTORIA HINCKLEY as a student, expungement of all disciplinary records of relating to participation in TBSDS activities.

394.    Plaintiffs demand reasonable attorney's fees and court costs.

**COUNT IX**
**Florida Common Law**
**INVASION OF PRIVACY BY PUBLIC DISCLOSURE OF PRIVATE FACTS**
**Publication of Allegations Against TBSDS And Members**
**(Against Defendants USF, GRAHAM, LAW, and MCDONALD)**

395.    Paragraphs 1 through 244 are re-alleged and incorporated herein by reference.

396.    This is an action for common law intrusion on Plaintiff's right of privacy and for public disclosure of private facts regarding Plaintiff TBSDS, for example through the publication of the USF websites Conduct History page.

397.    Defendant USF GRAHAM, LAW, and/or MCDONALD, disclosed private facts about Plaintiff to anyone with access to the school website, including the facts set forth above regarding the conduct results and expulsion.

398.    Defendants do not have a pattern and practice of publishing such private confidential information, and in fact this is an extraordinary act on behalf of USF.

399.    The actions of Defendants were such that a reasonable person could see that they would cause mental distress and injury to persons situated like Plaintiffs.

400.    Defendants' actions would be highly offensive to any reasonable person.

401.    The actions of Defendant USF's agents, including but not limited to Defendants GRAHAM, LAW, and MCDONALD were done in a malicious manner and were not reasonably limited or designed to convey information pertinent to Defendants' educational mission.

402.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs were injured and sustained economic damages, including lost prestige, lost potential recruitment, lost time to advocate in a critical moment in history, and good standing in the community.

403.    Plaintiffs have sustained severe emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience and hurt, because of Defendant USF and its agents' actions.

404.    Plaintiffs are therefore entitled to compensatory and punitive damages.

405.    Plaintiff's damages are continuous; they have occurred in the past, are occurring in the present, and will continue to occur in the future.

**COUNT X**
**Florida Common Law**
**DEFAMATION, LIBEL, & SLANDER**
**Publication of "Conduct History" Page and Allegations Against TBSDS**
**(Against Defendants USF & LAW)**

406.   Paragraphs 1 through 244 are re-alleged and are incorporated herein by reference.

407.   This count sets forth a claim against Defendants USF, GRAHAM, LAW, and MCDONALD for common law defamation, for example the publication of a statement insinuating SDS or its members initiated the violence at MLK Plaza or falsely equating peaceable assembly beyond a fabricated curfew with violence.

408.   On or around April 30, 2024, Defendant LAW published or caused to be published or allowed to be published false statements about Plaintiff to third parties as set forth in part above.

409.   These statements made by Defendant USF through Defendant LAW were malicious and intended to harm Plaintiff.

410.   Alternatively, Defendants USF and LAW were negligent in publishing these statements, or published these statements with knowledge that they were false or reckless disregard as to their falsity.

411.   The statements referred to above directly and proximately caused harm to Plaintiffs' reputations in the community, and subjected Plaintiffs to distrust, ridicule, contempt or disgrace.

412.   These statements have deterred others from associating with Plaintiff as alleged more fully above and are actionable on their face.

413.   The communications made by Defendants LAW and USF imputed to Plaintiff conduct, characteristics, and a condition incompatible with the exercise of Plaintiff's lawful business, trade, profession and office.

414.    Alternatively, Defendants engaged in slander per quod and Plaintiff is entitled to damages as a consequence thereof.

415.    Defendant did not publish these statements in good faith.

416.    As a result of the false statements made by Defendants USF and LAW, set forth above, and the publication thereof, Plaintiff has suffered damages which include, without limitation, special and general damages.

417.    Defendants engaged in slander per se which is actionable on its face and general damages are presumed.

418.    The communications made by Defendants USF and LAW imputed to Plaintiffs' conduct which is incompatible with his functioning as a member of his community and occupation.

419.    Few good, decent or honorable people want to have business relationships a person with the qualities attributed to Plaintiffs by Defendant serving them in a personal or professional capacity.

420.    As a result of the defamatory statements, Plaintiffs suffered extreme humiliation, embarrassment, and mental anguish, pain and suffering, inconvenience, loss of consortium, lost capacity for enjoyment of life, loss of business and profits, loss of reputation, good standing in the community and other tangible and intangible damages.

