**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TAMPA BAY STUDENTS FOR
A DEMOCRATIC SOCIETY,
VICTORIA HINCKLEY, SABA
INDAWALA, AND VICKY TONG,

Case No.: 8:25-cv-02752-SDM-AAS

Plaintiffs,

v.

UNIVERSITY OF SOUTH FLORIDA,
RHEA LAW, MELISSA GRAHAM,
and DANIELLE MCDONALD

Defendants.

---

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**


**INTRODUCTION ........ 4**
**JURISDICTION AND VENUE ........ 5**
**PARTIES ........ 6**
**CONDITIONS PRECEDENT ........ 8**
**STATEMENT OF FACTS ........ 8**

**I. DEFENDANTS' SUPPORT FOR ISRAEL AND HOSTILITY TO PRO-PALESTINIAN ADVOCACY ........ 7**

**II. DEFENDANTS' VIEWPOINT-DISCRIMINATORY INVESTIGATION AND GROSSLY DISPROPORTIONATE SANCTION AGAINST TBSDS FOR OUTDOOR FLIERS FOLLOWING EXTERNAL COMPLAINT ........ 10**

**III. DEFENDANTS' SUSPENSION OF SDS FOLLOWING SPEECH IN A DESIGNATED PUBLIC FORUM ........ 13**

**IV. GRAHAM'S DENIAL OF PLAINTIFFS' DUE PROCESS RIGHTS DURING CONDUCT PROCESS ........ 16**

**V. USF'S ATTEMPTS TO CANCEL NAKBA COMMEMORATION EVENT AND BAN ON SPEECH IN PUBLIC FORUMS ........ 17**

**VI. USF UNCONSTITUTIONALLY DISRUPTS PLAINTIFFS' APRIL 29TH GATHERING, IMPOSES ARBITRARY CURFEWS, AND BANS DISCUSSION OF PALESTINE ........ 19**

**VII. THE APRIL 30TH DEMONSTRATION AND THE SELECTIVE ENFORCEMENT OF AN ARBITRARY CURFEW AGAINST PRO-PALESTINIAN PROTESTORS ........ 21**

**VIII. LAW'S DEFAMATORY STATEMENT ABOUT THE DEMONSTRATION ........ 23**

**IX. DEFENDANTS' UNCONSTITUTIONAL EXPULSION OF HINCKLEY FOR HER ASSOCIATION, EXPRESSION, AND REFUSAL TO LIMIT FUTURE SPEECH ........ 23**

**X. DEFENDANTS' PERMANENT BAN ON PLAINTIFFS' VIEWPOINT AND RIGHT TO ASSOCIATE ........ 24**

**XI. USF'S PUBLIC DISCLOSURE OF PRIVATE FACTS OF TBSDS CONDUCT HEARING AND EXPULSION, STIGMATIZING PLAINTIFFS....................................................................25**

**XII. DEFENDANTS' REPEATED RETALIATION AGAINST TBSDS, ITS MEMBERS, AND OTHERS FOR EXERCISING THEIR EXPRESSIVE RIGHTS IN PUBLIC FORUMS ON CAMPUS................................26**

**CAUSES OF ACTION ........................................................................ 32**
**DAMAGES ........................................................................................ 48**
**PRAYER FOR RELIEF ...................................................................... 49**
**JURY DEMAND ................................................................................ 50**

## INTRODUCTION

1. This is a civil action seeking monetary damages, declaratory judgment, equitable and injunctive relief against the UNIVERSITY OF SOUTH FLORIDA and certain of its departments, employees, and officials (individually and collectively, "USF") for violation of Plaintiffs' constitutional rights to freely associate, speak and assemble, and to due process.

2. Plaintiffs are the organization TAMPA BAY STUDENTS FOR A DEMOCRATIC SOCIETY ("TBSDS" or "SDS") and some of its members, current and former USF students who collectively want to advocate for diversity, equity, and inclusion ("DEI"), and in solidarity with marginalized communities including, particularly, Palestinians.

3. Although the outdoor areas of USF are traditional public forums under state law, and receive the broadest and most stringent speech protections, USF disciplined, suspended, and/or expelled plaintiffs based substantially on their exercise of free speech and associational rights in these public forums.

4. To this day, USF explicitly bans plaintiffs from assembling and speaking in its public plazas and parks where any other member of the public is free to preach virtually any other message, and USF even purports to bar its students from associating with each other to pursue similar purposes under another name.

5. The leadup to this unconstitutional ban was a series of often baseless, always viewpoint-selective student conduct enforcement actions against TBSDS and its members, based solely on their Palestine solidarity advocacy, a message strongly

disfavored by USF's wealthy and powerful donors and political patrons. This use of the student conduct code to selectively punish or suppress disfavored expression was at each step violative of the First Amendment, as it was transparently viewpoint discriminatory.

6. USF deployed several unconstitutional official university policies to quash Plaintiffs' message: its policy on suspended and expelled student organizations *permanently* bars students who previously associated with such an organization from associating "under a new name but with similar members and purpose" anywhere on campus, under threat of sanction. USF appears to apply this policy even to alumna, who it has barred from its campus, and even to virtual communications.

7. USF's permitting policies unconstitutionally grant the administration unlimited discretion to deny permits for "tabling"[1].

8. Demonstrations past 5:00 PM are also explicitly subject to an opaque and entirely arbitrary permitting policy.

9. Where USF has allegedly imposed facially neutral time, place and manner restrictions on speech in its public forums, the policies have been selectively enforced, draconian, shotgun bans without prior notice—far from the "narrowly tailored" solutions required by the Constitution.

## **JURISDICTION AND VENUE**

[1] "Tabling" is one of the most common methods of student organization outreach, involving setting up a foldable table in a popular location on campus and speaking with other members of the community as they walk by, usually discussing the organization's goals, announcing upcoming meetings and events, and providing educational materials. USF's tabling policies themselves are unconstitutional as addressed elsewhere in this Complaint.

10. This action is brought under 42 U.S.C. §1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to the Plaintiff by the Constitution and laws of the United States, and by 42 U.S.C. §1988 which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. §1983, and by §1000.05 Fla. Stat (2024) (Florida Educational Equity Act) directly and through §760.07 Fla. Stat. (2024) (which incorporates damages outlined in 760.11(5) Fla. Stat. (2024)), § 1004.097(3)(a) Fla. Stat. (2018) (the Florida Free Expression on Campus Act "the CAFE Act") and the common law of the State of Florida.

11. The Court has subject matter jurisdiction over Plaintiffs' federal claims because Plaintiffs seek to recover for violations of their civil rights that "aris[e] under the Constitution [and the] laws… of the United States." 28 U.S.C. §§ 1331, 1343.

12. The Court has supplemental jurisdiction over Plaintiffs' state-law claims because they arise out of the same events and thus "form part of the same case or controversy." *Id*. § 1367(a).

13. Venue is proper under 28 U.S.C. § 1391(b)(1) because: (1) all Defendants reside in the Middle District of Florida, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Middle District of Florida-namely, in the City of Tampa and on the University of South Florida Campus.

## PARTIES

14. At all relevant times, Plaintiff TBSDS has been an association of collectively organized, like-minded students, recent graduates, and community

members advocating for improvements in campus conditions for themselves and their communities and for a more just, democratic society globally. TBSDS is a chapter of the National Students for a Democratic Society, a nonprofit organization that promotes and supports student speech, advocacy, and assembly on the pressing issues that affect them and their associates on campus. TBSDS was registered as an official student organization at USF until its expulsion.

15. At all relevant times, Plaintiff VICTORIA HINCKLEY ("HINCKLEY") has been a resident of Hillsborough, County, FL and a member of TBSDS. She attended USF until USF expelled her in June 2024 for her association and speech with TBSDS.

