UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TAMPA BAY STUDENTS FOR A
DEMOCRATIC SOCIETY et al,

     Plaintiffs,

v.                               CASE NO. 8:25-cv-02752-SDM-AAS

UNIVERSITY OF SOUTH FLORIDA et al,

     Defendants.

_____/

## <u>ORDER</u>

Alleging constitutional, statutory, and common-law violations, Tampa Bay Students for a Democratic Society (SDS) and SDS members Victoria Hinckley, Saba Indawala, and Vicky Tong sue (Doc. 17) the University of South Florida (USF) and three USF officials — President Rhea Law and Deans Danielle McDonald and Melissa Graham. The plaintiffs move (Doc. 18) for a preliminary injunction; the defendants respond (Doc. 21) in opposition; and the plaintiffs reply.[1] (Doc. 27) Also, the defendants move (Doc. 20) to dismiss the complaint for failure to state a claim, and the plaintiffs respond (Doc. 28) in opposition.

_____

[1] Each citation to Doc. 18 refers to the CM/ECF page number (1–27) at the top-right corner of each page, not to the page number appearing in the footer.

## BACKGROUND

SDS describes itself as "current and former USF students who collectively want to advocate for diversity, equity, and inclusion (DEI) and in solidarity with marginalized communities including, particularly, Palestinians." (Doc. 17 at ¶ 2) SDS's "particularly pro-Palestinian" advocacy at USF began in 2014, when SDS collected student signatures "in support of divesting USF's endowment from Israel's illegal occupation of Palestine."[2] (Doc. 17 at ¶ 24)

As a USF student organization, SDS must follow the directive of USF Policy 6-017.VIII.A that:

> Each student organization is expected to . . . ensure membership purposes and activities conform and comply with the United States Constitution; federal laws, the laws of the State of Florida; Board of Governors regulations; policies, guidelines and regulations of the University of South Florida and the purposes set forth in the Constitution.
>
> The student organization is independently and solely responsible and accountable for the conduct and all actions of the organization and its Members.
>
> Any violation of [a] law . . . or USF guidelines and regulations will be considered as [a] violation[] by the organization and its Officers and, in cases involving deliberate, intentional complicity or assistance in any such violation by other individuals, shall also be considered as violations by those individuals.
>
> All student organization activities are subject to policies, regulations, guidelines, procedures, and processes related to student activities management outlined on each USF campus.

(Doc. 18-8 at 10)

---

[2] At least one other USF student organization expresses a similar view: Students for Justice in Palestine, which remains in good standing and has never incurred suspension or expulsion. (Doc. 22-2 at ¶ F.4)

- 2 -

SDS's history of non-compliance with USF policy began no later than December 2020, when USF suspended SDS for disregarding COVID-19 containment measures. SDS violated the suspension at least three times. (Doc. 22-2 at ¶¶ B.1–B.6) In March 2023, police were deployed when SDS refused an official order to disperse during an unapproved "sit-in" at a USF administrative building. SDS members who "engaged in acts of physical violence against the police" were disciplined. (Doc. 22-2 at ¶ B.8)

### "From the River to the Sea" Flyer and Conduct Probation

In January 2024, the USF administration received a complaint concerning flyers posted in an unapproved location on campus.[3] (Doc. 17 at ¶ 37) The flyer depicts children inside a bomb-damaged building and holding a Palestinian flag: the background includes several displays of the slogan "From the River to the Sea." The SDS logo appears in the flyer's top-right corner. (Doc. 18-2)

USF staff removed the SDS flyers and others posted in the unapproved location. (Doc. 17 at ¶ 40) After investigating, Student Conduct and Ethical Development (SCED) invited Hinckley, then the president of SDS, to a February 12, 2024 "informational meeting."[4] At the meeting, Hinckley consented to a "resolution agreement" that waived SDS's right to a formal hearing and appeal.

---

[3] USF policy provides (1) that "any non-compliant signage will be removed," (2) that signs "may be located only in designated areas," and (3) that "Violations of this Policy may be reported for sanctions or legal action." (Doc. 22-2 at Ex. B)

[4] SCED is the committee tasked with administering the USF "Student Code of Conduct." (Doc. 22-2 at Ex. A)

- 3 -

Because Hinckley, on behalf of SDS, admitted to "posting flyers in multiple unapproved locations," SCED found SDS responsible for "[f]ailure to adhere to or abide by policies" and placed SDS on conduct probation.[5] SCED states that conduct probation "is a period of reflection on behavior and an opportunity to demonstrate satisfactory citizenship" and that conduct probation "may result" in restriction on (1) "hosting/co-hosting/attending any programs, functions, socials, or events with other student organizations;" (2) "utilizing any services/resources offered to student organizations through any University office/department;" and (3) "participating in or holding leadership positions in your governing council." SCED advises SDS that "further conduct violations while on conduct probation may impact the severity of future sanctions." (Doc. 18-13)

### "Petition Delivery Action" and Interim Suspension

On April 22, 2024, while SDS was on conduct probation and a week before final-exams, a group of at least ten SDS members, including one participant carrying a petition addressed to Dean McDonald, marched — without approval — through the Marshall Student Center, ascended toward Dean McDonald's fourth-floor office, and chanted: "Dean McDonald, you're no good; defend diversity like you should! USF, shame on you; student voices matter too!" (Doc. 17, Fig. 1 at 16; Doc. 18-4)

---

[5] USF Policy 6-017.VI.C.1 provides that a student group on conduct probation "May have limited access to benefits and resources due to violation of USF regulation or policy." (Doc. 18-8 at 9)

The petition, not "particularly pro-Palestinian," concerned USF's commitment to funding various DEI programs. Participants held signs bearing messages such as "Expand Africana Studies!!!," "PROTECT WOMENS [sic] AND GENDER STUDIES," and "Defend Divesity [sic]."

Dean McDonald met the group on the third floor. After receiving the petition, Dean McDonald, facing the demonstrators with her back pressed against the atrium railing, said: "Sure, thanks. I will take that. Now you all need to leave the building quietly and not disrupt students who are studying. . . . [6] You are welcome to send an email to request a meeting with me." Dean McDonald departed, and the demonstrators resumed chanting. (Doc. 18-4)

After this incident, which the plaintiffs characterize as a "petition delivery action," SCED charged SDS with the following violations:

> Actions and/or behaviors that disrupt, disturb, impair, or interfere with the processes and/or functions of the University or the rights of members of the University community.
>
> Actions and/or behaviors that disrupt, disturb, impair, or interfere with the academic environment, and/or failure to abide by USF 3.025 Disruption of Academic Process.
>
> Actions and/or behaviors that are disorderly, unruly, and/or disturb the peace.
>
> Failure to comply with an official request or lawful directive of law enforcement or a University Official acting within the scope of their

---

[6] USF Policy 6-028.VII.A.9 states "To provide an environment conducive to preparation of final or cumulative exams, the final two weeks of any academic term, no Activities will be permitted in or near Academic Spaces on campus, without reservations." (Doc. 18-12 at 8)

[7] Both a video and a photograph of the incident appear to show numerous students in the background studying, or attempting to study. (Doc. 17 Fig. 1 at 16; Doc. 18-4)

- 5 -

assigned duties. This includes failing to comply with assigned sanc-
tions and/or related University sanctions.

(Doc. 18-6 at 1)

Finding that SDS "pose[s] an ongoing threat, disruption, or interference to
the health and safety and continued functions of the USF community," SCED
placed SDS on interim suspension.[8] (Doc. 18-6 at 2) During the interim suspension,
SDS could not (1) "hold or participate in any formal or informal meetings regard-
ing the organization or the alleged violations;" (2) "host/co-host/attend any pro-
grams, functions, or activities;" (3) "utilize any services/resources offered to the
student organization through any University office/department;" (4) "participate in
or hold leadership positions;" or (5) "conduct any recruitment/new mem-
ber/pledge activities or have contact with any potential new members/new mem-
bers/pledges."[9]

On April 25, 2024, SDS met with SCED to discuss the "petition delivery ac-
tion." (Doc. 22-2 at ¶ B.14) The following day, SDS received a letter confirming the
continuation of the interim suspension and related restrictions. (Doc. 22-2 at
¶ B.15) The letter specified that "the activity scheduled for Monday, April 29, 2024,

---

[8] USF Policy 6-017.VI.C.1 provides that a student group on suspension "[m]ay not access
benefits, resources, nor organize until suspension is lifted and received Re-Registration approval
due to violation of USF regulation or policy." (Doc. 18-8)

[9] Dean Graham declares that "This language is not intended to prevent the organization
from gathering evidence or information to prepare for any stage of the student conduct process. If
Tampa Bay Students for a Democratic Society had asked for clarity, which it did not, I would have
told them the same. In fact, Tampa Bay Students for a Democratic Society was advised that, dur-
ing the student conduct process, it had the right to be accompanied by an advisor of its choice, that
it had the opportunity to present relevant information, and had the opportunity to question wit-
nesses." (Doc. 22-2 at ¶ B.13)

at noon inside *or outside* the USF Library must be canceled as hosting the activity will violate the Interim Suspension and will result in further violations of the USF Student Code of Conduct." (Doc. 22-2 at ¶ B.16) (emphasis in original) The "activity" that "must be cancelled" was a "Nakba Day commemoration event" that SDS had planned for April 29, 2024 — the third day of final-exam week.[10] (Doc. 17 at ¶ 81)

### "Nakba Day Commemoration Event"

Despite (1) the interim suspension; (2) the explicit prohibition of the April 29, 2024 event; (3) the fact that April 29, 2024, fell during final-exam week, during which student-organization activity was generally restricted; and (4) the fact that Nakba Day occurs on May 15 and not on April 29, SDS continued to publicize the event on Instagram.[11][12][13][14] (Doc. 22-2 at ¶ B.21)

---

[10] According to the plaintiffs, "During the Nakba, more than 75,000 Palestinians were ethnically cleansed from Palestine to make way for what would later become the state of Israel. Every year, Palestinians commemorate it with Nakba Day events." (Doc. 17 at ¶ 81)

[11] In an April 28, 2024 email, Dean Graham reminded SDS that the planned event was unauthorized and that the event, if held, would result in additional violations. (Doc. 22-2 at ¶ B.16) This message was repeated in an April 29, 2024 email to SDS by Dean McDonald. (Doc. 22-2 at ¶ B.20)

[12] The spring 2024 final-exam week was April 27–May 2. *See* Important Dates & Deadlines Archives, Spring 2024, USF Office of the Registrar, https://www.usf.edu/registrar/documents/archive/uro-important-dates-and-deadlines-archive-spring-2024.pdf.

