## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

TAMPA BAY STUDENTS FOR
A DEMOCRATIC SOCIETY,
VICTORIA HINCKLEY, SABA
INDAWALA, VICKY TONG, AND
YUNQING ZHENG,

     Plaintiffs,

v.

RHEA LAW, MELISSA GRAHAM,
and DANIELLE MCDONALD,

     Defendants.

_____/

Case No.: 8:25-cv-02752-SDM-AAS

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................1

II.   ARGUMENT .......................................................................................1

    A.    **Defendants Fail to Address Plaintiffs' First Amendment Associational Claims Arising From Their Blanket Ban on Plaintiffs' Speech and Association in the Public Square, Which Plaintiffs Bring as Members of the Public** ...........................................1

          **1. Plaintiffs' Amplified Pleading** .........................................................3

          **2. Defendants' Misplaced Reliance on the Combined Decision** .........5

    B.    **The Eleventh Circuit Consistently Finds Prior Restraints Like Those Complained of Here to be "For All Intents and Purposes, Content Based" Despite Their Facial Neutrality, and thus Applies Strict Scrutiny** .........................................................7

          **1.    Defendants' Prior Restraints "Present Enough of A Risk of Chilling Otherwise Permissible Speech on the Basis of Content" That They Are "For Intents and Purposes, Content Based" and Fail Strict Scrutiny** ...................................6

          **2.    The Challenged Policies Fail Unbridled Discretion Analysis** ...............................................................................11

          **3.    The Lack of Time Limits for Permit Determinations** .............12

          **4.    The Ban on Organizations with "Similar Members and Purpose" to That of an Expelled Organization** ......................15

    C.    **The SAC States a Claim Against Defendant Law and Amply Supports a Conspiracy Claim** .........................................................14

    D.    **The Claims for Prospective Injunctive Relief Are Not Barred by the Eleventh Amendment and Defendants' Monell Arguments Are Inapplicable** .........................................................16

CONCLUSION ..........................................................................................18

**TABLE OF AUTHORITIES**

Cases

*Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ........................................3

*Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961 (10th Cir. 2020) ....................10

*Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298 (11th Cir. 2003) ........................................................................................................13

*Barrett v. Walker Cnty. Sch. Dist., 872 F.3d 1209* (11th Cir. 2017)..................... 6, 12, 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)........................................................15

*Benning v. Comm'r, Georgia Dep't of Corr.*, 71 F.4th 1324 (11th Cir. 2023) ..................17

*Cafe Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274 (11th Cir. 2004) ...................7

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661 (2010) ........................................................................................................13

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ...................... 7, 11, 13

*City of Watseka v. Illinois Pub. Action Council*, 796 F.2d 1547 (7th Cir. 1986), aff'd, 479 U.S. 1048 (1987) ........................................................................................10

*Connick v. Thompson*, 563 U.S. 51 (2011)...............................................................17

*Elfbrandt v. Russell*, 384 U.S. 11 (1966) ............................................................ 2, 5, 14

*Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025)................................................5, 8

*Ghee v. Flix N. Am., Inc.*, No. 24-12580, 2025 WL 2408957 (11th Cir. Aug. 20, 2025) ........................................................................................................16

*Grider v. City of Auburn, Ala.*, 618 F.3d 1240 (11th Cir. 2010) ..................................16

*Green v. Mansour*, 474 U.S. 64 (1985) ......................................................................17

*Healy v. James*, 408 U.S. 169 (1972) ................................................................... 2, 13

*Hobbs v. Roberts*, 999 F.2d 1526 (11th Cir. 1993)......................................................18

*Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306 (11th Cir. 2024), cert. denied sub nom. *Moats v. Jarrard*, 145 S. Ct. 2702 (2025).................................................. 6, 11, 12

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967) ......................2

*McDonough v. Garcia*, 116 F.4th 1319 (11th Cir. 2024).................................. 5, 10, 14