421.    These damages have occurred in the past, present and are reasonably expected to continue into the future.

422.    Plaintiff is entitled to equitable/injunctive relief and to punitive damages.

## COUNT XI
### Florida Common Law
### MALICIOUS PROSECUTION
### Retaliatory Conduct Changes, Investigation, Suspensions, and Expulsion of Plaintiffs and Their Organization TBSDS
### (Against All Defendants)

423.    Paragraphs 1 through 244 are hereby realleged and incorporated herein by reference.

424.    USF and individual Defendants caused the commencement and/or continuation of conduct proceedings against Plaintiffs.

425.    There was no probable cause or reasonable basis in fact or in law for Defendant USF to cause the commencement of the conduct proceedings against Plaintiff.

426.    These proceedings were initiated in whole or in major part specifically because of Plaintiff's association and assembly with SDS, and the specific content of Plaintiffs' speech regarding Palestinian liberation and freedom.

427.    Defendant USF acted with malice in initiating the conduct proceedings against Plaintiffs, as well as in making the arrests, and Defendant USF knew or should have known that their actions against Plaintiff were not even arguably supported by probable cause.

428.    As a direct and proximate result of Defendant USF's actions, Plaintiffs have been damaged, including: mental anguish, pain and suffering, embarrassment, humiliation, injury, and loss of reputation.

429.    These damages have occurred at present, in the past and will most likely occur in the future.

430.    Plaintiffs are entitled to punitive damages under this count.

## COUNT XII
### Florida Common Law
### ABUSE OF PROCESS
### Retaliatory Conduct Changes, Investigation, Suspensions, and Expulsion of Plaintiffs and Their Organization TBSDS
### (Against All Defendants)

431.    Paragraphs 1 through 244 are incorporated herein by reference.

432.    This is an action against Defendant USF for abuse of process.

433.    Defendants repeatedly and with malice, used frivolous or false conduct charges against purported violations of school Policy, and in the issuance of student conduct charges.

434.    Defendants had the ulterior motive or purpose in exercising the improper process specifically and without limitation to silence, or otherwise prevent SDS and its members from exercising their constitutionally protected rights on campus; and did cause grievous harm and damage to Plaintiffs as a result of Defendant's actions.

435.    In order to stop Plaintiffs in their attempts to speak, associate, and peaceably assemble, Defendants caused multiple conduct charges to be issued against Plaintiffs, and maintained those cases despite knowledge that there was no factual basis therefore.

436.    Defendants caused at least one conduct charge to be issued against Plaintiffs INDAWALA, HINCKLEY, and TONG, and failed to have the charges withdrawn despite knowing that the charges lacked any basis in fact or law.

437.    Defendants continued to prosecute Plaintiffs on concocted charges for improper gain, and at the behest of third party megadonors.

438.    As a direct and proximate result of the actions taken by Defendants, Plaintiffs have suffered injury, including but not limited to past and future wage losses, loss of benefits, and other tangible and intangible damages.

439.    These damages have occurred in the past, are occurring at present and will occur in the future.

**COUNT XIII**
**Florida Common Law**
**COMMON LAW CIVIL CONSPIRACY**
<u>**Conspiracy to Violate Rights**</u>
**(Against All Defendants)**

440.    Paragraphs 1 through 244 are re-alleged and incorporated herein by reference.

441.    Together with co-conspirators, Defendant USF, including any and all acts of its agents, officers, employees, or administrators, including USF PD, GRAHAM, LAW, and MCDONALD, or any other agents thereof, conspired to commit the above-described deprivations of rights, and the below-described tortious acts against Plaintiffs.

442.    The acts of individual defendants which are determined to have been outside the course and scope of their employment in furtherance of this conspiracy are

exempt from the intercorporate conspiracy doctrine and render defendants USF PD, GRAHAM, LAW, and MCDONALD individually and jointly liable for their part in the conspiracy.

443.   Defendants acted in concert to commit an unlawful act, or a lawful act by unlawful means, to wit: imposing unlawful speech restrictions, assembly restrictions, enforcement of those made up policies with excessive force by USF PD, including the unnecessary deployment of tear gas against peaceful protesters, depriving Plaintiffs of their constitutional freedoms of speech, assembly, and due process, and of equal access and equal protection and other sever persecution and public shaming as set forth more fully above.

444.   The defendants formed an agreement between them and co-conspirator the JCC to inflict a wrong against or injury upon Plaintiffs and each defendant took an overt act that resulted in damage.