16. At all relevant times, Plaintiff SABA INDAWALA ("INDAWALA") has been a resident of Hillsborough, County, FL, and a member of TBSDS. She is a current USF student and was interim suspended and sanctioned by USF for her association and speech with TBSDS.

17. At all relevant times, Plaintiff VICKY TONG ("TONG") has been a resident of Hillsborough, County, FL and a member of TBSDS. She is a USF alumna who was issued a "trespass order" for her association and speech with TBSDS.

18. Plaintiffs individually and collectively seek to continue exercising their constitutional rights to speak, advocate, assemble, and associate with each other on the USF campus and to spread the messages that TBSDS embodies.

19. At all relevant times, Defendant USF has been organized and existed under the laws of the State of Florida. It is a member of the State University System of Florida and runs a full-service law enforcement agency.

20. At all relevant times, Defendant RHEA LAW ("LAW") was President of the University of South Florida. She was a final decisionmaker in the actions taken against plaintiffs described in this Complaint.

21. At all relevant times, Defendant DANIELLE MCDONALD ("MCDONALD") was Associate Vice President of Student Affairs and Dean of Students. She was a final decisionmaker with respect to the acts described herein, including the decision to refer TBSDS for disciplinary charges and enforcement of Defendants' unconstitutional policies against Plaintiffs.

22. At all relevant times, Defendant MELISSA GRAHAM ("GRAHAM") was an Assistant Dean and Director Student Conduct and Ethical Development at USF. She was a final decisionmaker in the acts described herein, including during the unconstitutional student conduct proceedings.

## CONDITIONS PRECEDENT

23. Written notice of intent to initiate litigation on Plaintiff's state law claims asserted herein, were submitted to Defendant pursuant to 768.28(6), Florida Statutes, on July 8, 2025 and again on August 8, 2025.

## STATEMENT OF FACTS

### I. DEFENDANTS' SUPPORT FOR ISRAEL AND HOSTILITY TO PRO-PALESTINIAN ADVOCACY

24. Since its founding, TBSDS has advocated for justice, freedom, and independence for Palestinians. As early as 2014, for example, TBSDS was centrally involved in a petition drive that gathered more than 10,000 student signatures in support of divesting USF's endowment from Israel's illegal occupation of Palestine.

25. On October 7, 2023, Hamas, the democratically elected governing entity in the Gaza Strip, Palestine, attacked Israeli military facilities and civilian settlements near the Gaza border, murdering hundreds of civilians and taking hostages.

26. Almost immediately, Israel began what is widely recognized[2] as a genocide, conducting mass slaughter and displacement of Palestinians on a scale that almost immediately dwarfed that of the Hamas attack.

27. USF has persistently and publicly condemned Hamas, but not the Israeli government's actions. And while USF actively reached out to support Jewish community leaders and campus organizations, equating Judaism with the State of Israel, they never reached out to TBSDS or its members, including Palestinian students, despite the organization's long-standing and leading association with Palestinians on campus.

28. On May 5, 2024, the Tampa Jewish Community Centers & Federation ("JCC") published a letter commending the USF administration for its zero-tolerance

[2] Including by Amnesty International, Israeli human rights organization B'Tselem, the UN Independent International Commission of Inquiry on the Occupied Palestinian Territory, the International Court of Justice (in an indictment brought by South Africa- a nation that knows something about overcoming apartheid), and the International Association of Genocide Scholars.

approach to Palestinian and allied student organizing against Israel's actions in Gaza since October 2023.

29. The JCC stated that the USF administration met with them on multiple occasions since October 7, 2023, had been in 'ongoing contact' (outside the sunshine) with 'several key stakeholder groups,' had met with the Deputy Consul General of Israel for Florida, had watched a 42-minute propaganda film about Hamas, and had been paying for around-the-clock police presence at the Hillel building on campus.

30. The JCC and USF have conspired for over a decade to target and silence pro-Palestinian speech, the Divestment movement, and any speech critical of the Israeli government or US institutions' complicity in Israel's crimes.[2]

31. On or around January 29, 2016, the JCC pledged $25,000 to assist USF Hillel members in opposing the Boycott, Divest and Sanction (BDS) movement on campus, led by TBSDS, Students for Justice in Palestine (SJP), and their associates.

32. In 2019, the Jewish Federation of Florida's Gulf Coast gave USF $11 million for the construction of the Hillel building, now known as the Bryan Glazer Family Jewish Community Center's USF Hillel.

33. In 2023, USF Hillel raised a record breaking $157 million for USF.

---

[2] According to the JCC's Annual Report from 2015-2016, the JCRC "continued to work with other organizations in efforts to combat the 'Boycott, Divestment and Sanctions' campaign against Israel" – a campaign that TBSDS actively supported and participated in by helping to gather over 10,000 signatures on a divestment petition. *See* "Annual Report 2015-16", Tampa Jewish Community Centers & Federation. <https://fedweb-assets.s3.amazonaws.com/fed-96/2/AnnualReport2016s.pdf>.

34. The incredible record of the USF administration's outreach to, accommodation of, and even direct financial support of USF's pro-Israel students and community members contrasts sharply with USF's utter lack of any similar support for the Palestinian community on campus nor its associates.

35. Upon information and belief, USF has not met with Muslim community leaders, nor offered any additional protection to Muslim or Palestinian-associated spaces, organizations, or places of worship.

36. In reaction to USF's apparent deeper concern for Israelis than for the stateless and relatively powerless Palestinians in the Occupied Territories, TBSDS members increased their advocacy for Palestinians, exercising their assembly and speech rights by participating in protests in support of Palestinians over the weeks following October 7, 2023.

## II. DEFENDANTS' VIEWPOINT-DISCRIMINATORY INVESTIGATION AND GROSSLY DISPROPORTIONATE SANCTION AGAINST TBSDS FOR OUTDOOR FLIERS FOLLOWING EXTERNAL COMPLAINT

37. On January 9, 2024, Defendants received a complaint by Freddi Kadden—someone who claimed to be a "Liaison" to the off-campus groups "End Jew Hatred" and "Mothers Against Anti-Semitism on Campus," and who upon information and belief, is not a member of the USF community.[3]

[3] To be clear, TBSDS has long included Jewish members, and Plaintiffs are vehemently opposed to antisemitism, harbor no "Jew Hatred", and do not view support for Palestinian rights as incompatible with the rights of Jewish students. Plaintiffs' commitment to freedom and equality for all—including Jewish students—is part of what drives them to advocate for DEI programs on campus, and for justice for Palestinians.

38. Mr. Kadden cc'd the "head of the Hillel on Campus" and complained that as a result of pro-Palestine fliers posted on campus, which contained the pro-Palestine phrase "From the River to the Sea"[4] and an SDS logo, "[unidentified] Jewish students do not feel safe on USF campus".

39. Within a day MCDONALD forwarded Kadden's complaint to USF Operations Manager Antonio Morales and asked him to investigate the fliers.

40. Morales removed multiple fliers from the nearby outdoor locations, including fliers posted by two other organizations.

41. That same day, Defendant MCDONALD forwarded Mr. Kadden's complaint to USF's Deputy General Counsel & Managing Attorney Joanne Adamchak, and to Vice President for Student Success Cindy Deluca.

42. On information and belief, USF General Counsel's role does not include dictating student discipline for posting flyers to lampposts in alleged violations of the student code. Yet, within 20 minutes, Adamchak suggestively responded, "[w]hat is sanction on student org?"

43. Deluca responded two hours later, directing an investigation and saying that the President of the University, Defendant LAW, wanted a "written explanation of this incident" and that it was "important for the President that this information is shared asap."