[13] In an April 28, 2024 email, Dean McDonald notified USF students that no event, protest, or demonstration in or around an academic building was permitted during final-exam week and that no event, protest, or demonstration elsewhere on campus was permitted during final-exam week unless previously approved. (Doc. 22-2 at ¶ B.17) *See also* USF Policy 6-028.VII.A.9, *supra* note 6.

[14] That May 15, rather than April 29, is the generally accepted date of Nakba Day is confirmed by the United Nations, Amnesty International, *Al Jazeera*, and a *TIME* article the plaintiffs cite as an authority on Nakba Day. (Doc. 17 at ¶ 81 n.5) "The Question of Palestine," United

(continued…)

On April 29, 2024, demonstrators — SDS members, unaffiliated USF students, and non-students, among others — arrived at the library.[15] They were met by USF staff, who reiterated the Dean's email prohibiting the demonstration and told the demonstrators to depart.[16] After moving to MLK Plaza, an area outside the Marshall Student Center, the demonstrators pitched tents, distributed umbrellas and orange safety vests, and wheeled in a cart containing makeshift wooden shields studded with protruding metal bolts. (Doc. 18-13; Doc. 22-2 at ¶ B.22) Around 4:30 p.m., Dean McDonald ordered the demonstrators to remove the tents and disperse or face arrest.[17] (Doc. 17 at ¶ 92) The police arrested the demonstrators who refused the orders. (Doc. 22-2 at ¶ B.22) That evening, Hinckley announced on Instagram that SDS would return to MLK Plaza the following day. (Doc. 22-2 at ¶ B.24)

---

Nations, https://www.un.org/unispal/about-the-nakba/; "Marking the 77th Anniversary of Nakba," Amnesty International, https://www.amnesty.org.au/nakba-day-77th-anniversary-we-must-listen-to-palestinian-voices-and-take-action/ (May 15, 2025); Ali Younes, "Nakba Day: For Palestinians, not just an historical event", *Al Jazeera*, https://www.aljazeera.com/news/2020/5/15/nakba-day-for-palestinians-not-just-an-historical-event (May 15, 2025); Juwayriah Wright, "The Solemn History Behind Nakba Day," *TIME*, https://time.com/6978612/nakba-day-history (May 16, 2024).

[15] USF Policy 6-028.VII.I.2 (Doc. 18-12 at 11) ("Non-University guests who wish to attend an Activity sponsored by a University Entity may be required to be accompanied by a USF representative (student, faculty, or staff member) with a valid USF identification card. Non-University guests must show a valid drivers' license or another form of picture ID upon request. Guests may be required to be registered for some Activities.").

[16] *See* USF Policy 6-028.III (Doc. 18-12 at 4) ("When circumstances permit, the University may attempt to mitigate disruptions caused by Activities by using reasonable alternative means before cancelling or stopping an Activity. For example, the University may direct groups or individuals engaged in an Activity away from an Academic Space to an adjacent Public Space, if such space is available, and subject to the discretion of the President, or designee.").

[17] USF policy provides, "Tents may be on campus only between the hours of 7:00 a.m. and 5:00 p.m. Tents may not be left out overnight." (Doc. 22-2 Ex. B) *See* USF Policy 6-028.VII.P.1 (Doc. 18-12 at 15); *see also* USF Policy 6-028.VII.L.3 (Doc. 18-12 at 11–12) ("A reservation through the Reserved Activity Request process is required" for the use of space by a student organization after 5:00 p.m.).

Demonstrators returned the following day to MLK Plaza, again with orange vests, umbrellas, and wooden shields distributed with instruction on their use against police. When demonstrators refused an order to disperse, police deployed tear gas, discharged rubber bullets, and arrested ten demonstrators. One arrestee, a USF student, possessed a club; another, a 39-year-old male unaffiliated with USF, possessed a firearm.[18] (Doc. 22-2 at ¶ 25)

### Hinckley and SDS Expelled

SCED placed Hinckley on interim suspension on the evening of April 30, 2024. After an "informational meeting" and an "administrative hearing," USF expelled Hinckley, effective June 14, 2024. (Doc. 22-2 at ¶¶ C.4–5) The expulsion letter concludes the following:

> On April 29, 2024, [Hinckley] was responsible for leading a protest event for [SDS] after the organization, of which [Hinckley] is the President, was placed on an Interim Suspension on April 22, 2024. SDS received several warnings that the event could not occur. At the event, participants were told they could not put up tents but failed to comply with warnings from USF staff. The organization's failure to comply resulted in several arrests by UPD.

> On April 30, 2024, [SDS] held another protest event while still on interim suspension status. A cart was brought in by a participant that was covered by mats. Two USF staff members talked with leaders of SDS to find out what was in the cart, but the leaders failed to share. Around 1 p.m., the groups circled up and [Hinckley] led the event with speeches. Several individuals began putting on orange safety vests. The mats were removed from the carts and large wooden squares that appeared to have bolts sticking out of them were uncovered. Umbrellas were also handed out to participants and participants were directed on how to use them against police.

---

[18] Neither Hinckley, Indawala, nor Tong was arrested on April 29 or April 30, 2024. *See* "University of South Florida Failed Encampments," Canary Mission, https://canarymission.org/campaign/University_Of_South_Florida_Failed_Encampments#First-Encampment-Attempt%C2%A0 (Nov. 26, 2025).

SDS utilized its Instagram account to tell people to come to the MLK Plaza at USF because police intended to use force against them resulting in more people arriving on campus in an already dangerous environment.

[Hinckley] approached the Dean of Students multiple times asking why SDS had to leave at 5 p.m. It was explained that the event was against policies and had to end at 5 p.m. [Hinckley] continued to argue with the Dean of Students. The 5 p.m. deadline was reiterated by Chief Daniel. The event resulted in several arrests and tear gas being used on participants and bystanders who did not leave when warnings were given. [Hinckley] created an unsafe environment for the USF community.

(Doc. 18-13 at 1)

The expulsion letter states that by a preponderance of the evidence SCED found Hinckley responsible for the following violations:

Failure to comply with an official request or lawful directive of a law enforcement or a University Official acting within the scope of their assigned duties. This includes failing to comply with assigned sanctions and/or related University sanctions.

Failure to adhere to or abide by policies, including but not limited to, local ordinance, state law or federal law. Adjudicating by an outside entity is not a prerequisite to a determination of responsibility by the University.

The prompting, facilitating, or encouraging of others to violate standards of behavior.

Actions and/or behaviors that disrupt, disturb, impair, or interfere with the processes and/or functions of the University or the rights of members of the University community.

The illegal possession, storage, use, or sale of any weapon (lethal or non-lethal), firearm, ammunition, or any incendiary, explosive or destructive device. . . . This also covers any item used as a weapon to cause actual physical harm or threaten physical harm. Reference Policy 6-009 Weapons on USF Property.

Conduct non-compliant with University policies, guidelines, or directives related to the health and safety of the University community.

- 10 -

(Doc. 18-13 at 2)

The expulsion letter conferred the right to appeal no later than June 19, five days after the effective date of Hinckley's expulsion and twelve days after the date of the letter. (Doc. 18-13 at 6) Hinckley appealed, unsuccessfully. (Doc. 22-2 at ¶ C.4)

On July 23, 2024, after finding SDS responsible for "aiding and abetting, disruptive conduct, failure to comply, policy violations, and weapons offenses," Dean Graham expelled SDS. (Doc. 17 at ¶ 120; Doc. 22-2 at ¶ B.29) Vice-Chancellor Jacob L. Diaz denied SDS's appeal on August 8, 2024. (Doc. 22-2 at ¶ B.30; Doc. 24)

USF Policy 6-017.VI.C.1 defines the expulsion of a student group as a "Permanent restriction that provides the organization may not access benefits, resources, nor organize due to violation of USF regulation or policy." USF Policy 6-017.VI.C.2 provides that:

> Members of student organizations that are suspended or expelled may not continue to represent themselves as active members of the organization either under its original name or any new name. Efforts to suggest that a sanctioned organization is still active; to recruit new members to a sanctioned organization; or to attempt to continue to function at the university under a new name but with similar members and purpose will be considered a violation of the Student Code of Conduct and the individual student(s) conduct in that regard which could include permanent restriction from campus.