*N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)....................................2, 14

*Ohio Citizen Action v. City of Englewood*, 671 F.3d 564 (6th Cir. 2012).......................10

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ..............................2

*Rowe v. City of Fort Lauderdale*, 279 F.3d 1271 (11th Cir. 2002) ................................16

*Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178 (11th Cir. 2025).......................9

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008).........................................................................................................................2

Statutes

Fla. Stat. § 1004.097 ..................................................................................................6

## I.    INTRODUCTION

Plaintiffs have plausibly alleged ongoing First Amendment violations of their associational and speech rights in a public forum, identified specific, fatal flaws in a number of USF policies enforced by Defendants, and provided ample circumstantial and direct evidence of Defendant Law's involvement, and Defendants' conspiracy to punish and prevent Plaintiffs' speech based on its content and viewpoint.  Defendants' Motion to Dismiss should be denied.

## II.    ARGUMENT

A. **Defendants Fail to Address Plaintiffs' First Amendment Associational Claims Arising From Their Blanket Ban on Plaintiffs' Speech and Association in the Public Square, Which Plaintiffs Bring as Members of the Public**

Plaintiffs' primary First Amendment associational claims are simple and clear. Tampa Bay Students for a Democratic Society ("TBSDS") is banned from the public square.  First Amendment jurisprudence can be esoteric.  This point is not.  It's not about a "time, place and manner restriction."  It's not necessarily about a "policy."  It doesn't turn on fine distinctions between "subject matter discrimination" vs. "viewpoint discrimination".  Thanks to the clarity of Florida's CAFE Act, it's not about "forum analysis".  It is about a blanket prohibition on a public interest group and anyone associating with that group, over every inch of Defendants' jurisdiction, for all time.  It is independent of Plaintiffs' status as USF students or alumnus, or as an officially recognized student organization.  This is about a citizen ban in the public square.

The First Amendment protects the "cherished freedom of association." *Elfbrandt v. Russell*, 384 U.S. 11, 19 (1966). This "furthers a wide variety of political, social, economic, educational, religious, and cultural ends and is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021). "Regulations that impose a severe burden on associational rights are subject to strict scrutiny" since "legitimate legislative goals cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Elfbrandt* at 19. (*cleaned up*); *see also N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 920 (1982); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008). "While a college has a legitimate interest in preventing disruption on the campus, which under circumstances requiring the safeguarding of that interest may justify such [prior] restraint, a 'heavy burden' rests on the college to demonstrate the appropriateness of that action." *Healy v. James*, 408 U.S. 169, 184 (1972). "Legislation which sanctions membership unaccompanied by specific intent to further [any] unlawful goals of the organization" violates the First Amendment. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 608 (1967).

The only way Defendants even purport to address Plaintiffs' ongoing First Amendment associational claims is by a perfunctory cite to this Court's combined decision on the first Motion to Dismiss and Motion for a Preliminary Injunction. (Doc. 29, "Combined Decision"). This reference is inapt because the Combined Decision relates to a superseded complaint that has been significantly expanded, and because

2

the Combined Decision solely addressed Plaintiffs' associational claims in the context of the student organization expulsion policy, but did not address the broader, now amplified First Amendment associational violation untethered from the disciplinary proceedings against the former student organization.

1.  Plaintiffs' Amplified Pleading

The Combined Decision obviously did not rule on the as-yet undrafted Second Amended Complaint ("SAC"). The SAC significantly amplifies and clarifies Plaintiffs' associational claims to make it clear that Plaintiffs litigate not just as students and a student association, but as general community members and a broad-based community organization whose associational rights as such have been infringed. Plaintiffs and their supporters and would-be associates are chilled from associating with TBSDS going forward, for fear of further sanctions. ¶¶ 4-7, 12, 15, 21, 25, 64-65, 92-95, 126-128, 135, and most particularly, 139-186.[1]

For example, the SAC alleges that "TBSDS was originally both a local community organization as well as an official student organization" (¶ 4); "TBSDS has continued existing and operating as a local community organization for the broader Tampa Bay area… and continues to include… non-students and members of the general public" (¶ 5); "[t]his ban has been enforced… even after TBSDS ceased operating as a USF student organization… to bar Plaintiffs' speech in association with the TBSDS community organization in the public forums on campus" (¶ 12); and that

---

[1]      Paragraph numbers refer to the Second Amended Complaint unless otherwise specified.