445.   Defendants each agreed to prevent pro-Palestinian and pro-DEI speech and advocacy from proliferating on campus by penalizing and stigmatizing those view points and that speech through punitive disciplinary measures, public stigma, and police response.

446.   Plaintiffs have sufficiently pled a prima facia case of deprivation of speech, assembly, association, privacy, equal protection, and due process rights, as well as several tort claims including but not limited to negligence, infliction of emotional distress, abuse of process, malicious prosecution, and other tortious conduct.

447.    Alternatively, each defendant possesses—individually and by virtue of their combination with the other conspirators—a peculiar power of coercion over Plaintiffs.

448.    For example, Defendants are the gatekeepers of Plaintiffs' academic futures, the security forces empowered to police their classrooms and campus, and in some cases their landlords.

449.    Defendants had the power, and indeed used said power, to disrupt Plaintiffs' academic progress, ban them from campus, and permanently prejudice their disciplinary records.

450.    Many of these powers of Plaintiffs are powers which the co-conspirators each individually could not have exercised if not for the conspiracy.

451.    Defendants, together with third parties including the JCC, agreed or conspired—expressly or by implication—to accomplish the unlawful goal (or lawful goal through unlawful means) of silencing TAMPA BAY SDS and its members, prejudicing their futures, and violating their rights.

452.    With this as their goal, Defendants deprived Plaintiffs of their constitutional rights, caused defamatory statements to be published about them, engaged in a vicious and targeted campaign of malicious prosecution and abuse of process to intimidate and deter Plaintiffs' protected conduct.

453.    Each member of this conspiracy performed an overt act in pursuance of this goal by some overt act to wit, the imposition of suspensions and expulsion against Plaintiffs and the banishment from campus of their organization.

454.    As a direct and proximate result of said conspiracy and acts committed in pursuance thereto, the individually named defendants damaged Plaintiff.

455.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs were injured and sustained economic damages, including lost income, lost prestige, lost potential employment and good standing in the community, sustained severe emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience and hurt, postponed graduations, and tremendous mental and emotional damages due to Defendants' conspiracy.

456.    Defendants are therefore entitled to compensatory and punitive damages pursuant to the above provisions.

457.    Plaintiffs' damages are continuous; they have occurred in the past, are occurring in the present, and will continue to occur in the future.

**COUNT XIV**
**Florida Common Law**
**NEGLIGENT TRAINING**
**Abusive Raid of MLK Plaza**
**(Against Defendant USF & USF PD)**

458.    Paragraphs 1 through 244 are re-alleged and incorporated herein by reference.

459.    This count sets forth claims against Defendants USF and USF PD for negligent training of their agents, officers, and employees including but not limited to Defendants USF PD, GRAHAM, LAW, MCDONALD, and any law enforcement personnel that took place in the unlawful raid on MLK Plaza.

460.    The actions of Defendant complained of in this count were taken in the performance of "operational" functions, i.e., functions that are not necessary to or inherent in policymaking or planning, and which merely reflect secondary decisions as to how existing policies or plans will be implemented.

461.    The duties of care owed by Defendants USF and USF PD to Plaintiffs included duties to properly train their employees and agents. Plaintiff was in foreseeable zones of risk, and these duties of care arose.

462.    Defendants USF and USF PD breached their duties of care to Plaintiff by negligently failing to properly train their employees or by delivering no training at all to such employees and agents.

463.    As a direct and proximate result of the unlawful acts and omissions of Defendants USF and USF PD set forth in part above, Plaintiffs have been damaged, including physical pain, mental anguish, pain and suffering, bodily injury, embarrassment, humiliation, loss of reputation, loss of employment opportunities, lost wages, and loss of other emoluments.

464.    These damages have occurred in the past, are occurring at present, and are likely to continue into the future.

## COUNT XV
### Florida Common Law
### NEGLIGENT SUPERVISION
### Tortious and Illegal Campaign of Targeting Plaintiffs and Their Organization
### (Against Defendants USF & USF PD)

465.    Paragraphs 1 through 244 are re-alleged and incorporated herein by reference.  This Count is pled in the alternative.

466.    This count sets forth a claim against Defendants USF and USF PD for negligent supervision.

467.    Defendants USF and USF PD breached their duty to properly supervise Defendants GRAHAM, LAW, MCDONALD, any law enforcement personnel that took place in the unlawful raid on MLK Plaza, and other officers, employees, and agents.