[4] "From the River to the Sea" is an expression used in the Palestine solidarity movement to call for full and equal rights and freedom for Palestinians throughout their historic homeland, whether in modern day Israel—where more than two million Palestinians currently reside as a minority community—or in the Occupied Palestinian Territories. By January 9, 2024, Israel had already killed more than 20,000 Palestinians in Gaza over the preceding three months.

44. Deluca asked Defendant MCDONALD to ask the USF Police Department to check "if there are cameras to see who posted the fliers."

45. Defendant MCDONALD asked the USF Police Chief, Chris Daniel, who said he had people checking on it.

46. Six days later, MCDONALD "followed up and recommended the incident be referred to Student Conduct," and Morales referred TBSDS for "conduct charges".

47. On January 23, 2024, Defendant GRAHAM charged TBSDS with violating University policy by "post[ing] flyers on light posts and exterior walls of facilities in multiple locations on campus without going through the proper approval process", including "the Library, Martin Luther King Jr. Plaza, Student Services Building Breezeway, Education buildings, and Cooper Hall".

48. The charges against TBSDS make no mention of the content of the flyers, but during the disciplinary process University officials repeatedly referred to the email from Mr. Kadden, which utterly and cynically mischaracterized the message and meaning of the TBSDS flyers.

49. TBSDS was not asked to explain the meaning of the flyers nor the intent behind the message.

50. On February 16, 2024, Defendant GRAHAM, found TBSDS responsible for violating campus signage policy by "posting flyers in multiple unapproved locations" and she placed TBSDS on "conduct probation".

51. This selectively enforced viewpoint-discriminatory punishment set off a cascade of increasingly draconian viewpoint-discriminatory sanctions for minor perceived offenses.

52. "Conduct probation" rendered TBSDS "not in good standing with the university" for the rest of the semester as punishment for their outdoor fliers, and resulted in a limitations on continued speech and assembly which "may result in restrictions of privileges and/or activities which may include… being prohibited from hosting/co-hosting/attending any programs, functions, socials, or events… utilizing any services/resources offered to student organizations… participating in or holding leadership positions in your governing council."

53. On information and belief, other organizations who have postered in similar areas—including two other organizations Morales identified that had postered in the same unauthorized locations and on the very same day as TBSDS—were not issued conduct charges, their fliers were not forwarded to the President of the University, University Police were not asked to investigate, they were not placed on conduct probation, and their freedom of expression and association on campus was not restricted for the remained of the semester.

54. The two other organizations who were identified as posting fliers in the same unauthorized locations, on the same day as the TBSDS flyer

55. TAMPA BAY SDS had regularly posted non-Palestine-related fliers and informational posters around campus announcing their events prior to October 7, 2023, without facing any conduct charges.

56. The disparate discipline for the posting of these particular flyers, the draconian punishment for something less serious than littering, the direct involvement of the President's Office and General Counsel's office in a such a minor disciplinary matter, and USF's own historic hostility to the flyers' point of view, all strongly suggest the discipline arose from the flyers' viewpoint and not the underlying violation of a student policy or the disciplinary history of TBSDS.[4]

57. Defendants from that point onward conspired with unindicted co-conspirators including influential and wealthy donors including but not limited to the Tampa JCRC and USF Hillel, to rid USF campus and all of its forums of TBSDS and its speech and viewpoint through a combination of abusive, discriminatory, and selective enforcement of completely arbitrary policies, direct criminal enforcement and conduct sanctions, intimidation, and stigmatization of Plaintiffs on campus.

## III. DEFENDANTS' SUSPENSION OF SDS FOLLOWING SPEECH IN A TRADITIONAL PUBLIC FORUM

58. The Marshall Student Center ("the Marshall Center") at USF's Tampa Campus is considered the heart of the USF campus. It is open to the public and contains a food court with a Papa John's and a Panda Express. It is intended as a place to cultivate a sense of community and exchange ideas, and is a traditional public forum.

[4] Graham referenced, without specificity, the "conduct history" of TBSDS in imposing what she conceded was the "severity" of the Conduct Probation sanction.

59. On April 22, 2024, TBSDS held a petition delivery action as part of its ongoing campaign against budget cuts to Diversity, Equity, and Inclusion ("DEI") programs at USF and in solidarity with Palestine.

60. TBSDS called for a meeting with Dean MCDONALD to discuss cuts to DEI programs, and ways that USF can support minority students.

61. On April 22, 2024, a small group of TBSDS members entered the Marshall Center, to deliver a petition to Dean MCDONALD with hundreds of students' signatures on it.

62. TBSDS members wore keffiyehs during the petition delivery, a visible expression of solidarity with Palestinian culture and history.




*Figure 1: TBSDS petition delivery action.*

63. At one point while inside the building, a staff member encountered the TBSDS group, and when the students asked if they could proceed and give Dean MCDONALD the petition, the staff member permitted them to continue.

64. Though the students chanted slogans, the protest did not impede any activities in the student center and did not appear to disturb anyone there.

65. After the students left, however, GRAHAM issued TBSDS four conduct charges and put the organization on interim suspension, *effective immediately*, claiming the students had been disruptive and failed to comply with orders.

66. Even if the punishment of Plaintiffs' speech was not an unconstitutional restriction on speech in a designated public forum, the draconian nature of the punishment, like the punishment for the flyering on campus, strongly reflected an unconstitutional viewpoint-specific discriminatory motivation by USF, and an attempt to quash upcoming speech events that USF was aware of, further described below.

## IV. GRAHAM'S DENIAL OF PLAINTIFFS' DUE PROCESS RIGHTS DURING CONDUCT PROCESS

67. The interim suspension is a shockingly overbroad gag order that banned TBSDS members from even discussing "the organization *or the alleged violations*" or even "participat[ing]" in such a discussion.

68. The interim suspension notice barred "host[ing]… any programs, functions, or activities; utiliz[ing] any services/resources offered to the student organization through any University office/department… This interim suspension is

to include any activity or events sponsored/co-sponsored by the organization or any other entity." (Emphasis added).

69. The shocking overbreadth of this notice and its speech and association prohibitions denied students the ability to even discuss or understand the charges—much less pool resources, retain counsel, and prepare a defense, in clear violation of fundamental due process.

70. USF Policy 6-017 purports to ban interim suspended student organizations from continuing to exist or operate whatsoever, and to silence and shackle their members' and supporters' abilities to associate in any capacity: "Interim Suspended: May not access benefits, resources, *nor organize* due to alleged violation of USF regulation of policy" (emphasis added).

71. The term "organize" is not defined in the policy, but the incredible breadth of conduct prohibited in the interim suspension notice is evidence of the policy's unrestrained reach.

72. Without the ability to prepare a defense, on April 25, 2024, TBSDS was hauled into a conduct hearing with GRAHAM.

73. On April 26, 2024, TBSDS received the outcome letter from the hearing, continuing the suspension and its prohibition on expressive and associative activity anywhere on campus for an indefinite period.

74. USF Policy 6-017 states the implications of the suspension: "Suspended: May not access benefits, resources, nor organize until suspension is lifted and receives Re-Registration approval due to violation of USF regulation or policy."

75. By requiring members of a suspended organization to receive "Re-Registration approval" before regaining their associative rights gives the university unbridled discretion to deny those rights permanently by denying re-registration.

76. USF's suspension meant that these same students, even ones who had not been involved with the specific activities that alleged violated campus policy—including Palestinians—were prohibited from assembling to discuss and advocate around issues directly affecting them on campus.

77. These students were prohibited from engaging in that speech and advocacy because of the content of their speech, and because of the ethnicity, religion, and race of those with whom SDS demonstrated solidarity.