(Doc. 18-8 at 9)

On August 31, 2024, USF announced the expulsion on the university's webpage:

> [SDS] is expelled from all USF campuses. Expulsion is the permanent termination of the student organization's status. The organization is permanently restricted from hosting any events or meetings, in-person, virtually, or by any other means, and cannot utilize university space or reserve space. The organization is not allowed to participate in any official University functions, programs, intercollegiate competitions, or other student activities. The organization is not permitted to participate in member recruitment.[19]

(Doc. 17 at ¶ 126; Doc. 18-11)

USF has enforced the prohibition on an organization with "similar members and purpose" against SDS only; the prohibition has not impaired the activity of any other student organization, including Students for Justice in Palestine. (Doc. 22-2 at ¶ F.4)

**Post-Expulsion Activity of SDS**

On August 29, 2024, Dean McDonald, accompanied by police, shut down an SDS recruitment table on campus and reminded the participants that any SDS activity on campus was prohibited.[20] (Doc. 17 at ¶¶ 132–133) When asked whether SDS members could "assemble as individuals" to discuss "ongoing advocacy efforts," Dean McDonald responded, "if it walks like a duck and quacks like a duck, it is a duck." (Doc. 17 at ¶ 134)

---

[19] Conduct History, University of South Florida, https://www.usf.edu/student-affairs/leadership-civic-engagement/student-organizations/student-org-conduct-history.aspx.

[20] *See* USF Policy 6-028.VI.E.1 (Doc. 18-12 at 9) ("Displays, tables, and exhibits need prior approval using the Reserved Activity Request or Space Impact Process.").

On September 3, 2024, as SDS was preparing to hold an event titled "Stand with Palestine: Defend Student Protests," Dean McDonald approached and re-minded the participants that the event would result in a conduct charge. (Doc. 17 at ¶¶ 135–136) When asked how the event could occur without qualifying as an SDS activity, Dean McDonald responded that that was impossible: USF would consider the event an SDS activity in any case. (Doc. 17 at ¶ 137)

On October 1, 2024, accompanied by police and other USF staff, Dean McDonald stopped four SDS members, including Indawala and Tong, *en route* to a planned rally titled "Defend Free Speech on Campus," and stated: "I need your student IDs. This organization has been expelled. You are not allowed to be here having this rally. . . . If you do not give me your student IDs, then I will treat you as a community member who is not supposed to be here with this organization. The police will then trespass you, and if you do not leave then, you will be arrested." (Doc. 17 at ¶¶ 16–17, 138–139; Doc. 18-9)

After the participants declined to produce identification, a police officer stated: "You are engaging in conduct which is interfering with the normal orderly and peaceful . . . activities of this university. I am ordering you to leave this loca-tion and university grounds immediately. If you fail to leave immediately you will be arrested for trespassing." (Doc. 17 at ¶¶ 140–142; Doc. 18-9)

After this warning and followed by police, the four SDS members departed the USF campus. (Doc. 18-9)

That evening, based on her continued affiliation with SDS and her involvement in the planned rally, SCED placed Indawala on interim suspension. (Doc. 17 at ¶ 143) After an "informational meeting," Dean Graham modified the interim suspension to permit Indawala to attend classes. (Doc. 22-2 at ¶ D.3) At a "formal hearing," Lauren Ready, USF's Student Programs Coordinator, found Indawala responsible for "disruptive conduct and failure to comply" but lifted the interim suspension and all related restrictions. (Doc. 22-2 at ¶ D.4)

On February 10, 2025, Tong, a graduate of USF, along with two current USF students, placed a table in front of an academic building and displayed a banner featuring the phrases "Protect Immigrants" and "Defend LGBTQ Rights"; featuring a representation of a Palestinian flag and a gay pride flag; and featuring the SDS logo.[21] (Doc. 17 at ¶ 146; Doc. 18-10) Following Dean McDonald's directive to identify students involved with SDS, a police officer approached the table and requested identification.[22] (Doc. 17 at ¶¶ 147–148)

On March 3, 2025, SCED charged Tong with "failure to comply" and scheduled a "formal hearing" for April 7, 2025. Tong failed to attend. (Doc. 17 at ¶ 152; Doc. 22-2 at ¶ E.2) Dean Graham suspended Tong through December 12, 2025, and — mistakenly believing Tong was still a student — requested that the

---

[21] Tong participated in the planned October 1, 2024 rally and underwent the student conduct process, during which SCED advised her that any further participation in SDS activity at USF was prohibited. (Doc. 22-2 at ¶ D.1)

[22] *See* USF Policy 6-028.VI.E.1, *supra* note 20.

police enter a trespass order; the police declined because Tong was not a USF student.[23] (Doc. 18-10; Doc. 22-2 at ¶¶ E.2–E.3)

### Attempt to Reinstate SDS

On October 30, 2024 — four months after Hinckley's expulsion and two months after USF denied SDS's appeal — Victoria Hinckley contacted civil rights lawyer Collin Poirot, who filed a Title VI complaint with the U.S. Department of Education's Office for Civil Rights (OCR).[24]  (Doc. 27-1 at ¶¶ 2–4) Over the following months, Poirot filed several demand letters and attempted unsuccessfully to schedule a meeting with an OCR lawyer. (Doc. 27-1 at ¶¶ 5–6)

In March 2025, Indawala emailed Dean McDonald to ask whether Indawala, together with other members of the expelled SDS, could reconstitute as the "South Florida Students for a Democratic Society." Indawala specified in the email that SDS, under an altered name, would continue to advocate "Diversity, Equity, and Inclusion on campus"; continue to address "USF's role in the ongoing Genocide in Gaza"; and continue to "associate with national Students for a Democratic Society and our sister chapters on campuses across the country."[25]

---

[23] Contrary to Dean Graham's account, which was relayed to plaintiffs' counsel on May 26, 2025, the complaint alleges that USF police entered a trespass order barring Tong under threat of arrest from "the entire USF system" until December 12, 2025. (Doc. 17 at ¶ 157; Doc. 22-2 at ¶ E.4)

[24] Hinckley's search for counsel began no earlier than August 2024. (Doc. 27-2 at ¶ 4)

[25] Tong sent Deans Graham and McDonald a similar email, to which neither dean responded, on February 26, 2025. (Doc. 27-1 at ¶ 8)

Dean McDonald rejected the proposal because the proposal violated USF's prohibition on any student organization operating "under a new name but with similar members and purpose" as an expelled organization. (Doc. 18-7)

Also in March, after another (unidentified) lawyer, apparently an acquaintance of Poirot, advised that "OCR would almost certainly not investigate the case based on the changed priorities of the administration under new presidential leadership" and that "pursuing it further would risk retaliatory charges based on Plaintiffs' political views," Poirot abandoned the Title VI action. (Doc. 27-1 at ¶ 10)

Not licensed to practice law in Florida, Poirot engaged Walker John Smith, IV, as local counsel. (Doc. 27-1 at ¶¶ 3 and 11) The two lawyers sent a demand letter to the defendants on July 8, 2025, and another on August 8, 2025, but received no response. (Doc. 27-1 at ¶ 14)

### Claims and Requested Relief

The plaintiffs sue President Law, Dean Graham, and Dean McDonald for deprivation of a constitutional right (Counts I–III); sue USF for violating the Campus Free Expression Act (Count V); and sue all defendants for violating the Florida Educational Equity Act (Count IV), for public disclosure of private facts (Count VI), for civil conspiracy (Count VII), and for negligence (Count VIII).

In addition to damages and an attorney's fee, the plaintiffs request (1) reinstatement of SDS as a student organization in good standing at USF; (2) reinstatement of Hinckley as a student in good standing at USF; (3) expungement from the USF record of any disciplinary sanction imposed for each plaintiff's SDS-related

activity occurring from January 10, 2024, to the date of this order; (4) an injunction prohibiting USF from "enforcing speech limitations in its public forums;" and (5) an injunction barring enforcement of the following USF policies:

> **Policy 6-017.VI.C.2**: "Members of student organizations that are suspended or expelled may not . . . attempt to continue to function at the university under a new name but with similar members and purpose."
>
> **Policy 6-028.VI.E.1**: "Displays, tables, and exhibits need prior approval using the Reserved Activity Request or Space Impact Process."
>
> **Policy 6-028.VII.I.2**: "Non-University guests who wish to attend an Activity sponsored by a University Entity may be required to be accompanied by a USF representative (student, faculty, or staff member) with a valid USF identification card. Non-University guests must show a valid drivers' license or another form of picture ID upon request. Guests may be required to be registered for some Activities."
>
> **Policy 6-028.VII.L.3**: "A reservation through the Reserved Activity Request process is required" for the use of space by a student organization after 5:00 p.m.
>
> **Policy 6-028.VII.A.9**: "To provide an environment conducive to preparation of final or cumulative exams, the final two weeks of any academic term, no Activities will be permitted in or near Academic Spaces on campus, without reservations."