3

"TBSDS… has continued as a local community organization since [expulsion], organizing meetings and events off-campus" (¶ 21).

In fact, the SAC has an entirely new Plaintiff, Yunqing Zheng, who "have never been associated with USF, and have attended numerous TBSDS events outside of the USF campus." ¶ 25.  The SAC alleges that Zheng "seek to associate with TBSDS in the public forums on the USF campus… but are barred from doing so by USF under threat of trespass charges" (¶ 25); "McDonald… stated that TBSDS was expelled from USF and that any students who affiliated with TBSDS on campus would be issued conduct charges" (¶ 143); "McDonald told them… that any protest action held at that date and time would be considered a TBSDS event and would subject the participants to punishment" (¶ 147); and that Dean McDonald told students attempting to associate with TBSDS that "your organization that is not a student organization is not supposed to be doing anything on our campus" (¶ 152) (clarification that she was consciously extending the ban to non-student organizations).  Subsequent paragraphs detail continued actions against people associating with TBSDS on campus.

All of this is occurring in a "traditional public forum," which "by government fiat ha[s] been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). *See Fla. Stat*. § 1004.097(3)(a-e) (2018) ("generally accessible areas… in which members of the campus community are commonly allowed" are "traditional public forums", protecting "all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; [and] circulating petitions").  In a traditional public forum the "government's ability to restrict speech is highly

4

constrained. Regulations that depend on the content of speech need to satisfy strict scrutiny." *McDonough v. Garcia*, 116 F.4th 1319, 1323 (11th Cir. 2024).[2] "Strict scrutiny" requires "the least restrictive means of achieving a compelling governmental interest"—"the most demanding test known to constitutional law." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484 (2025). It is beyond doubt that the ban on TBSDS is content related—whether the ban applies or not depends on whether the speech in question includes an association or identification with TBSDS. It is also beyond doubt that the ban is not only *not* narrowly drawn, but an indiscriminate shotgun blast to disfavored speech and association. The ban "broadly stifle[s] fundamental personal liberties when the end can be more narrowly achieved" and is not "narrowly drawn" to address conduct "constituting a clear and present danger to a substantial interest of the State." *Elfbrandt* at 18.

2. Defendants' Misplaced Reliance on the Combined Decision

Defendants' rote citation to the Combined Decision, with virtually no analysis, is fatal to their Motion to Dismiss, because the Combined Decision never addressed the blanket prohibition on the public's right to associate with TBSDS as a community organization in USF's public forums. Rather, it analyzed specific policy arguments raised by Plaintiffs, in the context of "reasonable time, place and manner restrictions". One of those policies was USF's Expulsion Policy, Policy 6-017.VI.C.2, and the Court's analysis of whether this was a constitutional *policy* (discussed below) stands

---

[2] The matters addressed in *McDonough* predated the CAFÉ Act, so it cannot be cited for the proposition that Florida university campuses are limited public forums.

apart from the question of whether USF can ban a non-student organization and its adherents from gathering in the public square. The answer is unequivocally "no."

If the City of Tampa can lawfully ban the Anti-Defamation League from ever gathering in front of City Hall because a few members conducted a sit-in at a City Council meeting, Defendants might have an argument.  It can't, and they don't.