468.    To wit, GRAHAM, LAW, MCDONALD, USF PD were able to engage in months-long targeted campaigns to silence particular speech by any and all means, including but not limited to commandeering the USF PD and their officers to enforce non-existent, or made up policies against only those students who spoke about Palestine or assembled in association with SDS without any supervisors noticing.

469.    The breach of this duty to properly supervise Defendants GRAHAM, LAW, MCDONALD, and other officers, employees and agents resulted in damages and injury to Plaintiff.

470.    Defendants USF and USF PD knew or should have known that the actions, omissions, and derelictions of officers, employees, and agents could cause injury to Plaintiff.

471.    Defendants USF and USF PD breached their duties to supervise their employees and agents while on duty and take appropriate disciplinary actions against said employees and agents.

472.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs sustained damages, including emotional pain, anguish,

humiliation, insult, indignity, loss of self-esteem and inconvenience and hurt and are therefore entitled to compensatory damages pursuant to the above provisions.

**COUNT XVI**
**Florida Common Law**
**NEGLIGENT RETENTION**
**<u>Failure to Discipline and Rectify Employee Conduct</u>**
**(Against Defendant USF & USF PD)**

473.    Paragraphs 1 through 244 are re-alleged and incorporated herein by reference.  This Count is pled in the alternative.

474.    This count sets forth a claim against Defendants USF and USF PD for negligent retention.

475.    Defendants USF and USF PD breached their duty to properly discipline Defendants GRAHAM, LAW, MCDONALD, and other officers, employees, and agents, and negligently kept Defendant GRAHAM, LAW, MCDONALD, and officers of USF PD on staff while failing to discipline them when warranted.

476.    Plaintiff was in the foreseeable zone of risk attached thereto.

477.    Defendants' lack of a policy or lack of proper implementation thereof regarding employee's behavior and appropriate disciplinary actions allowed GRAHAM, LAW, MCDONALD, and officers of USF PD to retain employment even after the conduct described more fully above, and caused Plaintiffs additional injury.

478.    The breach of this duty to properly discipline or terminate Defendants GRAHAM, LAW, MCDONALD, USF PD and other officers, employees and agents resulted in damages and injury to Plaintiff.

479.    Defendants USF and USF PD knew or should have known that the actions, omissions, and derelictions of officers, employees, and agents when left unchecked, could cause injury to Plaintiff.

480.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiff sustained damages, including emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem and inconvenience and hurt and are therefore entitled to compensatory damages pursuant to the above provisions.

## COUNT XVII
### Florida Common Law
### COMMON LAW NEGLIGENCE
### Violation of Duty of Reasonable Care
### (Against All Defendants)

481.    Paragraphs 1 through 244 are re-alleged and incorporated herein by reference.

482.    This count sets forth a claim against all Defendants for common law negligence.

483.    Defendant USF and its agents, including but not limited to Defendants USF PD, GRAHAM, LAW, and MCDONALD knew or should have known that Plaintiff was with a zone of risk related to contact with its agents/employees.

484.    Defendants, as the university Plaintiffs were enrolled and registered at and its agents, owed a duty of care to Plaintiff due to the nature of the relationship between Plaintiff and Defendants.

485.    Legal duties devolved upon Defendants because Plaintiffs were in the foreseeable zone of risk to be harmed by their actions.

486.    Defendants failed to exercise reasonable care in their treatment of Plaintiffs by permitting them to be subject to a hostile environment, and by conspiring to commit the above-described deprivations.

487.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs sustained economic and emotional damages.

### COUNT XVIII
### Florida Common Law
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Extreme and Outrageous Conduct
### (Against All Defendants)

488.    Paragraphs 1 through 244 are realleged and are incorporated herein by reference.

489.    This count sets forth a claim against Defendants USF, USF PD, LAW, GRAHAM, and MCDONALD for intentional infliction of emotional distress.

490.    This claim is pled in the alternative to Count XIX.

491.    Defendants USF, USF PD, LAW, GRAHAM, and MCDONALD's conduct set forth in part above, included several instances of mistreatment of Plaintiffs.

492.    This conduct by Defendants USF, USF PD, LAW, GRAHAM, and MCDONALD constituted extreme and outrageous conduct that would shock the conscience of a reasonable person and goes beyond all bounds of decency.

493.    Defendants USF, USF PD, LAW, GRAHAM, and MCDONALD's conduct was the proximate cause of Plaintiff's emotional distress and Plaintiff's emotional distress was severe.

494.    Defendants USF, USF PD, LAW, GRAHAM, and MCDONALD's conduct constitutes the actionable tort of intentional infliction of emotional distress.