78. Explicit USF policy prohibits suspended student organizations from continuing to function at the university under a new name but with similar members and purpose, and provides that:

> "Members of student organizations that are suspended or expelled may not continue to represent themselves as active members of the organization either under its original name or any new name. Efforts to suggest that a sanctioned organization is still active; to recruit new members to a sanctioned organization; or to attempt to continue to function at the university under a new name but with similar members and purpose will be considered a violation of the Student Code of Conduct and the individual student(s) conduct in that regard which could include permanent restriction from campus". (Emphasis added).

79. Through their imposition of the suspension, Defendants thereby directly outlawed expressive and associative conduct linked to a particular viewpoint and organization, anywhere on campus, indefinitely.

80. Upon information and belief, Defendant GRAHAM and others devised the excessively and unconscionably disproportionate interim suspension and suspension sanctions as illicit means through which to further the above-identified conspiracy to silence Plaintiffs by preventing their upcoming event in commemoration of the Nakba, which was scheduled to occur one week later, on April 29, 2024.

## V. USF'S ATTEMPTS TO CANCEL NAKBA COMMEMORATION EVENT AND BAN ON SPEECH IN PUBLIC FORUMS

81. As one of the student organizations most directly connected to the Palestinian community on campus, TBSDS planned a Nakba Day commemoration event for April 29, 2024. During the Nakba, more than 75,000 Palestinians were ethnically cleansed from Palestine to make way for what would later become the state of Israel. Every year, Palestinians commemorate it with Nakba Day events.[5]

82. At the time GRAHAM imposed the interim suspension on TBSDS, she knew of the planned Nakba commemoration event. GRAHAM even made explicit reference to it in her outcome letter of April 26, where she demanded that the "activity scheduled for Monday, April 29, 2024 at noon inside *or outside* the USF Library must be canceled as hosting the activity will violate the Interim Suspension and will result in further violations of the USF Student Code of Conduct" (emphasis added).

83. On April 28, GRAHAM took her silencing efforts a step further, and emailed three suspected TBSDS members directly, and ordered them to cancel the

[5] *See e.g.* Juwayriah Wright, "The Solemn History Behind Nakba Day," Time Magazine, May 16, 2024 <https://time.com/6978612/nakba-day-history/>.

Nakba Day event under threat of "further violations of the USF Student Code of Conduct" and "No Trespass Orders."

84. Outside areas of the USF campus, including the area outside the USF library, are explicitly, by law, "traditional public forums". GRAHAM's message made it obvious she and others intended the unconscionably disproportionate interim suspension as a means to silence Plaintiffs by preventing their upcoming event.

85. That same day—a day before the planned Nakba Day commemoration—defendant MCDONALD emailed the entire student body declaring a sudden, unprecedented, week-long "time, place, and manner restriction" on "all academic buildings, which includes the Libraries, Information Commons (SM) the Marshall Student Center (T) and similar student centers… no events without current approved reservations, *protests*, or *demonstrations near those facilities* on campus will be permitted" during the entire week of Nakba Day (emphasis added).

86. Although the outdoor areas of the campus were open to the public, and explicitly traditional public forums, USF did nothing to promulgate this sudden speech ban to members of the public outside USF's student body.

87. On information and belief, USF had never imposed such a week-long speech ban on any and all expressive activities before.

88. This week-long prohibition was clearly designed to thwart *any* attempt by Plaintiffs to commemorate Nakba Day in the outdoor, traditional public forums on campus, even outside the umbrella of TBSDS.

89. The University did not offer an alternative location or accommodate the memorial event in any way, prohibiting Palestinians in TBSDS and their allies from assembling to honor the suffering of their people—treatment unthinkable in the context of a Holocaust or 9/11 memorial.

## VI. USF UNCONSTITUTIONALLY DISRUPTS PLAINTIFFS' APRIL 29th GATHERING, IMPOSES ARBITRARY CURFEWS, AND BANS DISCUSSION OF PALESTINE

90. On April 29, 2024, TBSDS members, insistent on their constitutional rights, attempted to assemble for the Nakba Day event as planned, in the outdoor public forum.

91. Having failed to intimidate the students into silence through emails and threats, USF deployed campus security directly to prevent students from gathering in the announced location so they relocated to another public forum, the MLK Plaza.

92. There, the Nakba Commemoration event continued briefly. Around 4:30 PM, Dean MCDONALD announced an unreasonable, arbitrary, and previously unheard of 5:00 pm curfew on threat of arrest. Previously in the semester, TBSDS and other student organizations had regularly hosted events in the public forums on campus which concluded later than 5:00 pm, including a TBSDS event earlier that same month which started at 6:30pm in MLK Plaza.

93. Although USF policy now allegedly required permission and formal request for any events past 5:00 PM, the policy was arbitrarily enforced, and the guidelines for granting such requests in the traditional public forums opaque, arbitrary, capricious, and subject to the unbridled whim of the administration.

94. At the time students were informed of the brand new 5:00 pm curfew policy, TBSDS members had just ordered pizza for Nakba Day event attendees.

95. Dean MCDONALD told attendees that if they sat in the Plaza and ate the pizza, without engaging in the planned Palestine-related programing or engaging in any sort of advocacy or protest, she would allow them to remain in the plaza past the curfew and would not have them arrested.

96. The students ate their pizza without discussing the forbidden topics and went home.

97. Dean MCDONALD clearly exercised unbridled discretion to declare which speech and association would be permitted in the public forum and which would not, based on political viewpoint and content.

98. Dean MCDONALD used her discretion to discriminate against Plaintiffs on account of their race and ethnicity, the content of their speech, and the race and ethnicity of those they associate with and advocate in support of.

99. That very same night, USF hastily installed readily observed surveillance cameras on a tree next to the MLK Plaza in furtherance of its extraordinary efforts to chill and punish pro-Palestinian speech.

100. This targeted, ham-fisted surveillance contributes to Defendants' chilling and stigmatizing of Plaintiffs' speech and viewpoint on campus, by showing that students who advocate for DEI programs and support Palestinians are subject to additional suspicion and investigation based on their public advocacy.

## VII. THE APRIL 30th DEMONSTRATION AND THE SELECTIVE ENFORCEMENT OF AN ARBITRARY CURFEW AGAINST PRO-PALESTINIAN PROTESTORS

101. The next day, April 30, TBSDS members attempted to resume use of the MLK Plaza, and again inquired about the curfew. Dean MCDONALD informed the students the policy would remain in force, prohibiting TBSDS's activities after 5:00 pm.

102. But even before 5:00pm, USF and USF police requested Tampa riot police to enter the MLK Plaza; without any provocation from any students or SDS members, the USF Police shot tear gas and rubber bullets against the attendees, forcing them to disperse. One officer named Sara Bringer declared, "we have chemical munitions we will use against you."

103. As students were dispersing, many attendees were arrested, including visibly pro-Palestinian Jewish and Muslim students and community members.

104. Many of the people arrested were seriously injured. One arrestee was run over by police bicycles and sent to the hospital with a concussion, after police violently ripped off his yarmulke. Other attendees suffered additional injuries due to the police aggression directed by defendant MCDONALD.

105. At the same time, pro-Israel students stood nearby—in violation of the same curfew—and shouted Islamophobic threats and harassing statements.

106. Those anti-Palestinian students were not targeted for arrest.

107. Upon information and belief, this differential treatment of the anti-Palestinian students was based on the content of their speech.

108. Dean MCDONALD was present during the violent arrests, directing and encouraging the police, and pointing out specific students for the police to target.

109. Upon information and belief, MCDONALD specifically ordered the police to arrest people who she believed supported or associated with TBSDS.

110. Upon information and belief, the number of arrests and the sheer force used against Plaintiffs and their associates is unprecedented in the history of USF.

111. The scale of USF PD's response to the Nakba Day event is yet another example of the differential treatment of and selective enforcement against this specific content, individuals, and organization.