The plaintiffs move also for a preliminary injunction requesting the same equitable relief as the complaint.[26]

---

[26] The motion for a preliminary injunction additionally requests USF to vacate Tong's suspension, which ended on December 12, 2025. (Doc. 18-10)

## DISCUSSION

To obtain a preliminary injunction, the moving party must show that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "Failure to show any of the four factors is fatal." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

"Mandatory preliminary relief, which goes well beyond simply maintaining the status quo, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. Appx 581, 583 (11th Cir. 2017). Because four of the plaintiffs' ten requests contemplate compelling an affirmative act by USF, each requests mandatory relief:

> The reinstatement of SDS as a student organization in good standing at USF;
>
> The reinstatement of Hinckley as a student in good standing at USF;
>
> The vacatur of Tong's suspension from USF; and
>
> The expungement from the USF record of any disciplinary sanction imposed for each plaintiff's SDS-related activity occurring from January 10, 2024, to the date of this order.

*Antoine on behalf of I.A. v. Sch. Bd. of Collier Cnty.*, 301 F. Supp. 3d 1195, 1202 (M.D. Fla. 2018) (Chapell, J.).

The plaintiffs characterize the injunction as wholly non-mandatory because the requested relief allegedly returns the parties to the "status quo" or the "last uncontested status which preceded the pending controversy." *Oil Com Uganda v. Van Tonder*, 2022 WL 596848, at *4 (M.D. Fla., 2022) (Steele, J.) (quoting *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1194 (5th Cir. 1975)). However, "[t]here is no particular magic in the phrase 'status quo.'" *United States v. Stinson*, 661 F. Appx 945, 952 (11th Cir. 2016) (internal quotation marks omitted). Rather, the decisive distinction between a "mandatory" and a "prohibitory" injunction is that one compels and the other forbids. *See Antoine on behalf of I.A.*, 301 F. Supp. 3d at 1212. Accordingly, each injunction forbidding enforcement of a university policy is "prohibitory," and each injunction compelling administrative action is "mandatory" and subject to the heightened "clearly favor[able]" standard of proof. *Powers*, 691 F. Appx at 583.

### The Likelihood of Success on the Merits

First, "the movant must convince the Court, not that it *might* succeed, or could *possibly* succeed; rather, the movant must *clearly* convince the Court that they are *substantially* likely to succeed." *Gulf Coast Commercial Corp. v. Gordon River Hotel Associates*, 2006 U.S. Dist. LEXIS 30492, at *26 (M.D. Fla. 2006) (Covington, J.) (emphasis in original). "To carry its burden, a plaintiff seeking a preliminary injunction must offer proof beyond unverified allegations in the pleadings. . . . [A]ffidavits based on personal knowledge are accorded more weight than affidavits based upon mere belief or hearsay." *Palmer v. Braun*, 155 F. Supp. 2d 1327 (M.D. Fla. 2001)

- 19 -

(Presnell, J.), *affd*, 287 F.3d 1325 (11th Cir. 2002); *see also Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 777 F.2d 598, 608 (11th Cir. 1985) (affirming the denial of a preliminary injunction "on the basis of the [plaintiff's] naked allegations."). "At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

### USF Lacks Capacity to be Sued

The law of the forum state governs the capacity of an entity to be sued. Fed. R. Civ. P. 17(b)(3). Under Section 1001.72(1), Florida Statutes, a university's board of trustees, but not the university itself, can be sued. ("Each board of trustees shall be a public body corporate by the name of 'The (name of university) Board of Trustees,' with all the powers of a body corporate, including the power to . . . sue and be sued."). Therefore, USF is "not a proper party in this action." *United States v. Olavarrieta*, 812 F.2d 640, 643 (11th Cir. 1987); *Rivadeneira v. Univ of S. Fla*, 2022 U.S. Dist. LEXIS 26225, at *4 (M.D. Fla. Feb. 14, 2022) (Honeywell, J.) ("First things first. [The plaintiff] sues USF and USFBOT, but USF is an improper defendant.").

### The Plaintiffs Fail to State a Claim Against President Law

Although the subject of seven of the complaint's eight claims, President Law appears in only three (Doc. 17 at ¶¶ 20, 42, and 112) of the complaint's one hundred fifty-eight paragraphs of factual allegations:

> At all relevant times, [President Law] was president of the University
> of South Florida. She was a final decisionmaker in the actions taken
> against plaintiffs described in this Complaint.
>
> [Another USF administrator] responded [to an inquiry about the unap-
> proved SDS flyers], directing an investigation and saying that [Presi-
> dent Law] wanted a "written explanation of this incident" and that it
> was "important for the President that this information is shared asap."
>
> Later on April 30, 2024, [President Law and the Board of Trustees
> Chair] sent an email to students about the arrests, in which they falsely
> accused Plaintiffs of causing the violence by attempting to stay in the
> MLK Plaza past 5:00 p.m.

By failing to plead facts showing that "through [her] own individual actions, [President Law] has violated the Constitution," the plaintiffs fail to state against President Law a claim under 42 U.S.C. § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The same fatal defect applies to each claim against President Law. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092 (11th Cir. 2004) ("For a traditional injunc-tion to be even theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Fed.R.Civ.P. 12(b)(6).").

**Counts I, II, and V: First Amendment and the Campus Free Expression Act[27]**

The First Amendment provides that "Congress shall make no law . . . abridg-ing the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.[28]

---

[27] Because the Campus Free Expression Act, Section 1004.097, Florida Statutes, affords substantive protection coextensive with the First Amendment, no separate analysis is needed.

[28] "Expressive activities protected under the First Amendment to the United States Consti-tution and Art. I of the State Constitution include, but are not limited to, any lawful oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distrib-uting literature; carrying signs; circulating petitions . . ." § 1004.097(3)(a), Fla. Stat.

"Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. . . . There can be no doubt that denial of official recognition, without justification, to college organizations burdens or abridges that associational right." *Healy v. James*, 408 U.S. 169, 181 (1972). At the same time, "the Court has repeatedly emphasized the need for affirming the comprehensive authority . . . of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). Accordingly, a public university may "regulate student expression when it substantially interferes with the work of the school or impinges upon the rights of other students." *Doe v. Valencia College*, 903 F.3d 1220, 1229 (11th Cir. 2018) (internal quotation marks omitted).

<u>Each Challenged Policy Is a Reasonable Time, Place, and Manner Restriction</u>

"[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."[29] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

---

[29] "Outdoor areas of campus are considered traditional public forums for individuals, organizations, and guest speakers. . . . 'Outdoor areas of campus' means generally accessible areas of a public institution of higher education in which members of the campus community are commonly allowed, including grassy areas, walkways, or other similar common areas." §§ 1004.097(3)(c), (2)(d), Fla. Stat.

"The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. . . . A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not on others." *Ward*, 491 U.S. at 791. "To determine whether an ordinance is content-neutral, a court generally looks to the terms of the ordinance to see if the ordinance 'distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed.'" *Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1330 (M.D. Fla. 2011) (Steele, J.) (quoting *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1259 and n. 4 (11th Cir. 2005); *See also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys.") (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011)).

If content-neutral, the policy "need not be the least restrictive or least intrusive means . . . Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 791, 798–799 (internal quotation marks omitted); *see also Cincinnati v. Discovery Network*, 507 U.S. 410, 416 (holding that narrow tailoring requires a "reasonable fit" between the government's asserted interest and the challenged ordinance). "To demonstrate the significance of its interest, the [university] is not required to present detailed evidence, but is

- 23 -

entitled to advance its interest by arguments based on appeals to common sense and logic." *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1318 (11th Cir. 2000).

"Finally, a content-neutral restriction must allow ample alternative channels of communication. The [university] can satisfy this requirement even if the other channels may be less effective than plaintiffs would prefer." *Occupy Fort Myers*, 882 F. Supp. 2d at 1331 (citing *Coal. for the Abolition of Marijuana Prohibition*, 219 F.3d at 1319).

### Policy 6-028.VII.I.2 (Guest Policy)

The plaintiffs offer no argument as to why the Guest Policy, which regulates the access of non-students to the USF campus, violates the First Amendment. The claim fails.

### Policy 6-028.VII.A.9 (Final-Exam Week Policy)

The Final-Exam Week Policy states: "To provide an environment conducive to preparation of final or cumulative exams, the final two weeks of any academic term, no Activities will be permitted in or near Academic Spaces on campus, without reservations." Patently content-neutral and expressly and reasonably tied to a significant university interest, the Final-Exam Week Policy allows ample alternative channels of communication both during the final two weeks of each academic

term and during the forty-eight weeks the policy does not apply, which includes the week of May 15 (also known as Nakba Day).[30]

*Policy 6-028.VII.L.3 (Reservation Policy) and 6-028.VI.E.1 (Tabling Policy)*

Mischaracterizing the Reservation Policy as a "curfew," the plaintiffs argue that the hours set by the policy are "untenably early for speech and advocacy outdoors on a public university campus" and cite three inapposite cases: (1) *Watseka v. Illinois Pub. Action Council,* 796 F.2d 1547, 1556 (7th Cir. 1986), *affd.*, 479 U.S. 1048 (1987), (invalidating a 5 p.m. to 9 p.m. ban on solicitation); (2) *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 566 (6th Cir. 2012) (invalidating an ordinance banning all door-to-door canvassing and soliciting between 6 p.m. and 9 a.m.); and (3) *Aptive Env't*, *LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 966 (10th Cir. 2020) (invalidating a 7:00 p.m. curfew on commercial door-to-door solicitation). Neither a "curfew" nor a "ban," the Reservation Policy, which the plaintiffs concede is a "permit requirement[]," requires only advance reservation for the use of university space during evening hours: a permissible time, place, and manner restriction by any standard. (Doc. 18 at 19)

The plaintiffs argue that the Reservation Policy, along with the Tabling Policy, afford USF "unbridled discretion" because "no published standards exist for

---

[30] Wright *supra* note 14 ("Every year on May 15, Palestinian people across the world observe what is known as Nakba Day").

consideration of such requests."[31] (Doc. 18 at 15) Although USF Policy 6-028.III affords the university discretion to "take appropriate action if there are reasonable grounds to believe an Activity presents an imminent threat to the health, safety, welfare, or operation of campus," that discretion is subject to the extensive "published standards" set forth in Policy 6-028, which span twenty pages and incorporate seven additional USF policies,[32] four USF regulations,[33] and four Florida statutes.[34] (Doc. 18-12 at 3 and 20)

*Policy 6-017.VI.C.2 (Expulsion Policy)*

The plaintiffs contend that "[c]ontent neutrality is absent from defendants' complete ban on []SDS and groups with 'similar members and purpose.'" (Doc. 18 at 12) Adopted long before the expulsion of SDS,[35] the Expulsion Policy applies without regard to viewpoint and serves to prevent an expelled student organization

---

[31] *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1221 (11th Cir. 2017) ("[T]he plainest example of an unconstitutional grant of unbridled discretion is a law that gives a government official power to grant permits but that provides no standards by which the official's decision must be guided.").