**B. The Eleventh Circuit Consistently Finds Prior Restraints Like Those Complained of Here to be "For All Intents and Purposes, Content Based" Despite Their Facial Neutrality, and thus Applies Strict Scrutiny**

Defendants do not address the specifics of Plaintiffs' claims of unconstitutional policies in Count II.  But because they cite the Combined Decision, which rejected Plaintiffs' now further delineated policy complaints at least in part because the Court found the policies were content neutral, we address the claims here.

    1. <u>Defendants' Prior Restraints "Present Enough of A Risk of Chilling Otherwise Permissible Speech on the Basis of Content" That They Are "For All Intents and Purposes, Content Based" and Fail Strict Scrutiny</u>

In *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209 (11th Cir. 2017) the 11th Circuit crystalized their long-held skepticism toward "content neutrality" when analyzing prior restraints such as permitting schemes.[3]  A "prior restraint" exists "when the government can deny access to a forum for expression before the expression occurs." *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1321–22 (11th Cir. 2024), *cert. denied sub nom. Moats v. Jarrard*, 145 S. Ct. 2702 (2025).  Prior restraints that, in "practice, might

---

[3]    Though the policies here refer to "reservations", Policy 6-025(V), "Process to Reserve Space," is clear that the "use of public space for an activity requires approval"; 6-025 VII(A)(7) says "appropriate paperwork must be completed and approved."  "Permit" "license" and "reservation" are therefore interchangeable.

present enough of a risk of chilling otherwise permissible speech on the basis of content," are "for all intents and purposes, content based"" and subject to strict scrutiny. *Barrett* at 1227. *Barrett* considered the "potential for the permit administrator to more finely evince the content of applicants' intended messages by using context clues... an administrator can often infer the content based on the nature of the applicant… especially when a long history of conflict exists" between the applicant and the licensor. *Barrett* at 1227 (cleaned up). "[T]here is a distinct possibility" such a licensor "could decline to issue a permit based on content and that, consequently, the ordinance itself did in fact distinguish based on content." *Id*. *See also Cafe Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274, 1289 (11th Cir. 2004) ("licensing scheme where the licensor does not necessarily view the text of the words about to be spoken, but can measure their probable content or viewpoint by speech already uttered is sufficiently threatening to invite judicial concern," *citing City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759-60 (1988)). Exacerbating such concerns, where an "individual must apply for multiple licenses over time… the licensor does not necessarily view the text of the words about to be spoken, but can measure their probable content or viewpoint by speech already uttered." *Lakewood* at 759. Though the Court wrote in the Combined Decision that the policies are content neutral, it does not appear to have considered this ample and historically narrow view of content-neutrality in a prior-restraint scheme. It is abundantly clear that under this framework, the Eleventh Circuit would consider Defendants' licensing schemes to be content based.

Indeed, applying *Lakewood*, *Barrett*, and *Erotica* to the facts of this case highlights the wisdom of their holdings. Directly on point, it is clear that USF administrators charged with approving "reservations" will almost always have ample contextual clues about the content of the message of any applicants, especially because student groups will most frequently be the applicants for activities in USF's traditional public forums. Since the policies onerously require reservations for any event after 5:00 PM, or for any weekend, or for the last two weeks before any finals week, it's plain the applicants will need to "apply for multiple licenses over time," exacerbating potential scrutiny of the content as described by *Lakewood* and progeny. Pro-Palestine organizations, unpopular with Defendants, the press, donors and the governor (*see* note 4) will be chilled from applying and are well-exposed to content discrimination without strict parameters to govern Defendants' discretionary review of their applications.

Since *Barrett* compels the conclusion that these are content based regulations, and since they are applied to USF's traditional public forums, they are subject to strict scrutiny, which only permits constraints on speech and association that are "the least restrictive means of achieving a compelling governmental interest." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484 (2025). Plaintiffs seek to enjoin continued enforcement of USF policies 6-028(VII)(A)-(L) which require "reservations" for "activities" the final two weeks of any academic term, for any "weekend activity" that is or should be publicized in advance, for any "activity" after 5:00 PM, and for any "displays, tables, or exhibits".