495.    Defendants USF, USF PD, LAW, GRAHAM, and MCDONALD intentionally and/or recklessly caused Plaintiff emotional distress by abusing their position as fiduciaries, law enforcement, and Plaintiffs' University and by making false statements to cause Plaintiff to be unjustifiably subjected to brutality, arrest, imprisonment, conduct charges, expulsion, suspension, and other unjust prosecution.

496.    These actions by Defendant USF and its agents, officers, and employees were made in bad faith and with a malicious purpose and with a willful disregard for Plaintiff's rights.

497.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs were injured and sustained economic damages, including lost income, lost prestige, lost potential employment and good standing in the community.

498.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs sustained severe emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience and hurt.

499.    Plaintiffs are therefore entitled to compensatory and punitive damages.

500.    Plaintiff's damages are continuous; they have occurred in the past, are occurring in the present, and will continue to occur in the future.

## COUNT XIX
**Florida Common Law**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
<u>**Extreme and Outrageous Conduct**</u>
**(Against All Defendants)**

501. Paragraphs 1 through 244 are realleged and are incorporated herein by reference.

502. This count sets forth a claim against Defendants USF, USF PD, LAW, GRAHAM, & MCDONALD for negligent infliction of emotional distress.

503. This claim is pled in the alternative to Count XVIII.

504. Defendants USF, USF PD, LAW, GRAHAM, & MCDONALD's conduct set forth in part above, including several instances of mistreatment of Plaintiff, constituted extreme and outrageous conduct that would shock the conscience of a reasonable person and goes beyond all bounds of decency.

505. Defendants USF, USF PD, LAW, GRAHAM, & MCDONALD's conduct was the proximate cause of Plaintiff's emotional distress and Plaintiff's emotional distress was severe.

506. Defendants USF, USF PD, LAW, GRAHAM, & MCDONALD's conduct constitutes the actionable tort of intentional infliction of emotional distress.

507. Defendant USF, USF PD, LAW, GRAHAM, & MCDONALD knew or should have known that their conduct would cause Plaintiffs emotional distress.

508. Defendants' actions were carried out knowing that Plaintiffs were in a zone of risk to be affected by Defendants' conduct and with a willful disregard for Plaintiff's rights.

509.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiff was injured and sustained economic damages, including lost income, lost prestige, lost potential employment and good standing in the community.

510.    As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs sustained severe emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience and hurt.

511.    Plaintiffs are therefore entitled to compensatory and punitive damages.

512.    Plaintiff's damages are continuous; they have occurred in the past, are occurring in the present, and will continue to occur in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A. That process issue and this Court take jurisdiction over this case;

B. That this Court grant equitable relief against Defendants under the applicable counts set forth above, mandating Defendants' obedience to the laws enumerated herein and providing other equitable and declaratory relief to plaintiffs, including but not limited to the following:

    i.    The reinstatement of TBSDS as a student organization in good standing at USF;

    ii.    The reinstatement of HINCKLEY as a student in good standing at USF;

    iii.    The expungement of all conduct records resulting from or relating to alleged participation in the TBSDS organization;

C. Enter judgment against Defendants and for Plaintiff awarding damages to
Plaintiff from Defendants for Defendant's violations of law enumerated
herein;

D. Enter judgment against Defendants and for Plaintiff permanently enjoining
Defendants from future violations of the state and federal laws enumerated
herein;

E. Enter judgment against Defendants and for Plaintiff awarding Plaintiff
attorney's fees and costs; and

F. Grant such other further relief as being just and proper under the
circumstances.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff
respectfully demands a trial by jury of all issues triable by jury.

Dated this 8th day of October, 2025.

Respectfully submitted,

*/s/ Walker Smith IV*
Walker Smith IV
FL Bar No.: 1031486

**LegalSmiths Consulting Group, PA.**
283 Cranes Roost Boulevard, Suite 111
Altamonte Springs, FL 32701
Tel.: (407) 887-1370
Fax: (407) 205-0157
Walker@LegalSmithsConsulting.com
LegalSmithsConsulting@Gmail.com

*/s/ Collin Poirot*
Collin Poirot, Esq.
(Motion for Special Admission Forthcoming)

2603 Oak Lawn Ave, Ste. 300
Dallas, TX 75219
T: (214) 392-2281
E: cpoirot.law@gmail.com

*Attorneys for Plaintiffs*