112. Later on April 30, 2024, defendant LAW and Board of Trustees Chair Will Weatherford sent an email to students about the arrests, in which they falsely accused Plaintiffs of causing the violence by attempting to stay in the MLK Plaza past 5:00 pm.

113. Plaintiffs and the other TBSDS members present were protesting peacefully, and it was Defendants who initiated the violence.

114. This false statement was widely disseminated through the media and caused a substantial portion of the community to associate Plaintiffs and their viewpoint with violence.

## VIII. DEFENDANTS' UNCONSTITUTIONAL EXPULSION OF HINCKLEY FOR HER ASSOCIATION, EXPRESSION, AND REFUSAL TO LIMIT FUTURE SPEECH

115. On the night of April 30, USF issued conduct charges against Plaintiff HINCKLEY and another TBSDS member and placed them on interim suspension because of their membership in TBSDS and presence in the Nakba Day event.

116. During HINCKLEY's conduct hearing, USF administrators specifically asked if she was planning to attend any future TBSDS events, implying that her continued affiliation would affect the outcome of the disciplinary hearing.

117. As a result of these retaliatory charges against her, HINCKLEY was expelled on June 7, 2024, while the other member was suspended for an entire year.

118. In HINCKLEY's outcome letter, GRAHAM stated that the expulsion is based on HINCKLEY's leadership position in TBSDS, and the organization's purported violation of the terms of its interim suspension—originally imposed through the due process-less conduct proceedings described above.

119. GRAHAM conceded that HINCKLEY was never identified doing anything other than attending the rally in question and was not observed handing out any dangerous or unpermitted items, was not observed violating the curfew, and was not observed engaging in any other unlawful or dangerous activity.

## IX. DEFENDANTS' PERMANENT BAN ON PLAINTIFFS' VIEWPOINT AND RIGHT TO ASSOCIATE

120. On July 23, 2024, Defendants expelled TBSDS, permanently banning it from any speech or associative activity anywhere on campus—including in the public forums. Upon information and belief TBSDS is the only student organization ever to be expelled by Defendants.

121. TBSDS attempted to appeal the 'expulsion' and filed the required paperwork, but the appeal was summarily denied without due process or any meaningful opportunity to present their claim or for an in-person evidentiary hearing.

122. The denial failed to provide any explanation or engage with the facts of the case, and was arbitrary, capricious, and predetermined.

123. Dean McDonald has explicitly directed Plaintiffs to Policy 6-017 as prohibiting future associative and expressive activity that has common participants or content as TBSDS.

124. Thus, through the expulsion of TBSDS and Policy 6-017, USF purports to banish any association of individuals with similar purposes to that of TBSDS. They have, effectively, banned any pro-Palestinian or SDS affiliated ideas, even in USF's traditionally public forums where, as long as you were never a USF student and do not associate with Plaintiffs, you can opine on the very same issues, or any other ideas, no matter how heinous.

125. In fact, even if you are a USF student, you are free to gather and discuss Palestine- so long as you do not share TBSDS's purpose of a free Palestine, or associate with TBSDS's membership.

## X. USF'S PUBLIC DISCLOSURE OF PRIVATE FACTS OF TBSDS CONDUCT HEARING AND EXPULSION, STIGMATIZING PLAINTIFFS

126. Around August 31, 2024, the USF Center for Leadership & Civic Engagement ("the Center") took the unprecedented move of editing its webpage to officially proclaim its thus far successful expulsion of TBSDS.

127. The Center edited the "Conduct History" page of its website to specifically call out TBSDS and note it "is permanently restricted from hosting any events or meetings, in-person, virtually, or by any other means."

128. This act directly contributed to the stigmatization of Plaintiffs and their viewpoints on campus.

## XI. DEFENDANTS' REPEATED RETALIATION AGAINST TBSDS, ITS MEMBERS, AND OTHERS FOR EXERCISING THEIR EXPRESSIVE RIGHTS IN PUBLIC FORUMS ON CAMPUS

129. After the TBSDS expulsion, USF repeatedly violated it and its members' right to free speech in its outdoor, traditional public forums.

130. Since the expulsion of TBSDS, every time or nearly every time TBSDS members attempt to engage their fellow students through tabling in the public forums on campus, Defendants shut them down and issue conduct charges.

131. The Tampa Bay SDS table always includes content in support of Palestinian students and their families, student freedom of speech, and DEI programs.

132. On August 29, 2024, TBSDS attempted to conduct outreach on campus about their activities and campaigns by setting up an informational table.

133. Dean MCDONALD personally accompanied USF police and directed the officer present to shut down the TBSDS table. She stated TBSDS was expelled from USF, and that any students who affiliated with TBSDS on campus would be issued conduct charges and told the attempted tablers that TBSDS was forbidden from hosting peaceful general body meetings on campus.

134. When the students asked MCDONALD if TBSDS members could assemble as individuals to discuss the "expulsion" of the organization and their ongoing advocacy efforts, she made clear their viewpoint itself was forbidden, saying "if it walks like a duck and quacks like a duck, it is a duck".

135. On September 3, 2024, TBSDS attempted to hold a "Stand with Palestine: Defend Student Protests" event, calling on USF to cease its illegal repression of student organizing, disclose its investments which harm Palestinian students and their families, reinstate and support DEI initiatives, and divest from Israel's genocide.

136. The students were immediately accosted by Defendants and threatened with conduct charges should they even attempt to set up for the TBSDS event.

137. Asked for clarification of how the students as individuals could carry out the planned event without affiliating as TBSDS; MCDONALD replied that any Palestine-related events held that day at that time would be deemed a TBSDS event and result in conduct charges.

138. On October 1, 2024, TBSDS attempted to hold a "Defend Free Speech on Campus" rally to demand that USF stop its unlawful suppression of student speech and advocacy.

139. Four TBSDS members began to walk toward the event location but were promptly accosted by MCDONALD and USF police; MCDONALD started filming students, demanding IDs and threatening conduct charges.

140. The students asked multiple times why they were being forced to show their IDs and what provision of the code of conduct had been violated by them simply walking on campus, but MCDONALD refused to answer any questions.

141. MCDONALD refused to let students disperse and instead attempted to detain them and unlawfully held them against their will, threatening additional charges if students declined to hand over their student IDs upon demand.

142. Upon MCDONALD's request, a USF police officer issued a "trespass warning" to the small cluster of students.

143. Later the night of October 1, 2024, INDAWALA and another TBSDS members were placed under interim suspension based on their alleged affiliation with TBSDS and involvement in the Defend Free Speech event earlier that day.

144. Three weeks later, on October 25, 2024, Defendants issued additional conduct charges against TONG and two other TBSDS-affiliated students based on having associated with, assembled at, and participated in a TBSDS event.

145. The three students charged on October 25th all got the impression from their hearing officer that if they would denounce TBSDS and disclaim any affiliation, they would be spared the punitive formal hearing process; the vast majority of the questions asked by the hearing officer were not related to the individual students and their alleged conduct but asked about their knowledge of and association with TBSDS.

146. On February 10, 2025, TONG—then an alumnus—and two current students were tabling in the Cooper Hall lawn area on campus, with a TBSDS banner

bearing the words "Protect Immigrants" and "Defend LGBTQ Rights", alongside representations of the Palestinian flag and the queer liberation flag.

147. USF police approached and forced them to show their IDs.

148. They asked why and were told that TBSDS had been expelled and that Dean McDonald had asked USF PD to "get more information" about students who continued to participate in or associate with TBSDS.

149. On March 3, 2025, the three individuals were issued conduct charges based on the SDS associated tabling.

150. During an informational meeting on March 25, 2025, one of the students was interrogated about their knowledge of TBSDS, past interactions with TONG, and whether they had ever been involved with or interacted with TBSDS.

151. The student was asked what topics were discussed at the TBSDS table and what the individuals did after the table was shut down.