[32] USF Policy 0-215 Use of USF Name and Symbols; USF Policy 0-502 Appropriate Use of Information Technology Resources; USF Policy 0-505 Use of University Space (All-Inclusive); USF Policy 6-012 Access Control to Buildings and Facilities; USF Policy 6-022 Campus Design & Construction Program; USF Policy 6-035 Abandoned Vehicles; USF Policy 30-023 Alcohol Policy.

[33] USF Regulation 4.0010 Parking General Guidelines, Registration, Rates, and Penalties; USF Regulation 4.0140 No Trespass and Loitering; USF Regulation 6.017 Student Organizations; USF Regulation 6.026 Distribution of Material and Solicitation on Campus

[34] Florida Statute §403.413; Florida Statute §403.031(7); Florida Statute §876.12; Florida Statute §877.03.

[35] The version of USF Policy 6-017 in effect at the time of SDS's expulsion was last substantively amended on March 26, 2008. (Doc. 18-8 at 14)

from evading expulsion through reconstitution under an alias — a tactic attempted by the plaintiffs. (Doc. 18-7)

That the Expulsion Policy "incidental[ly]" affects SDS, whose "entire 'purpose' . . . is to further a particular viewpoint through expressive action," does not render the policy viewpoint-based. (Doc. 18 at 12) *Ward*, 491 U.S. at 791. The dispositive inquiry is whether the Expulsion Policy, "on its face," draws "distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163.

The plaintiffs contend that the Expulsion Policy "is viewpoint based by definition" because a reference to an organizational "purpose" allegedly causes the "terms of the [Expulsion Policy] . . . [to] distinguish favored speech from disfavored speech on the basis of the ideas or views expressed." (Doc. 18 at 21) *Occupy Fort Myers*, 882 F. Supp. 2d at 133. But the Expulsion Policy restricts only an organization expelled due to misconduct, regardless of the organization's viewpoint.

The plaintiffs ignore the underlying function served by the Expulsion Policy's requirement of both "similar members" and a "similar purpose." The Expulsion Policy employs the two criteria conjunctively to ensure "narrow[] tailor[ing]." *Ward*, 491 U.S. at 791. Absent the "similar purpose" limitation, a former member of an expelled organization could face university discipline for participation in an unrelated student organization. Absent the "similar members" limitation, a student organization sharing a purpose with an expelled organization but otherwise compliant with university policy could theoretically face university discipline for the conduct of a non-member. By requiring similarity in both membership and purpose,

- 27 -

the Expulsion Policy limits enforcement to expulsion-evasion efforts and preserves "ample alternative channels" for expression. *Occupy Fort Myers*, 882 F. Supp. 2d at 1331 (M.D. Fla. 2011). If the members of an expelled organization re-assemble to form a new organization for the same purpose, the result is a mere name change, an evasion, a deception — permitted neither by USF disciplinary rules nor in many instances by the law in other circumstances.

Relying on *Healy*, the plaintiffs argue that "a heavy burden rests on the college to demonstrate the appropriateness" of SDS's expulsion because the "denial of recognition [is] a form of prior restraint."(Doc. 18 at 17) *Healy*, 408 U.S. at 184. But *Healy* concerned the expressly viewpoint-based denial of a student organization's initial application for "official campus recognition." *Healy*, 408 U.S. at 174. This action follows SDS's expulsion for a past, conduct-based violation of university policy — an ongoing punishment for prior misconduct, not a prior restraint.

Finally, the plaintiffs argue that "the bans on associating with []SDS [were] neither 'clear' nor 'published,'" an untenable position in light of (1) the "clear," "published" announcement of the expulsion, attached by the plaintiffs as Exhibit 18-11; (2) the plaintiffs' later acknowledgments that the "USF website publicly proclaims []SDS' [sic] pariah status" and that the "Defendants published []SDS's disciplinary sanction openly and publicly on the USF Conduct website, on the general Student Conduct page for the whole school to see"; and (3) Count VI, which alleges

- 28 -

"public" disclosure of private facts, a claim predicated on the online "publication" of the group's status.[36] (Doc. 18 at 12 and 24; Doc. 28 at 17)

### Count III: Fourteenth Amendment — Procedural Due Process

The Due Process Clause of the Fourteenth Amendment provides that a state must not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *J.R. v. Hansen*, 736 F.3d 959, 965 (11th Cir. 2013) (internal quotation marks omitted). A protected property interest requires a "legitimate claim of entitlement" arising from a source independent of the Constitution. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

The Plaintiffs Lack a Protected Property or Liberty Interest in SDS-Related Activity

"[A] student does not have a cognizable property interest in extracurricular activities at public institutions." *James v. Tallassee High Sch.,* 907 F.Supp. 364, 366–67 (M.D.Ala.1995), *aff'd.*, 104 F.3d 372 (11th Cir. 1996); *see also L.P.M. v. Sch. Bd. of Seminole Cnty.*, 753 So. 2d 130, 133 (Fla. Dist. Ct. App. 2000).[37] SDS is a student organization. The conduct probation, interim suspension, and expulsion addressed

---

[36] This argument appears to rely on the Campus Free Expression Act's provision that a time, place, and manner restriction "be clear and published." § 1004.097(3)(c), Fla. Stat.

[37] Although attempting to distinguish *James* and *L.P.M.* on the ground that each case concerns continued participation in an extracurricular sport, the plaintiffs cite no authority limiting either holding to athletics or otherwise recognizing a procedural due process right in continued participation in a student organization. (Doc. 28 at 9–10)

- 29 -

SDS's organizational activity and the conduct of members acting on behalf of SDS. As such, the plaintiffs fail to state a procedural due process claim.

The plaintiffs argue that "the First Amendment right to advocate on political issues and school policy through speech and association with like-minded members of the campus . . . is unquestionably a protected liberty interest" under the Fourteenth Amendment. (Doc. 28 at 10) It is not. The plaintiffs misread *Paul v. Davis*, 424 U.S. 693 (1976), to suggest that the First Amendment itself constitutes a liberty interest protected by the Due Process Clause. The footnote on which the plaintiffs rely explains the opposite: independently actionable under 42 U.S.C. § 1983, the deprivation of a First Amendment right requires no additional protection under the guise of a Fourteenth Amendment "liberty interest." *Paul*, 424 U.S. at 711 n. 5. Properly understood, *Paul* forecloses the plaintiffs' attempt to recast an alleged violation of the First Amendment as a violation of the right to procedural due process. In fact, in Counts I and II, where those claims properly belong, the plaintiffs allege a claim under 42 U.S.C. § 1983 for violation of the First Amendment.

Similarly, neither Article I, section 4, of the Florida Constitution nor the Campus Free Expression Act convert an alleged deprivation of the freedom of speech into a procedural due process claim. "The scope of protection accorded to freedom of expression in Florida under article I, section 4 is the same as is required under the First Amendment," and an alleged violation is therefore actionable to the same extent under 42 U.S.C. § 1983. *Dep't of Educ. v. Lewis*, 416 So. 2d 455, 461 (Fla. 1982). The speech protections of the Campus Free Expression Act, also

- 30 -

coextensive with the First Amendment, are enforceable under the statute's own terms. §§ 1004.097(3)(a), (4)(a)–(b), Fla. Stat.

USF Policy Creates an Entitlement to Continued Enrollment

Due process protects an entitlement to continued enrollment created by university policy. *Barnes v. Zaccari*, 669 F.3d 1295, 1304−1305 (11th Cir. 2012) (holding that a for-cause disciplinary policy creates a protected interest in continued enrollment). USF policy permits suspension and expulsion only for cause and therefore creates a protected interest in continued enrollment.[38]

USF Provided Constitutionally Adequate Process

Even assuming the deprivation of a protected interest, the plaintiffs must show that USF failed to provide constitutionally adequate process. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "What process is due is measured by a flexible standard that depends on the practical requirements of the circumstances." *Nash v. Auburn Univ.*, 812 F.2d 655, 660 (11th Cir. 1987).[39]

---

[38] *See* "Student Code of Conduct," University of South Florida, https://usf.app.box.com/v/usfregulation60021 (providing a "Charged student" certain "Due Process Rights," including "written notice of the Charges and allegations," a "fair and impartial hearing," and a "presumption that no violation occurred").