8

The challenged policies fail both prongs of strict scrutiny analysis. First, the state interest in this case is nothing other than the suppression of disfavored speech and association. Regulations are content-based when they are "adopted by the government because of disagreement with the message the speech conveys." *Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178, 1185 (11th Cir. 2025). In the context of the nation-wide upsurge in student organizing in support of Palestinian rights and opposition to Israel's genocide in Gaza, Defendants' scramble to enact the permit requirement for the final two weeks of any semester was plausibly born of content discrimination. ¶¶ 96–100.[4] It is more than plausible that the pre-finals policy was hurriedly adopted for fear of protests and demonstrations on this particular subject.[5]

It is not surprising that the other challenged policies fail the "compelling interest" test, since at the time they were drafted, USF's public areas were only limited public forums, where speech restrictions didn't have to address a "compelling interest" but

---

[4] *See e.g.*, Juan Perez, Jr., Campus Free Speech is Getting Murky for Republican Governors, Politico (April 27, 2024) <https://www.politico.com/news/2024/04/27/republican-states-colleges-free-speech-israel-gaza-complicated-00154702>; Jackie Llanos, 'The Inmates Run the Asylum:' DeSantis Criticizes Pro-Palestine Protests in College Campuses," The Florida Phoenix (April 22, 2024) <https://floridaphoenix.com/briefs/the-inmates-run-the-asylum-desantis-criticizes-pro-palestine-protests-in-college-campuses/>; Sequoia Carrillo, How Student Protests Are Changing College Graduations, NPR (May 7, 2024) <https://www.npr.org/2024/05/07/1249550559/the-unrest-on-college-campuses-is-running-up-against-graduation-season>; Melissa Korn, Pro-Palestinian Protests Force Colleges to Rethink Graduation Plans, The Wall Street Journal (April 23, 2024) < https://www.wsj.com/us-news/education/pro-palestine-protests-force-colleges-to-rethink-graduation-plans-89580ada>.

[5] This is also ample evidence that reservation approvals will also likely turn on content. You can bet the Girl Scouts or Jehovah's Witnesses would quickly get a permit to table the week before finals; Students for Justice in Palestine, or Jewish Voices for Peace, not so much. It is also ample evidence of President Law's direct involvement in the unconstitutional acts alleged; there's a clear inference the University President was involved in such an impactful, last minute, broadly disseminated policy.

9

merely to be "reasonable in light of the purpose served by the forum." *McDonough v. Garcia*, 116 F.4th 1319, 1328 (11th Cir. 2024).  Now that the CAFE act has by fiat unmistakably deemed the areas traditional public forums, strict scrutiny applies, and the policies fail to satisfy the applicable test.

Nor are the reservation requirements the "least restrictive means."  Whatever Defendants' purpose in imposing the 5:00 PM "reservation" requirement, it is unfenably early for speech and advocacy outdoors on a public university campus—so much so that it doesn't even pass a "narrow tailoring" standard.  *See City of Watseka v. Illinois Pub. Action Council*, 796 F.2d 1547, 1556 (7th Cir. 1986), *aff'd*, 479 U.S. 1048 (1987) ("Watseka is attempting to roll up the front sidewalks of all its citizens at a very early hour. Even Girl Scouts will have a difficult time selling their cookies by 5 p.m."); *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 572 (6th Cir. 2012) (restriction on canvassing activities after 6 P.M. not narrowly tailored); *Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 996 (10th Cir. 2020) (7:00 PM curfew does not "directly advance[] in a material way… substantial interest").  Requiring reservations for weekend events equally fails *Watseka*'s Girl Scout test.  Defendants' tabling ordinance fares no better—if Defendants seek passable plazas and walkways (it is unclear whether that is the purpose), there are far narrower ways to achieve that; the blanket prohibition on tabling without prior discretionary approval cuts off the marketplace of ideas that any university should encourage in a public forum.