152. During the meeting, the USF administrator said the University will find students individually responsible for "failure to comply" if they are found to be members of or otherwise associated with TBSDS on campus, including in the outdoor area where the students had been tabling.

153. The administrator warned: "now that you know that SDS is an expelled organization, don't be present in spaces under that umbrella if they're on campus."

154. The student's advisor requested clarification of whether students would be penalized for mere presence at a TBSDS rally on campus or congregating to listen to speeches by TBSDS members on campus.

155. Assistant Director of Student Conduct & Ethical Development Emily Granville explained that once it became clear that a speaker was associated with TBSDS or that an event put on by TBSDS, students must "separate" from it in order to avoid "being found in that space, appearing to be supporting the organization".

156. Although TONG was no longer a student, but an alumna who was present in her capacity as a private citizen and TBSDS member in a public forum, Defendants issued her the same student conduct charges and ordered her to appear.

157. TONG was then found responsible for the conduct charges, and USF PD issued her a trespass warning, banning her from "the entire USF System" until December 12, 2025 under threat of arrest.

158. On March 14, 2025, in response to an inquiry by INDAWALA about forming a new student organization to "speak, educate, and advocate around" "the substantive issues of Diversity, Equity, and Inclusion… and USF's role in the ongoing genocide in Gaza", McDonald wrote that "what you are describing violates" Policy 6.017 as an "attempt to function at the university under a new name but with similar members and purpose".

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983
### DEPRIVATION OF CONSTITUTIONAL RIGHTS
### First Amendment Rights to Speech, Assembly, And Association
### (Against Individual Defendants in their Personal Capacity)

159. Paragraphs 1 through 158 are re-alleged and incorporated herein by reference.

160. This count sets forth claims by Plaintiffs against the Individual Defendants in their personal capacity for violation of Plaintiffs' clearly established rights to exercise free and full speech, assembly, and association, under the First Amendment of the United States Constitution, through 42 U.S.C. §1983.

161. 42 U.S.C. § 1983 applies where a person acts under color of law to cause a deprivation of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The individual defendants, while acting outside the course and scope of their employment, purported to act under the color of state law (as a member of the Public University System, and as a Police Organization, USF PD and its officers) in their unconstitutional suppression of Plaintiffs' constitutional rights to speech, assembly, and association.

162. Where a person causes such a deprivation, they may be held liable "to the party injured in an action at law, suit in equity, or other proper proceeding for redress." *Id.*

163. Defendants are "persons" under 42 U.S.C. §1983.

164. Each of the Defendants acted under color of state law as a state university or law enforcement agency, or cloaked in its authority.

165. Each Defendant invaded Plaintiffs' clearly established rights under the First Amendment to the United States Constitution.

166. Defendants knew or should have known that their actions were in violation of Plaintiffs' constitutional rights of speech, assembly and association.

167. In the alternative, Defendants acted with callous or reckless indifference the Plaintiffs' rights.

168. USF, as a public university, is a forum for assembly, speech, and association, and the outdoor areas of USF, including the MLK Plaza, are traditional public forums—in keeping with the legacy of the Plaza's namesake.

169. Plaintiffs HINCKLEY, INDAWALA, and TONG were all associated with Plaintiff TBSDS and collectively advocated for improvements in campus conditions and policy for their constituent communities and for minority communities more broadly, including in particular Palestinians.

170. Defendants have each conspired to prevent Plaintiffs from associating, assembling, and speaking on campus, with the purpose of suppressing their viewpoint, and have taken overt acts in the form of an intense, targeted, and prejudicial campaign.

171. Plaintiffs desire to continue exercising their ability to associate with SDS, to assemble, and to engage in other expressive activity regarding those issues on the USF campus.

172. Defendants engaged in unprecedented, extensive persecution against Plaintiffs, including but not limited to blanket bans on their speech and association, even in traditional public forums; prohibitions against meeting to discuss pending conduct charges against the organization; publicly attacking TBSDS on the university website; and banning even future organizations from forming and registering as

student organizations if they include or associate with SDS members or advocate around SDS campaigns.

173. Defendants engaged in a pattern of arbitrary and discriminatory policy changes which were intentionally timed to specifically prevent TBSDS events, and engaged in selective prosecution and unprecedented, grossly retaliatory and unlawful sanctions.

174. None of the policies were content-neutral as applied, and many of the policies enforced against Plaintiffs unconstitutionally purported to give Defendants unbridled discretion to favor or disfavor specific groups and viewpoints within a public forum.

175. As a direct and proximate result of the acts and omissions of Defendants, described in part above, Plaintiffs have suffered irreparable physical, mental and other harm, have been prevented from graduating, and from fully enjoying the benefits and privileges of the educational system at USF just because of the content of their speech.

176. Plaintiffs suffered and continue to suffer harm by virtue of Defendants' ongoing interference with their rights to free expression and association on campus, and their unlawful sanctions.

177. Plaintiffs are entitled to actual damages, reasonable attorneys' fees and other litigation costs reasonably incurred.

178. Plaintiffs demand damages as well as prospective relief to remedy their ongoing damages and prevent future recurrence.

## COUNT II

**42 U.S.C. § 1983**
**DEPRIVATION OF CONSTITUTIONAL RIGHTS**
**<u>First Amendment Rights to Speech, Assembly, And Association</u>**
**(Against Individual Defendants in their Official Capacity for Prospective Relief)**

179. Paragraphs 1 through 158 are re-alleged and incorporated herein by reference.

180. This count sets forth claims by Plaintiffs against the Individual Defendants in their official capacities for violation of Plaintiffs' clearly established rights to exercise free and full speech, assembly, and association, under the First Amendment of the United States Constitution, through 42 U.S.C. §1983.

181. Defendants act under color of law and continue to enforce unconstitutional bans on Plaintiffs' First Amendment rights to freely speak, assemble, and associate.

182. Defendants have acted pursuant to official unconstitutional USF policies, including but not limited to Policy 6-017(VI)(C)(2)'s prohibition on suspended or expelled student organizations' "attempt to continue to function at the university under a new name but with similar members and purpose", extension of student organization suspensions and expulsions to the USF public forums, and completely discretionary permitting regulations for outdoor tabling and demonstrations past 5:00 PM.

183. Each of these policies is unconstitutional as applied to Plaintiffs.

184. Each individual Defendant has some connection with the enforcement of the provision at issue.

185. Plaintiffs each intend to continue their advocacy in USF's public forums, and each continues to be subject to USF's punishments, as well as continued bans on their freedom to speak, assemble and associate.

186. USF's ongoing enforcement of its ban on Plaintiffs' expressive and associational rights on campus, the ongoing expulsion of Plaintiffs TBSDS and HINCKLEY, and the ongoing attempt to publicly stigmatize Plaintiffs through its website are all ongoing actions and harms, amenable to prospective injunctive relief.

**COUNT III**
**42 U.S.C. § 1983**
**DEPRIVATION OF CONSTITUTIONAL RIGHTS**
**Fourteenth Amendment Right to Due Process**
**(Against Individual Defendants)**

187. Paragraphs 1 through 158 are re-alleged and incorporated herein by reference.

188. This count sets forth a claim against Individual Defendants in their personal and official capacities for abuse of power in violation of Plaintiffs' clearly established rights under the Due Process clause of the Fourteenth Amendment, brought through 42 U.S.C. §1983.

189. 42 U.S.C. § 1983 applies where a person acts under color of law to cause a deprivation of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

190. Where a person causes such a deprivation, they may be held liable "to the party injured in an action at law, suit in equity, or other proper proceeding for redress." *Id.*

191. Defendants, directly and through their agents, officers and employees, violated Plaintiffs' due process rights by subjecting them to excessively punitive and pre-determined conduct proceedings.