[39] *See also Nash*, 812 F.2d at 660–61 (internal quotation marks omitted) ("The due process clause is not a shield . . . from suspensions properly imposed, nor does it ensure that the academic disciplinary process is a totally accurate, unerring process; it merely guards against the risk of unfair suspension if that may be done without prohibitive cost or interference with the educational process.").

*USF Provided Meaningful Notice*

"There are no hard and fast rules to measure meaningful notice." *Nash*, 812 F.2d at 661. "An elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 13 (1978).

SCED charged Hinckley on April 30, 2024, for her participation in the unapproved "Nakba Day Commemoration Event" and afforded her the opportunity to contest the charge at an administrative hearing on May 31, 2024 — more than a month later.[40] (Doc. 18-13) The charge issued only after USF repeatedly warned Hinckley (before the event) that the event was prohibited:

> On April 26, 2024, SCED delivered to SDS a physical copy of the Interim Suspension outcome letter, which provided that SDS's interim suspension and all related restrictions — including the restriction on the "Nakba Day Commemoration Event" — would remain in effect.

> SCED emailed a digital copy of the outcome letter to SDS's official email address and to Hinckley's student email address; the letter was opened by SDS at 1:05 p.m. on April 26, 2024, and by Hinckley at 1:37 p.m. on April 27, 2024.

> In an April 28, 2024 email, Dean McDonald notified USF students that no event, protest, or demonstration in or around an academic building was permitted during final-exam week and that no event elsewhere on campus was permitted during that period unless previously approved.

---

[40] Similarly, Tong, a USF graduate with no protected interest in continued enrollment, and Indawala, who was never suspended or expelled, both received meaningful notice. Each received written notice and the opportunity to appear before SCED; Tong did not attend her hearing, which was scheduled more than two months after receipt of notice of the charge. (Doc. 22-2 at ¶¶ D.1–4 and E.1–4)

> In another April 28, 2024 email, Dean Graham reminded SDS that the planned event was unauthorized and that its occurrence would result in additional violations.
>
> Dean McDonald repeated that warning in an April 29, 2024 email to SDS.

(Doc. 18-13; Doc. 22-2 at ¶¶ B.16–17, B.20)

In addition to (1) providing written notice of Hinckley's charges; (2) providing more than a month to prepare for an "administrative hearing"; and (3) providing at least five advance warnings, USF provided Hinckley twelve days from the issuance of her "Expulsion Letter" to appeal the outcome.[41] (Doc. 18-13 at 6) "[U]nder all the circumstances," Hinckley was "apprise[d] . . . of the pendency of the action and . . . afford[ed] . . . an opportunity to present [her] objections." *Memphis Light, Gas & Water Div.*, 436 U.S. at 13.

### *USF Provided a Constitutionally Adequate Hearing*

"The fundamental requisite of due process is the opportunity to be heard. However, the nature of the hearing will depend on appropriate accommodation of the competing interests involved." *Nash*, 812 F.2d at 663 (internal quotation marks omitted). Due process requires that a university, before expelling or suspending a student, provide a hearing sufficient "to hear both sides in considerable detail," but does not require "a full-dress judicial hearing, with the right to cross-examine

---

[41] Although alleging that USF "summarily denied" SDS's appeal, the plaintiffs do not characterize Hinckley's unsuccessful appeal as "summary." In any event, due process does not require a university to conduct "*de novo* review" of any finding of a disciplinary committee if the underlying process was otherwise adequate. (Doc. 17 at ¶ 121) *Nash v. Auburn Univ.*, 812 F.2d 655, 666 (11th Cir. 1987).

witnesses." *Nash*, 812 F.2d at 660 (internal quotation marks omitted).[42] Nothing in the record supports the conclusion that USF denied Hinckley "an opportunity to be heard."

### SCED was a Fair Tribunal

"An impartial decision-maker is an essential guarantee of due process . . . Any alleged prejudice on the part of [a university disciplinary committee] must be evident from the record and cannot be based in speculation or inference." *Nash*, 812 F.2d at 665. Although contending that Hinckley's administrative hearing was "pre-determined," the plaintiffs allege no fact to support this "speculative" and "inferential" conclusion. (Doc. 17 at ¶ 191) Instead, the decision rested on four paragraphs of unrebutted "Allegations" and a wholly uncontested fifteen-paragraph "Rationale" issued by SCED to account for Hinckley's expulsion. (Doc. 18-13 at 1–4)

### Florida Provides an Adequate State Court Remedy

"[O]nly when a state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation under section 1983 arise. It is the state's failure to provide adequate procedures to remedy the otherwise flawed deprivation of a protected interest that gives rise to a federal procedural due process claim. *Cotton v. Jackson*, 216 F.3d 1328, 1330–1331 (11th Cir. 2000) (quoting *McKinney v. Pate*, 20 F.3d 1550, 1557 (11. Cir. 1994)) (internal quotation marks omitted).

---

[42] *See also Nash*, 812 F.2d at 664 ("Due process requires that appellants have the right to respond, but their rights in the academic disciplinary process are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial.")

"[T]he process a state provides is not only that employed by the board, agency, or other governmental entity whose action is in question, but also includes the remedial process state courts would provide if asked." *Horton v. Bd. of Cnty. Comm'rs of Flagler Cnty.*, 202 F.3d 1297, 1300 (11th Cir. 2000).

In Florida, *certiorari* review is "the proper remedy for a university student seeking review of a university's decision to impose certain disciplinary violations." *Brown v. Fla. Gulf Coast Univ. Bd. Of Trs.*, 2019 U.S. Dist. LEXIS 80110, at *12 (M.D. Fla. May 13, 2019) (cleaned up); *see also Doe v. Valencia College*, 903 F.3d 1220, 1235 (11th Cir. 2018) ("[C]ertiorari to the state courts is generally an adequate state remedy for procedural due process purposes."). Conceding that they "fail[ed] to pursue state remedies," the plaintiffs fail to state a procedural due process claim. (Doc. 27 at ¶ 4) *Watts v. Florida Intern. University*, 495 F.3d 1289, 1294 (11th Cir. 2007) ("Only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation become actionable.").[43]

Relying on *Horton*'s statement that "the *McKinney* rule does not turn on whether a plaintiff has presented the claim to the state courts," the plaintiffs overlook the following paragraph, which explains that "the *McKinney* rule looks to the existence of an opportunity — whether the state courts, if asked, generally would provide an adequate remedy for the procedural violation the federal court plaintiff

---

[43] *See also* "Appeals", University of South Florida, https://www.usf.edu/student-affairs/student-conduct-ethical-development/conduct/appeals.aspx ("A student may seek outside judicial review pursuant to Florida Rule of Appellate Procedure 9.190(b)(3) of a final University decision.").

claims to have suffered." (Doc. 28 at 12) *Horton*, 202 F.3d at 1300. Under the plaintiffs' circumstances, a Florida state court would provide *certiorari* review as an adequate remedy.

### Count IV: Florida Educational Equity Act

The Florida Educational Equity Act (FEEA), Section 1000.05(2)(a), Florida Statutes, prohibits "[d]iscrimination on the basis of race . . . national origin . . . [or] religion . . . against a student" at a public university. The FEEA "is patterned after Title IX," and, under Title IX, "an individual school official . . . may not be held liable." *Hawkins v. Sarasota County School Board*, 322 F.3d 1279, 1286 (11th Cir. 2003); *Hartley by Hartley v. Parnell*, 193 F.3d 1263, 1270 (11th 1999); *see also Hill v. Cundiff*, 797 F.3d 948, 977 (11th Cir. 2015) ("Title IX is enforceable against institutions and programs that receive federal funds, but does not authorize suits against individuals.").[44] Because the FEEA applies to neither Dean Graham, Dean McDoanld, nor President Law, and because USF is "not a proper party in this action," Count IV fails to state a claim against any defendant. *Olavarrieta*, 812 F.2d at 643.

Despite failing to name a single proper defendant, the plaintiffs argue:

> Count IV specifically alleges conduct violative of the FEEA, including but not limited to selectively enforcing policies against [SDS] and its members, and limiting access to educational resources because of Plaintiffs' national origin/ethnicity (Palestinian), or perceived national origin/ethnicity (Palestinian), and/or religion (Muslim/Jewish).

---

[44] Section 760.07, Florida Statutes, which governs "[r]emedies for unlawful discrimination," does not expand the FEEA's reach to encompass an individual defendant.

(Doc. 28 at 15–16) But SDS lacks standing under the FEEA, and neither Hinckley, Tong, nor Indawala alleges that she was Palestinian, "and/or" perceived as Palestinian, "and/or" or "Muslim/Jewish." Accordingly, each plaintiff fails to state a claim for discrimination based on "national origin/ethnicity . . . and/or perceived national origin/ethnicity . . . and/or religion."[45]

### Counts VI–VIII: Common-Law Claims

Under Section 768.28(9)(a), Florida Statutes, a governmental employee is liable for a tort committed within the scope of employment only if "act[ing] in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property." The plaintiffs allege in the conspiracy claim (and without factual support) that President Law and Deans Graham and McDonald acted "outside the course and scope of their employment." (Doc. 17 at ¶ 232) A "mere conclusory statement do[es] not suffice to state a claim." *Iqbal*, 556 U.S. at 676. Further, in each of the three common-law claims, the plaintiffs fail to allege the requisite mental state. *O'Boyle v. Thrasher*, 638 F. Appx 873, 878 (11th Cir. 2016) ("Since [the plaintiff] pled nothing more than the 'bare elements' of malice, bad faith, and wanton and willful disregard, his state-law claims do not sufficiently overcome § 768.28(9)(a) immunity."). Accordingly, Counts VI, VII, and

---

[45] *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977) ("[A]n association has standing to bring suit on behalf of its members when . . . neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."). The "claim asserted" under the FEEA requires the participation of "a student or an employee in the state system of public K-20 education." § 1000.05(2)(a), Fla. Stat.