10

2.  The Challenged Policies Fail Unbridled Discretion Analysis

Defendants' policies are unconstitutional under the "unbridled discretion" doctrine.  There are "two major First Amendment risks associated with unbridled licensing schemes: self-censorship… and the difficulty of effectively detecting… and correcting content-based censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988).  Thus, permit schemes require "narrowly drawn, reasonable, and definite standards to guide administrators' decision making." *Jarrard* at 1322 (*cleaned up*).  Otherwise "*post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *Lakewood* at 758.

In the Combined Decision the Court wrote that "[a]lthough USF Policy 6-028.III affords the university discretion to 'take appropriate action if there are reasonable grounds to believe an Activity presents an imminent threat to the health, safety, welfare, or operation of campus,' that discretion is subject to the extensive 'published standards' set forth in Policy 6-028, which span twenty pages and incorporate seven additional USF policies, four USF regulations, and four Florida statutes."  Plaintiffs understand the Court to have been holding that this sufficiently bridles USF's permitting discretion.  But the specific section cited by the Court appears to apply to "cancelling or stopping an activity," not to what, if anything, guides "reservation" approvals.  Nowhere, in the "twenty pages and… and four Florida statutes" that Plaintiffs can

11

discern, are there any "narrowly drawn, reasonable, and definite standards to guide" reservation approvals. *Jarrard* at 1322. As a result, the policies are unconstitutional.

### 3. The Lack of Time Limits for Permit Determinations

The lack of time limits for reservation approval is an additional issue that was not explicitly before the Court when it issued the Combined Decision. The SAC has specifically identified that policy shortcoming: "USF publishes no reasonably accessible guidelines concerning… how long Defendants may take to decide on requests submitted to them ¶¶ 222 (a)-(f)." That lacuna is fatal to the policy's constitutionality. "If the prior restraint is content based, then the lack of a time limit necessarily renders the prior restraint unconstitutional." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1222 (11th Cir. 2017). "[U]nbridled discretion to indefinitely delay" a reservation renders a policy unconstitutional. *Barrett* at 1233 (11th Cir. 2017) (concurring opinion).[6] Plaintiffs demonstrate above that the reservation requirements are at the least content based, and it follows that the lack of time limits renders them unquestionably unconstitutional for this additional reason.

### 4. The Ban on Organizations with "Similar Members and Purpose" to That of an Expelled Organization

USF Policy 6-017(VI)(C)(2) bars the registration of any student organization with "similar members and purpose" to that of an expelled student organization. ¶¶ 222 (a)-(f). Unlike the complete ban on TBSDS's associational rights in the public

---

[6]    The *Barrett* majority and concurrence each found the lack of time limits to be fatal; they differed only in whether to apply "prior restraint" analysis or "unbridled discretion" analysis.

square discussed in Section II, official recognition of student organizations at a public university is indeed a "limited public forum." *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 682 (2010). But even though content discrimination may be permitted in a limited public forum, "unbridled discretion" analysis still applies there. *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1311 (11th Cir. 2003) (rejecting "unrestrained discretion" in a non-public forum), *Barrett* at 1233 (11th Cir. 2017) (Carnes, J., concurring). This is because unbridled discretion in licensing schemes presents the distinct danger of *viewpoint discrimination*, the bête noire of First Amendment jurisprudence. *Lakewood* at 763. Without a definition of "similar members" and "similar purpose", administrators' approval of other organizations is indeed unbridled. What if four former members of TBSDS want to register an organization to advocate for DEI funding? What if the new organization is made up of three former-TBSDS members and a newcomer? What if it is made up of two former members and two newcomers, and they want to advocate for "equal rights"? What purposes are similar? If USF wants to prevent a "mere name change, an evasion, a deception," as the Court wrote in the Combined Decision, they could specify these things. But as it is, Defendants have given themselves unbridled discretion as the gatekeepers of association.