192. Individual Defendants acted under color of law to violate Plaintiffs' clearly established rights to Due Process under the Fourteenth Amendment.

193. Plaintiffs have a protected right to benefit from the public education provided by USF and for which they have contracted and paid, and a protected liberty right in freedom of expression on the USF campus.

194. Because these rights and other rights and significant interests were at stake in the disciplinary process, those processes were required to include sufficient due process protections.

195. Defendants collectively provided procedural protections that fell far below the minimum required, and as a result, Plaintiffs were injured.

196. Defendants barred Plaintiffs from communicating with each other and preparing a defense to disciplinary charges.

197. Defendants' appellate process provided no meaningful review and was pre-ordained.

198. The violation of Plaintiff's rights, as described in part above, occurred under color of state law and is actionable under 42 U.S.C. §1983.

199. Defendants' abuse of the disciplinary and police powers was only possible because they were cloaked in the authority of state law, and were acting under color of state law.

200. Defendants acted with callous or reckless indifference to Plaintiffs' rights.

201. As a direct and proximate result of the Defendants actions, set forth in part above, Plaintiffs have been injured and have suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, along with other tangible and intangible damages.

202. These damages have occurred in the past, are occurring at present, and will likely continue into the future.

203. Plaintiffs demand damages as well as prospective relief to remedy their ongoing damages and prevent future recurrence.

**COUNT IV**
**FLA. STAT. § 1000.05(2)(A), (8), & (9) (2024); FLA. STAT. §760.07 (2024)**
**DISCRIMINATION UNDER THE FLORIDA EDUCATION EQUITY ACT**
**Violating Plaintiffs' Right to Equal Access and Enjoyment**
**(Against All Defendants)**

246. Paragraphs 1 through 158 are re-alleged and incorporated herein by reference.

247. Defendant USF receives and benefits from federal and state financial assistance.

248. The acts described above constitute discrimination on the basis of race, color, and national origin (Palestinian directly and by association), and/or religion (both Muslim and Jewish).

249. Defendants have excluded Plaintiffs with extreme prejudice from participation in, been denied the benefits of, and been subjected to discrimination

under any public K-20 education program or activity conducted by a public educational institution USF.

250. Defendants conspired among themselves to discriminate against Palestinian students and their associates and allies, including TBSDS and individual Plaintiffs, by punishing and stigmatizing pro-Palestinian speech and advocacy on campus.

251. Defendants have denied Plaintiffs their right to be free from discrimination under a public K-20 education program or activity—namely, USF's educational programming and attendant student body activities.

252. Such acts include but are not limited to: stigmatizing SDS and its members, tolerating hate speech of Palestinians, tolerating online bullying of Palestinian allies, silencing voices in public forums such as MLK Plaza, siccing USF PD on Plaintiffs and their associates with violence and chemical weapons, fabricating policies from whole cloth including time, place and manner restrictions which only applied to Plaintiffs, and enforcing them with extreme prejudice, placing surveillance on a traditional public forum in the wake of unpopular speech, conspiring with a megadonor to suppress particular speech opposed by that megadonor, interference with classes, suspension, imposition of frivolous conduct charges, imposition of sham proceedings with no meaningful opportunity to appeal, expulsion, banning from campus, and interference with ability to associate and advocate, all of which is in stark contrast to how USF treats its other students, particularly those who the megadonors such as the JCRC and Hillel lobbying and fundraising.

253. Defendants' acts were taken to specifically exclude Palestinians, their allies, affiliates, and supporters from full and free enjoyment of all of the rights and privileges of the educational system, including speech and assembly in the public forum for speech and assembly, and registering similar organizations.

254. Plaintiffs demand equitable relief in the form of reinstatement of TBSDS as a registered student organization, reinstatement of VICTORIA HINCKLEY as a student, expungement of all disciplinary records of relating to participation in TBSDS activities.

255. Plaintiffs demand reasonable attorney's fees and court costs.

**COUNT V**
**FLA. STAT. § 1004.097 (Campus Free Expression Act)**
**VIOLATION OF RIGHT TO FREE SPEECH ACTIVITIES**
**Banning Plaintiffs' Public Speech and Advocacy on Public Forums**
**(Against University of South Florida)**

256. Paragraphs 1 through 158 are re-alleged and incorporated herein by reference.

257. The Florida Free Expression on Campus Act ("the CAFE Act") provides that expressive activities on campus, including "all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; [and] circulating petitions" are protected under the First Amendment to the United States Constitution and Art. I of the State Constitution. Fla. Stat. § 1004.097(3)(a) (2018).

258. The CAFE Act also provides that "[a] person who wishes to engage in an expressive activity in outdoor areas of campus may do so freely, spontaneously, and contemporaneously as long as the person's conduct is lawful and does not

materially and substantially disrupt the functioning of the public institution of higher education or infringe upon the rights of other individuals or organizations to engage in expressive activities." Fla. Stat. § 1004.097(3)(b) (2018).

259. The CAFE Act provides that "[o]utdoor areas of campus are considered traditional public forums for individuals, organizations, and guest speakers.

260. Any reasonable, content-neutral restrictions on time, place, and manner "must be clear and published and must provide for ample alternative means of expression." Fla. Stat. § 1004.097(3)(c) (2018).

261. Any person injured by a violation of the CAFÉ ACT "may bring an action" "[a]gainst a public institution of higher education based on the violation of the individual's expressive rights in a court of competent jurisdiction to obtain declaratory and injunctive relief and may be entitled to damages plus court costs and reasonable attorney fees." Fla. Stat. § 1004.097(4)(a) (2018).

262. As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs were injured and sustained economic damages, including lost prestige, lost potential recruitment, lost time to advocate in a critical moment in history, and good standing in the community.

263. Plaintiffs have sustained severe emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience and hurt, because of Defendant USF and its agents' actions.

264. Plaintiffs suffer ongoing injury to their expressive rights.

265. Plaintiffs are therefore entitled to compensatory and punitive damages, and to declaratory and injunctive relief.

266. Plaintiff's damages are continuous; they have occurred in the past, are occurring in the present, and will continue to occur in the future.

## COUNT VI
## Florida Common Law
## INVASION OF PRIVACY BY PUBLIC DISCLOSURE OF PRIVATE FACTS
## Publication of Allegations Against TBSDS And Members
## (Against All Defendants)

267. Paragraphs 1 through 158 are re-alleged and incorporated herein by reference.

268. This is an action for common law intrusion on Plaintiff's right of privacy and for public disclosure of private facts regarding Plaintiff TBSDS, for example through the publication of the USF websites Conduct History page.

269. Defendant USF GRAHAM, LAW, and/or MCDONALD, disclosed private facts about Plaintiffs' disciplinary conduct record to anyone with access to the school website, including the facts set forth above regarding the conduct results and expulsion.

270. Defendants do not have a pattern and practice of publishing such private confidential disciplinary record information, and in fact this is an extraordinary act on behalf of USF.

271. The actions of Defendants were such that a reasonable person could see that they would cause mental distress and injury to persons situated like Plaintiffs.

272. Defendants' actions would be highly offensive to any reasonable person.

273. The actions of Defendant USF's agents, including but not limited to Defendants GRAHAM, LAW, and MCDONALD were done in a malicious manner and were not reasonably limited or designed to convey information pertinent to Defendants' educational mission.

274. As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs were injured and sustained economic damages, including lost prestige, lost potential recruitment, lost time to advocate in a critical moment in history, and good standing in the community.

275. Plaintiffs have sustained severe emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience and hurt, because of Defendant USF and its agents' actions.

276. Plaintiffs are therefore entitled to compensatory and punitive damages.

277. Plaintiff's damages are continuous; they have occurred in the past, are occurring in the present, and will continue to occur in the future.