VIII — already inapplicable to USF because USF "is not a proper party in this action" — fail as to every other defendant. *Olavarrieta*, 812 F.2d at 643.

Even apart from USF's incapacity to be sued and the other defendants' state law immunity, the plaintiffs fail to state any common law claim.

<u>Public Disclosure of Private Facts</u>

"Generally, the right of privacy is violated by publication of private material or matters of which there is no legitimate concern of the public." *Lewis v. Snap-On Tools Corp.*, 708 F. Supp. 1260, 1261 (M.D. Fla. 1989); *Cape Publications, Inc. v. Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989) ("The elements can be summarized as 1) the publication, 2) of private facts, 3) that are offensive, and 4) are not of public concern.").

The plaintiffs allege that USF's announcement of SDS's expulsion on the university's website "disclosed private facts about Plaintiffs' disciplinary conduct record."[46] (Doc. 17 at ¶ 269) No authority cited by the plaintiffs applies. (Doc. 28 at 17–18) *Marston v. Gainesville Sun Publ'g Co.*, 341 So. 2d 783, 785 (Fla. 1st DCA 1976), concerns the confidentiality "of a student's disciplinary records" and related "proceedings"; *Florida State Univ. v. Hatton*, 672 So. 2d 576, 578 (Fla. 1st DCA 1996), concerns "records or reports," "permit[ting] the personal identification of a

---

[46] "Conduct History," *supra* note 19 ("[SDS] is expelled from all USF campuses. Expulsion is the permanent termination of the student organization's status. The organization is permanently restricted from hosting any events or meetings, in-person, virtually, or by any other means, and cannot utilize university space or reserve space. The organization is not allowed to participate in any official University functions, programs, intercollegiate competitions, or other student activities. The organization is not permitted to participate in member recruitment.").

pupil or student." The announcement discloses neither (1) any "student's discipli-

nary records"; (2) the record of any disciplinary "proceedings"; nor (3) any infor-

mation "permitting the personal identification of a pupil or student." Also, the

plaintiffs fail to explain why the announcement of SDS's expulsion is "offensive" or

"not of public concern." (Doc. 17 at ¶¶ 267–277; Doc. 28 at 17–19).

Civil Conspiracy

"[T]he linchpin for conspiracy is agreement, which presupposes communica-

tion." *Bailey v. Bd. Of Com'ty Comm'rs of Alachua County*, 956 F.2d 1112, 1122 (11th

Cir. 1992). "It is not enough to simply aver in the complaint that a communication

existed." *Allen v. Sec'y Fla Dep't of Corr.*, 578 Fed. Appx. 836, 840 (11th Cir. 2014).

In support of their conspiracy claim (or, absent sufficiently particularized facts,

their conspiracy theory), the plaintiffs allege:

> On May 5, 2024, the Tampa Jewish Community Centers & Federation (JCC) published a letter commending the USF administration for its zero-tolerance approach to Palestinian and allied student organizing against Israel's actions in Gaza since October 2023.
>
> The JCC stated that the USF administration met with them on multiple occasions since October 7, 2023, had been in 'ongoing contact' . . . with 'several key stakeholder groups,' had met with the Deputy Consul General of Israel for Florida, had watched a 42-minute propaganda film about Hamas, and had been paying for around-the-clock police presence at . . . Hillel [another Jewish Organization].
>
> The JCC and USF have conspired for over a decade to target and silence pro-Palestinian speech, the Divestment movement, and any speech critical of the Israeli government or US institutions' complicity in Israel's crimes.
>
> On or around January 29, 2016, the JCC pledged $25,000 to assist USF Hillel members in opposing the Boycott, Divest and Sanction movement on campus, led by []SDS, Students for Justice in Palestine, and their associates.

- 39 -

> In 2019, the Jewish Federation of Florida's Gulf Coast gave USF $11 million for the construction of the Hillel building, now known as the Bryan Glazer Family Jewish Community Center's USF Hillel.
>
> In 2023, USF Hillel raised a record breaking $157 million for USF.
>
> Defendants from [February 2024] onward conspired with unindicted coconspirators including influential and wealthy donors including but not limited to the Tampa JCRC and USF Hillel, to rid USF campus and all of its forums of []SDS and its speech and viewpoint.

(Doc. 17 at ¶¶ 28–33 and 57)

In essence, the complaint names several Jewish and Jewish-aligned "mega-donors" (as the plaintiffs label them) and obliquely suggests that their contributions to USF compel the "inference" of a conspiracy "to discriminate against Palestinian students and their associates and allies." (Doc. 17 at ¶ 253; Doc. 28 at 19). Apart from failing to allege any fact supporting the "inference" that USF "discriminate[s] against Palestinian students and their associates and allies," the complaint fails to allege an agreement either between the defendants or between any defendant and any so-called "megadonor."[47] *See C.H. by Hilligoss v. School Board of Okaloosa County, Florida*, 2019 U.S. Dist. LEXIS 169142, at *63 (N.D. Fla. Sept. 30, 2019) ("Conclusory allegations of an agreement, without any factual basis to make the allegation plausible, are insufficient to state a conspiracy claim.").

---

[47] Notwithstanding, of course, the "agreement" to pay for "around-the-clock police presence" at the USF Hillel building. (Doc. 17 at ¶ 29)

- 40 -

Negligence

Only in an exceptional instance, not pertinent to this complaint, can a plaintiff sustain a negligence claim to recover purely economic damages. *See generally Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So. 2d 899, 902 (Fla. 1987) ("We hold contract principles more appropriate than tort principles for resolving economic loss without accompanying physical injury or property damage."). Similarly, Florida's "impact rule" precludes a negligence claim when "the plaintiff claims mental or emotional damages but has not sustained any physical impact or contact." *Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007); *see also E.O. v. School Bd. Of Hillsborough Cty.*, 2024 U.S. Dist. LEXIS 188794, at *10 (M.D. Fla. Oct. 17, 2024) ("The impact rule applies to the torts of negligent hiring, negligent retention, and negligent supervision.").

Neither Hinckley, Indawala, nor Tong was arrested during the "Nakba Day Commemoration Event" and none alleges physical contact by USF police or any other person during the event or at any other time. Although the plaintiffs allege that several other members of SDS were "impacted and harmed," no allegedly impacted member is a party to the action, and SDS cannot recover in negligence on a member's behalf. (Doc. 17 at ¶ 102; Doc. 28 at 20) *Fraternal Ord. of Police, Miami Lodge No. 20 v. City of Miami*, 233 So. 3d 1240, 1242 (Fla. Dist. Ct. App. 2017) (citing *Warth v. Seldin,* 422 U.S. 490, 515 (1975)). Because they request "economic and emotional damages" but fail to allege physical injury, property damage, or physical

impact sustained by any party to this action, the plaintiffs fail to state a claim for negligence.[48] (Doc. 17 at ¶ 253)

## Irreparable Injury

"A showing of irreparable injury is the *sine qua non* of injunctive relief," such that "even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel*, 234 F.3d at 1176.

### The Plaintiffs Unreasonably Delayed Requesting Injunctive Relief

"A delay in seeking a preliminary injunction of even only a few months — though not necessarily fatal — militates against a finding of irreparable harm. . . . [T]he very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits. . . . For this reason, . . . a failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248–49 (11th Cir. 2016) (affirming a finding of no irreparable harm based on the plaintiff's unexplained five-month delay in seeking injunctive relief) (emphasis in original).[49]

---

[48] In addition, the complaint merely recites the elements of a negligence claim and fails to allege any fact supporting the existence of a duty, a breach of that duty, causation, or damages. *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1339 (S.D. Fla. 2018).

[49] *See also Great Am. Ins. Co. v. Fountain Eng'g., Inc.* 2015 U.S. Dist. LEXIS 144289, at *12–13 (S.D. Fla. Oct. 22, 2015) (King, J.) ("A related consideration, relevant to the alleged irreparability of the harm, is timeliness. . . . [P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic speedy action.") (internal quotation marks omitted).