The policy is also not viewpoint neutral in that it bars "similar purpose[s]". This Court distinguished *Healy v. James*, 408 U.S. 169 (1972) because "this action follows SDS's expulsion for a past, conduct-based violation of university policy — an ongoing punishment for prior misconduct, not a prior restraint." But not so the ban on future

13

proposed organizations "with similar members and purpose." That future ban is plainly a prior restraint which must be viewpoint neutral. *McDonough* at 1327. So the policy fails the unbridled discretion test *and* it fails viewpoint neutrality. The Court viewed the conjunctive "similar members and purpose" to be dispositive, but if an organization with similar members but *not* a similar purpose is allowed, then that proves that the purpose, the message, the viewpoint—is dispositive to the University's decision.

Further, the First Amendment requires that, for access to a public forum to be denied "by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982). "[B]lanket prohibition of association with a group having both legal and illegal aims would pose a real danger that legitimate political expression or association would be impaired… there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share… It rests on the doctrine of 'guilt by association' which has no place here." *Elfbrandt v. Russell*, 384 U.S. 11, 15-19 (1966) (*cleaned up*).

**C. The SAC States a Claim Against Defendant Law and Amply Supports a Conspiracy Claim**

14

The SAC alleges participation by Defendant Law sufficient to, at the least, "nudge[] [their] claim across the line from conceivable to plausible" that Defendant Law was personally involved in the unconstitutional acts complained-of. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That reasonable inference derives in part from her high-level authority as USF President combined with her granular involvement in discipline and sanctions against TBSDS for anti-Zionist leafletting, and her detailed work with an outside organization to address "anti-Israel students and agitators" (their words not Plaintiffs'). "Anti-Israel" speech is unquestionably protected by the First Amendment, and few histrionics herald a First Amendment violation more than "agitators." Defendant Law is personally working to squelch anti-Zionism on campus, and Plaintiffs are the most vocal and active anti-Zionists on campus. It's not complicated, and it's not a reach.

Further, the SAC details frantic last-minute policy changes to bar protests in the lead-up to finals and graduation. Such a policy change unquestionably included personal involvement by the University President and was clearly driven by concerns about pro-Palestine-related messaging on campus. ¶¶ 96-100.[7] When, despite that last minute policy change, a pro-Palestine demonstration nevertheless went forward, it was Defendant Law who escalated by directing riot police to respond. No clear-eyed view of the pleadings can avoid the reasonable inference that Law was directly involved in the speech and assembly restrictions and disciplinary outcomes described.

---

[7]     *See infra*, note 4.

Defendants claim Plaintiffs insufficiently detail communications to support their conspiracy claim. But Plaintiffs allege that "Defendants' agreement to the conspiracy is evident from the email conversation following Freddi Kaden's complaint about TBSDS's fliers, from Defendant Law's extensive meetings and collaboration with the JCC and JCRC." ¶ 243. Paragraphs 46 through 52 of the SAC detail content and viewpoint related communications between Freddi Kadden, Defendant Law and her office, and Defendant McDonald. Paragraph 34 details Defendant Law's multiple meetings with the Tampa Jewish Community Centers and Federation ("JCC") during which she "work[ed] with them to address anti-Israel activity on campus" by "anti-Israel students and agitators" according to a published letter from the JCC.

"[A]n agreement may be inferred from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct." *Ghee v. Flix N. Am., Inc.,* No. 24-12580, 2025 WL 2408957, at *3 (11th Cir. Aug. 20, 2025). A "smoking gun" is not required; "[f]actual proof of the existence of a § 1983 conspiracy may be based on circumstantial evidence." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002); *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010). Plaintiffs have provided that in spades.

**D.    The Claims for Prospective Injunctive Relief are Not Barred by the 11th Amendment and Defendants' *Monell* Arguments are Inapplicable**

Defendants' Eleventh Amendment arguments are bewildering. They concede that *Ex Parte Young* creates an exception to Eleventh Amendment immunity and allows "prospective injunctive relief to prevent a continuing violation of federal law." *Green*

*v. Mansour*, 474 U.S. 64, 68 (1985).  That is exactly what Plaintiffs seek.  Declaratory relief for "both past and future conduct… is permitted in an official-capacity suit against a state official"; such suits "are not considered suits against the state and thus are not barred by sovereign immunity."  *Benning v. Comm'r, Georgia Dep't of Corr.*, 71 F.4th 1324, 1335–36 (11th Cir. 2023), *cert. denied sub nom. Benning v. Oliver*, 144 S. Ct. 1457 (2024) (*cleaned up*).  The SAC cannot be any more clear on this point: Plaintiffs seek to prevent ongoing enforcement of a complete ban on any member of the public associating with TBSDS in USF's public forums.  This ongoing enforcement of the ban continues to affect each Plaintiff—including Plaintiff Zheng—personally.  ¶¶196, 220, 241.  Plaintiffs complain of past enforcement and likely future enforcement of the unconstitutional policies described above that will prevent them from associating and speaking freely at USF, whether as members of the public or students.  Hinckley and TBSDS further complain of their ongoing expulsion and seek prospective relief to remedy it.  ¶¶ 211-214.

Defendants' *Monell* arguments are also wholly inapplicable. Defendants cite *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29 (2010), which provides that "plaintiffs suing a municipal entity under 42 U.S.C. § 1983 must show that their injury was caused by a municipal policy or custom." *Humphries* at 31.  *Monell* applies to claims "impos[ing] liability on local governments."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011). *Monell* does not, however, prevent suits against individual state actors for their personal involvement in unconstitutional conduct, and "the Eleventh Amendment

17

provides no bar to recovery of damages against state officers acting in their individual capacities." *Hobbs v. Roberts*, 999 F.2d 1526, 1528 (11th Cir. 1993).

## III.   CONCLUSION

As of the date of filing, any member of the public who wishes to associate with the community group TBSDS in the public forums on the USF campus is prohibited from doing so under threat of trespass and arrest.  This is so regardless of whether the individual poses any particular threat to the University or its function, and regardless of whether the individual was in any way connected to the disciplinary proceedings against TBSDS and its expulsion.  At the same time, Defendants have barred future students from accessing the limited public forum of official student organization status and the attendant privileges if their organizational purpose and membership are deemed to be too "similar" to TBSDS—not the same, not quantifiably indistinct, just "similar" in the eyes of Defendants.  Finally, Defendants' policies give them unbridled discretion to delay and deny any request for speech in its traditional public forums. These bans and burdens on speech and association—in traditional public forums, and one in a limited public forum—do not pass constitutional muster and must be struck down.  Because Defendants conspired to commit the ongoing constitutional deprivation against Plaintiffs, and took specific concrete steps to effectuate that deprivation, they are liable to Plaintiffs under the plead causes of action, and the Motion to Dismiss should be denied.

18

Dated: March 16, 2025

Respectfully Submitted,

*/s/ Collin Poirot*
Collin Poirot, Esq.
*Special Admission*
2603 Oak Lawn Ave, Ste. 300
Dallas, TX 75219
(214) 392-2281
cpoirot.law@gmail.com

Andrew B. Stoll
*Special Admission*
Stoll, Glickman & Bellina, LLP
300 Cadman Plaza West, 12th Fl.
Brooklyn, New York 11201
(718) 852-3710
astoll@stollglickman.com

*/s/ Walker Smith IV*
Walker Smith IV
FL Bar No.: 1031486
**LegalSmiths Consulting Group, PA.**
283 Cranes Roost Blvd., Ste. 111,
Altamonte Springs, FL 32701
(407) 887-1370
Walker@LegalSmithsConsulting.com
LegalSmithsConsulting@Gmail.com

19