**COUNT VII**
**Florida Common Law**
**COMMON LAW CIVIL CONSPIRACY**
**Conspiracy to Violate Rights**
**(Against All Defendants)**

229. Paragraphs 1 through 158 are re-alleged and incorporated herein by reference.

230. Plaintiffs have sufficiently pled a prima facia case of deprivation of speech, assembly, association, privacy, equal protection, and due process rights, as well as several tort claims including but not limited to negligence, infliction of

emotional distress, abuse of process, malicious prosecution, and other tortious conduct.

231. Together with co-conspirators (including but not limited to separate entities the JCRC and USF Hillel), Defendant USF, including any and all acts of its agents, officers, employees, or administrators, including USF PD, GRAHAM, LAW, and MCDONALD, conspired to commit the deprivations of rights and tortious acts described above.

232. The acts of individual defendants which are determined to have been outside the course and scope of their employment in furtherance of this conspiracy are exempt from the intercorporate conspiracy doctrine and render defendants USF PD, GRAHAM, LAW, and MCDONALD individually and jointly liable for their part in the conspiracy.

233. Defendants acted in concert to commit an unlawful act, or a lawful act by unlawful means, to wit: imposing unlawful speech restrictions, assembly restrictions, enforcement of those arbitrarily created and selectively enforced policies, suppressive surveillance, excessive force by USF PD, including the unnecessary deployment of tear gas against peaceful protesters, and a shaming campaign of conduct charges, publishing, expulsion, trespassing, and other acts depriving Plaintiffs of their constitutional freedoms of speech, assembly, and due process, and of equal access and equal protection and other sever persecution and public shaming as set forth more fully above.

234. The defendants formed an agreement between them and co-conspirator the JCC to inflict a wrong against or injury upon Plaintiffs and each defendant took an overt act that resulted in damage.

235. Defendants each agreed to prevent pro-Palestinian speech and advocacy from proliferating on campus by penalizing and stigmatizing those view points and that speech through punitive disciplinary measures, public stigma, and police response.

236. Alternatively, each defendant possesses—individually and by virtue of their combination with the other conspirators—a peculiar power of coercion over Plaintiffs.

237. For example, Defendants are the gatekeepers of Plaintiffs' academic futures, the security forces empowered to police their classrooms and campus, and in some cases their landlords.

238. Defendants had the power, and indeed used said power, to disrupt Plaintiffs' academic progress, ban them from campus, and permanently prejudice their disciplinary records.

239. Many of these powers of Defendants are powers which the co-conspirators each individually could not have exercised if not for the conspiracy.

240. With this as their goal, Defendants deprived Plaintiffs of their constitutional rights, caused defamatory statements to be published about them, engaged in a vicious and targeted campaign of malicious prosecution and abuse of process to intimidate and deter Plaintiffs' protected conduct.

241. Each member of this conspiracy performed an overt act in pursuance of this goal by some overt act to wit, the imposition of suspensions and expulsion against Plaintiffs and the banishment from campus of their organization.

242. As a direct and proximate result of said conspiracy and acts committed in pursuance thereto, the individually named defendants damaged Plaintiff.

243. As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs were injured and sustained economic damages, including lost income, lost prestige, lost potential employment and good standing in the community, sustained severe emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience and hurt, postponed graduations, and tremendous mental and emotional damages due to Defendants' conspiracy.

244. Defendants are therefore entitled to compensatory and punitive damages pursuant to the above provisions.

245. Plaintiffs' damages are continuous; they have occurred in the past, are occurring in the present, and will continue to occur in the future.

**COUNT VIII**
**Florida Common Law**
**COMMON LAW NEGLIGENCE**
**Violation of Duty of Reasonable Care**
**(Against All Defendants)**

246. Paragraphs 1 through 158 are re-alleged and incorporated herein by reference.

247. This count sets forth a claim against all Defendants for common law negligence, including negligent training, and negligent supervision.

248. Defendant USF and its agents, including but not limited to USF PD, and Defendants GRAHAM, LAW, and MCDONALD knew or should have known that Plaintiffs were within a zone of risk related to contact with its agents/employees.

249. Defendants, as Plaintiffs' university and fiduciary and its employees and agents, owed duties of care to Plaintiff due to the nature of the relationship between Plaintiffs and Defendants.

250. One of the duties of care owed by Defendants was the training and supervision of their agents, officers, and employees including but not limited to USF PD and Defendants GRAHAM, LAW, MCDONALD, and any law enforcement personnel that took place in the unconstitutional campaign of suppression of speech, assembly, and association with Plaintiff TBSDS including but not limited to the raid on MLK Plaza.

251. Additionally, legal duties devolved upon Defendants because Plaintiffs were in the foreseeable zone of risk to be harmed by their actions.

252. Defendants failed to exercise reasonable care in their treatment of Plaintiffs.

253. As a direct and proximate result of the above unlawful acts and omissions, Plaintiffs sustained economic and emotional damages.

## **DAMAGES**

254. Paragraphs 1 through 152 are re-alleged and incorporated herein by reference.

255. As a result of all of the above, Plaintiffs have suffered damages, including emotional suffering and trauma, impairment of their education, reduced future earnings potential, damage to their reputations, fear, anxiety, and past and ongoing loss of their First Amendment privileges.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A. That process issue and this Court take jurisdiction over this case;

B. That this Court grant equitable relief against Defendants under the applicable counts set forth above, mandating Defendants' obedience to the laws enumerated herein and providing other equitable and declaratory relief to plaintiffs, including but not limited to the following:

i. The reinstatement of TBSDS as a student organization in good standing at USF;

ii. The reinstatement of HINCKLEY as a student in good standing at USF;

iii. The expungement of all conduct records resulting from or relating to alleged participation in the TBSDS or its activities between January 10, 2024 and the date of this order;

iv. That USF be enjoined from enforcing speech limitations in its public forums;

v. That the USF be enjoined from enforcing the unconstitutional and unlawful policies described above, namely:

- Policy 6.017's bar on of student organizations with "similar members and purpose" to that of a suspended or expelled student organization;

- Policy 6-028's requirement of "prior approval" for displays, tables and exhibits used for expressive activity in public forums;

- Policy 6-028's requirement that non-university guests who wish to attend an activity sponsored by a university entity may be required to be accompanied by a USF representative, in its public forums;

- Policy 6-028's requirement of a "reservation" through the "reserved activity request form" for First Amendment events after 5:00 PM.

- Policy 6-028's requirement of a "reservation" for First Amendment activities near "Academic spaces" during the final two weeks of each semester.

C. That this Court Enter judgment against Defendants and awarding damages;

D. That this Court award Plaintiffs attorney's fees and costs; and

E. That this Court Grant such other further relief as being just and proper under the circumstances.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues triable by jury.

Dated this 26th day of November , 2025.

Respectfully submitted,

*/s/ Collin Poirot_*
Collin Poirot, Esq.
2603 Oak Lawn Ave, Ste. 300
Dallas, TX 75219
T: (214) 392-2281
E: cpoirot.law@gmail.com

*/s/ Walker Smith IV*
Walker Smith IV
FL Bar No.: 1031486
LegalSmiths Consulting Group, PA.
283 Cranes Roost Boulevard, Suite 111
Altamonte Springs, FL 32701
Tel.: (407) 887-1370
Fax: (407) 205-0157
Walker@LegalSmithsConsulting.com
LegalSmithsConsulting@Gmail.com

*/s/ Andrew Stoll*
Andrew B. Stoll
Special Admission Pending
Stoll, Glickman & Bellina, LLP
300 Cadman Plaza West, 12th Fl.
Brooklyn, New York 11201
(718) 852-3710
astoll@stollglickman.com

**ATTORNEYS FOR PLAINTIFFS**