USF expelled SDS on July 3, 2024, and denied the appeal on August 8, 2024.[50] (Doc. 17 at ¶ 120; Doc. 22-2 at ¶¶ B.29–30; Doc. 24) The plaintiffs did not move for a preliminary injunction until November 26, 2025 —fifteen months later, far more than "only a few months" and at least nine months longer than the delay in any case cited by the plaintiffs. (Doc. 15; Doc. 27 at 3–4) *Wreal*, 840 F.3d at 1248; *Larweth v. Magellan Health, Inc.*, 841 F. Appx 146, 151 (11th Cir. 2021) (finding reasonable a five-month delay); *Wood v. Fla Dep't of Educ.*, 729 F. Supp. 3d 1255, 1287-88 (N.D. Fla. 2024), *vacated on other grounds and remanded*, 142 F.4th 1286 (11th Cir. 2025) (finding reasonable a three-month delay); *Georgia v. United States*, F. Supp. 3d 1330, 1347 (S.D. Ga. 2019) (finding reasonable a two-month delay); *Kiloton Tactical, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2024 WL 1235543, at *3 (N.D. Fla. Feb. 13, 2024) (finding reasonable a two-month delay); *Hi-Tech Pharmaceuticals, Inc. v. Nutrition Resource Services, Inc.*, 717 F.Supp.3d 1318, 1330 (N.D. Ga. 2024) (finding reasonable a six-month delay); *Agape Hospice Care, Inc. v. Hospice Care of Ga., LLC*, 2022 WL 18777532, at *10 (N.D. Ga. Nov. 2, 2022) (finding reasonable a four-month delay); *Hydrapak, LLC, v. Sawyer Products, Inc.*, 2025 WL 3527753 (M.D. Fla. Nov. 7, 2025) (adopting a report and recommendation finding reasonable a five-month delay*); Boggs Contracting, Inc. v. Freismuth*, 2021 WL 6755466, at *4 (M.D. Fla. Dec. 27, 2021) (finding reasonable a two-month delay).

---

[50] At this point, Hinckley was already expelled. (Doc. 18-13)

Although they explain the delay, the plaintiffs fail to justify the full fifteen months, which comprised (1) two months between the denial of SDS's expulsion appeal and the plaintiffs' retention of Poirot as a lawyer; (2) five months between the retention of Poirot and Poirot's engagement of Walker as local counsel; (3) seven months between Poirot's engagement of Walker and the original complaint; and (4) nearly two months between the original complaint and the motion for a preliminary injunction. (Doc. 27-1 at ¶¶ 1–18)

The inadequacy of the plaintiffs' explanation persists even after accounting for the earlier Title VI action, which the plaintiffs abandoned in March 2025 — eight months before the motion for a preliminary injunction.[51] (Doc. 27-1 at ¶ 10) During this eight months, longer than the delay in any case the plaintiffs cite, the prelitigation effort to secure relief consisted solely of a July 8, 2025 "Demand Letter" and an August 8, 2025 "follow-up Demand Letter," neither of which appears as an exhibit and whose content remains unknown. (Doc. 27-1 at ¶¶ 11–15)

Finally, the plaintiffs argue:

> There is an irresolvable tension between Defendants' argument that Plaintiffs' delay in filing a federal motion for injunctive relief is fatal, and [the defendants'] argument that failure to pursue state court remedies is fatal. A party cannot be required to exhaust every conceivable avenue for relief while simultaneously being faulted for delay occasioned by such efforts.

_____

[51] Alternatively, the plaintiffs argue that March 14, 2025 — when Dean McDonald responded to Indawala's email and stated that USF would enforce the policy prohibiting any organization "with similar members and purpose" as SDS — marks the operative date for assessing the reasonableness of the delay. According to the plaintiffs, the alleged injury "ripened" on that date because only then did a "credible risk of enforcement" arise. (Doc. 27 at 5) This argument fails because the policy cited in Dean McDonald's email applied at the time of SDS's expulsion. *See* USF Policy 6-017.VI.C.2 (Doc. 18-8 at 9) Nor does the argument justify the eight-month delay between the email and the motion for a preliminary injunction.

- 44 -

(Doc. 27 at 4)

In fact, the plaintiffs can "be faulted," and the asserted "tension" readily "resolved," precisely because the plaintiffs did not "exhaust every conceivable avenue for relief."[52] The "delay" was not "occasioned" by "such efforts" because there were no "such efforts": the plaintiffs twice concede their "failure to pursue state court remedies" during the fifteen months preceding the motion. (Doc. 27 at 4; Doc. 28 at 12)

Even indulging an interpretation of events favorable to them, the plaintiffs "fail[ed] to act with speed or urgency in moving for a preliminary injunction," a failure that "necessarily undermines a finding of irreparable harm." *Wreal, LLC*, 840 F.3d at 1248 (11th Cir. 2016).

### USF Policy Does Not Chill or Prevent Pure Speech

Not every constitutional violation, even if "substantially likely," suffices to show irreparable injury. *See NE Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (rejecting any presumption of irreparable injury based on an alleged Equal Protection Clause violation); *Cunningham v. Adams*, 808 F.2d 815, 821–22 (11th Cir.1987) (rejecting any presumption of irreparable injury based on an alleged Due Process Clause violation).[53]

---

[52] For a student contesting suspension or expulsion from a state university, Florida law provides but one "conceivable avenue for relief": *certiorari* review. *Brown*, 2019 U.S. Dist. LEXIS 80110, at *12.

[53] The plaintiffs do not allege irreparable harm flowing from any supposed due process violation, but only from the alleged violation of the First Amendment. (Doc. 18 at 24–25)

"The only areas of constitutional jurisprudence where . . . an on-going violation may be presumed to cause irreparable injury involve the right to privacy and certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether." [54] *Siegel*, 234 F.3d at 1178 (citing *City of Jacksonville*, 896 F.2d at 1285). "The assertion of First Amendment rights does not automatically require a finding of irreparable injury thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits. Rather, it is the direct penalization, as opposed to incidental inhibition, of First Amendment rights which constitutes irreparable injury." *Siegel*, 234 F.3d at 1178 (quoting *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (cleaned up). As shown in the analysis of the plaintiffs' First Amendment and Campus Free Expression Act claims, no USF policy or disciplinary action "directly penalized" any First Amendment right.

### USF Has Not Denied Hinckley Educational Services Altogether

Quoting precedent outside the Eleventh Circuit, the plaintiffs argue that the expulsion renders Hinckley "unable to take exams and receive credit for courses," that the "delays occasioned will result in unquantifiable or unascertainable lost opportunities, interviews, and wages," and that "no level of monetary damages could possibly compensate [Hinckley] for the educational opportunities [she] will lose." (Doc. 18 at 25) *Doe v. Texas Christian Univ.*, 601 F. Supp. 3d 78 (N.D. Tex. 2022);

---

[54] The plaintiffs likewise fail to allege irreparable harm flowing from any supposed violation of the right to privacy. (Doc. 18 at 24–25)

*LIH ex rel. LH v. New York City Bd. of Educ.*, 103 F. Supp. 2d 658, 665 (E.D.N.Y. 2000).

Notwithstanding the incorrectly attributed language of non-binding district court caselaw, Hinckley's "desire to complete research . . . does not amount to irreparable harm under Eleventh Circuit precedent."[55] *Fac. Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1208 (S.D. Fla. 2007) (citing *Van Arsdel v. Texas A &M University*, 628 F.2d 344, 346 (5th Cir. 1980). *See also C.B. v. Board of School Com'rs of Mobile Co., AL*, 261 Fed. Appx. 192, 194 (11th Cir. 2008) (affirming a finding of no irreparable harm when a defendant has denied authorization for a plaintiff to receive educational services "at the school of his choice" but has not denied him those services "altogether").

### Balance of Harm and Public Interest[56]

"As a general matter, it is clear that a State's interest in protecting the safety and convenience of persons using a public forum is a valid governmental objective." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981). "Regulations of the use of a public forum that ensure the safety and convenience of the people are not inconsistent with civil liberties but are one of the means of

---

[55] *Doe v. Texas Christian University* does not contain the quoted language on which the plaintiffs rely.

[56] "Where the government is the party opposing the preliminary injunction, its interest and harm — the third and fourth elements — merge with the public interest." *State of Florida v. Dep't of Health & Human Services*, 19 F.4th 1271, 1293 (11th Cir. 2021).

safeguarding the good order upon which civil liberties ultimately depend." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002) (cleaned up).

Similarly, a university "has a significant interest in ensuring safety and order on campus, especially where the Free Speech Area is sited at a highly trafficked area of the campus." *Bloedorn v. Grube*, 631 F.3d 1218, 1238 (11th Cir. 2011); *see also Healy*, 408 U.S. at 184 ("[A] college has a legitimate interest in preventing disruption on the campus."). As discussed earlier, each policy challenged by the plaintiffs advances a significant institutional interest for USF, and — fatal to the plaintiffs' retort that "a state actor has no legitimate interest in enforcing an unconstitutional ordinance" — no policy violates the Constitution in any respect. (Doc. 18 at 25) *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

## CONCLUSION

On the present record, the plaintiffs (1) fail to state a claim on each count; (2) fail to show that any claim "has a substantial likelihood of success on the merits"; (3) fail to show that "the facts and law clearly favor" them; (4) fail to show that "irreparable injury will be suffered unless the injunction issues"; (5) fail to show that "the threatened injury to [the plaintiffs] outweighs whatever damage the proposed injunction may cause the [defendants]"; and (6) fail to show that "if issued, the inunction would not be adverse to public interest." *Siegel*, 234 F.3d at 1176; *Powers*, 691 F. Appx at 583. For these reasons, the plaintiffs' motion (Doc. 18) for a preliminary injunction is **DENIED** and the defendants' motion (Doc. 20) to dismiss is **GRANTED**. University of South Florida is **DISMISSED** from the action, and the clerk must **TERMINATE** University of South Florida from the service list. The complaint (Doc. 17) is **DISMISSED WITHOUT PREJUDICE**. No later than **JANUARY 30, 2026**, the plaintiffs may amend the complaint.

**ORDERED** in Tampa, Florida, on January 9, 2026.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE