UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TAMPA BAY STUDENTS FOR A
DEMOCRATIC SOCIETY et al,

     Plaintiffs,

v.

                                     CASE NO. 8:25-cv-02752-SDM-AAS

RHEA LAW et al,

     Defendants.

_____/

### AMENDED ORDER

After an earlier order (Doc. 29) dismissed their eight-count first amended complaint (Doc. 17) and denied their motion (Doc. 18) for a preliminary injunction, the plaintiffs file a second amended complaint. (Doc. 30) Alleging civil conspiracy, deprivation of a constitutional right, and violation of the Campus Free Expression Act, Tampa Bay Students for a Democratic Society (SDS); three SDS members — Victoria Hinckley, Saba Indawala, and Vicky Tong; and Yunqing Zheng, "a non-student and member of the general public," sue three University of South Florida (USF) officials: former President Rhea Law and Deans Danielle McDonald and Melissa Graham. The defendants move (Doc. 38) to dismiss for failure to state a claim, and the plaintiffs respond (Doc. 46) in opposition.

## BACKGROUND

The plaintiffs describe SDS as a student organization that "advocate[s] . . . for minority communities . . . including in particular Palestinians." (Doc. 30 ¶¶ 4, 205) SDS's "particularly Palestinian" advocacy at USF began in 2014, when SDS collected student signatures "in support of divesting USF's endowment from Israel's illegal occupation of Palestine."[1] (Doc. 30 ¶ 30)

As a USF student organization, SDS must comply with USF Policy 6-017.VIII.A:

> Each student organization is expected to . . . ensure membership purposes and activities conform and comply with the United States Constitution; federal laws, the laws of the State of Florida; Board of Governors regulations; policies, guidelines and regulations of the University of South Florida and the purposes set forth in the Constitution.
>
> The student organization is independently and solely responsible and accountable for the conduct and all actions of the organization and its Members.
>
> Any violation of [a] law . . . or USF guidelines and regulations will be considered as [a] violation[] by the organization and its Officers and, in cases involving deliberate, intentional complicity or assistance in any such violation by other individuals, shall also be considered as violations by those individuals.
>
> All student organization activities are subject to policies, regulations, guidelines, procedures, and processes related to student activities management outlined on each USF campus.

(Doc. 18-8 at 10)

---

[1] At least one other USF student organization expresses a similar view: Students for Justice in Palestine, which remains in good standing with USF and has never incurred suspension or expulsion. (Doc. 22-2 ¶ F.4)

SDS's history of non-compliance with USF's policy began in December 2020, when USF suspended SDS for disregarding COVID-19 containment measures. SDS violated the suspension at least three times. (Doc. 22-2 ¶¶ B.1–B.6) In March 2023, police were mobilized when during an unapproved "sit-in" at a USF administrative building SDS refused an official order to disperse. SDS members who "engaged in acts of physical violence against the police" were disciplined. (Doc. 22-2 ¶ B.8)

### "From the River to the Sea" Flyer and Conduct Probation

In January 2024, the USF administration received a complaint concerning flyers posted in an unapproved location on campus.[2] (Doc. 30 ¶ 45) The flyer depicts children holding a Palestinian flag within a bomb-damaged building; the background includes several displays of the slogan "From the River to the Sea." The SDS logo appears in the flyer's top-right corner. (Doc. 18-2)

USF's staff removed the SDS flyers and other flyers posted in the unapproved location. (Doc. 30 ¶ 48) After investigating, Student Conduct and Ethical Development (SCED) invited Hinckley, the then-president of SDS, to a February 12, 2024 "informational meeting."[3] At the meeting, Hinckley consented to a "resolution agreement" that waived SDS's right to a formal hearing and appeal.

---

[2] USF policy provides (1) that "any non-compliant signage will be removed," (2) that signs "may be located only in designated areas," and (3) that "Violations of this Policy may be reported for sanctions or legal action." (Doc. 22-2, Ex. B)

[3] SCED is the committee that administers the USF "Student Code of Conduct." (Doc. 22-2, Ex. A)

Because Hinckley, on behalf of SDS, admitted to "posting flyers in multiple unapproved locations," SCED found SDS responsible for "[f]ailure to adhere to or abide by policies" and placed SDS on conduct probation.[4] SCED stated that conduct probation "is a period of reflection on behavior and an opportunity to demonstrate satisfactory citizenship" and that conduct probation "may result" in restriction on (1) "hosting/co-hosting/attending any programs, functions, socials, or events with other student organizations;" (2) "utilizing any services/resources offered to student organizations through any University office/department;" and (3) "participating in or holding leadership positions in your governing council." SCED advised SDS that "further conduct violations while on conduct probation may impact the severity of future sanctions." (Doc. 18-13)

### "Petition Delivery Action" and Interim Suspension

On April 22, 2024, while SDS was on conduct probation and a week before final exams, a group of at least ten SDS members, including one participant carrying a petition addressed to Dean McDonald, marched — without approval — through the Marshall Student Center and ascended the stairs toward Dean McDonald's fourth-floor office, chanting: "Dean McDonald, you're no good; defend diversity like you should! USF, shame on you; student voices matter too!" (Doc. 30, Fig. 1 at 18; Doc. 18-4)

---

[4] USF Policy 6-017.VI.C.1 provides that a student group on conduct probation "[m]ay have limited access to benefits and resources due to violation of USF regulation or policy." (Doc. 18-8 at 9)

The petition, not "particularly Palestinian," concerned USF's commitment of money to various DEI programs. Participants held signs bearing messages such as "Expand Africana Studies!!!," "PROTECT WOMENS AND GENDER STUD-IES," and "Defend Divesity [sic]."

Dean McDonald met the group on the third floor. After receiving the petition and with her back pressed against the atrium railing, Dean McDonald responded to the demonstrators, "Sure, thanks. I will take that. Now you all need to leave the building quietly and not disrupt students who are studying.[5] . . . You are welcome to send an email to request a meeting with me."[6] Dean McDonald departed, and the demonstrators resumed chanting. (Doc. 18-4)

After this incident, which the plaintiffs characterize as a "petition delivery action," SCED charged SDS with the following violations:

> Actions and/or behaviors that disrupt, disturb, impair, or interfere with the processes and/or functions of the University or the rights of members of the University community.
>
> Actions and/or behaviors that disrupt, disturb, impair, or interfere with the academic environment, and/or failure to abide by USF 3.025 Disruption of Academic Process.
>
> Actions and/or behaviors that are disorderly, unruly, and/or disturb the peace.

---

[5] Both a video and a photograph of the incident appear to show numerous students in the background studying — or, at least, attempting to study. (Doc. 30, Fig. 1 at 18; Doc. 18-4)

[6] USF Policy 6-028.VII.A.9 states: "To provide an environment conducive to preparation of final or cumulative exams, the final two weeks of any academic term, no Activities will be permitted in or near Academic Spaces on campus, without reservations." (Doc. 18-12 at 8)

> Failure to comply with an official request or lawful directive of law enforcement or a University Official acting within the scope of their assigned duties. This includes failing to comply with assigned sanctions and/or related University sanctions.

(Doc. 18-6 at 1)

Finding that SDS "pose[s] an ongoing threat, disruption, or interference to the health and safety and continued functions of the USF community," SCED placed SDS on interim suspension.[7] (Doc. 18-6 at 2) During the interim suspension, SDS could not (1) "hold or participate in any formal or informal meetings regarding the organization or the alleged violations;" (2) "host/co-host/attend any programs, functions, or activities;" (3) "utilize any services/resources offered to the student organization through any University office/department;" (4) "participate in or hold leadership positions;" or (5) "conduct any recruitment/new member/pledge activities or have contact with any potential new members/new members/pledges."[8]

On April 25, 2024, SDS met with SCED to discuss the "petition delivery action." (Doc. 22-2 ¶ B.14) The following day, SDS received a letter confirming the

---

[7] USF Policy 6-017.VI.C.1 provides that a student group on suspension "[m]ay not access benefits, resources, nor organize until suspension is lifted and received Re-Registration approval due to violation of USF regulation or policy." (Doc. 18-8)

[8] Dean Graham declares, "This language is not intended to prevent the organization from gathering evidence or information to prepare for any stage of the student conduct process. If Tampa Bay Students for a Democratic Society had asked for clarity, which it did not, I would have told them the same. In fact, Tampa Bay Students for a Democratic Society was advised that, during the student conduct process, it had the right to be accompanied by an advisor of its choice, that it had the opportunity to present relevant information, and had the opportunity to question witnesses." (Doc. 22-2 ¶ B.13)

- 6 -

continuation of the interim suspension and related restrictions. (Doc. 22-2 ¶ B.15) The letter specified that "the activity scheduled for Monday, April 29, 2024, at noon inside *or outside* the USF Library must be canceled as hosting the activity will violate the Interim Suspension and will result in further violations of the USF Student Code of Conduct." (Doc. 22-2 ¶ B.16) (emphasis in original) The "activity" that "must be cancelled" was a "Nakba Commemoration Event" that SDS planned for Wednesday, April 29, 2024 — the third day of final-exam-week.[9] (Doc. 30 ¶ 92)

### "Nakba Commemoration Event"

Despite (1) the interim suspension; (2) the explicit prohibition of the April 29, 2024 event; [10] (3) the fact that April 29, 2024, fell during final-exam-week, [11] during which student-organization activity was generally restricted; [12] and (4) the

---

[9] According to the plaintiffs, "During the Nakba, more than 75,000 Palestinians were ethnically cleansed from Palestine to make way for what would later become the state of Israel. Every year, Palestinians commemorate the Nakba." (Doc. 30 ¶ 92)

[10] In an April 28, 2024 email, Dean Graham reminded SDS that the planned event was unauthorized and that the event, if held, would result in additional violations. (Doc. 22-2 ¶ B.16) This message was repeated in an April 29, 2024 email to SDS by Dean McDonald. (Doc. 22-2 ¶ B.20)

[11] The spring 2024 final-exam-week was April 27–May 2. *See* Important Dates & Deadlines Archives, Spring 2024, USF Office of the Registrar, https://www.usf.edu/registrar/documents/archive/uro-important-dates-and-deadlines-archive-spring-2024.pdf.

[12] In an April 28, 2024 email, Dean McDonald notified USF students that no event, protest, or demonstration in or around an academic building was permitted during final-exam-week and that no event, protest, or demonstration elsewhere on campus was permitted during final-exam-week unless previously approved. (Doc. 22-2 ¶ B.17) *See also* USF Policy 6-028.VII.A.9, *supra* note 6.

- 7 -

fact that Nakba Day occurs on May 15 and not on April 29,[13] SDS continued to publicize the event on Instagram.[14] (Doc. 22-2 ¶ B.21)

On April 29, 2024, demonstrators — SDS members, unaffiliated USF students, and non-students, among others — arrived at the library.[15] They were met by USF staff, who reiterated the Dean's email prohibiting the demonstration and ordered the demonstrators to depart.[16] After moving to MLK Plaza, an area outside the Marshall Student Center, the demonstrators pitched tents, distributed umbrellas and orange safety vests, and wheeled in a cart containing makeshift wooden shields studded with protruding metal bolts. (Doc. 18-13; Doc. 22-2 ¶ B.22) Around 4:30

---

[13] The plaintiffs asserted no fewer than thirty times in the original complaint, the first amended complaint, and the motion for a preliminary injunction that April 29 is "Nakba Day" or that the April 29 event was a "Nakba Day Commemoration Event." (Doc. 1 ¶¶ 16 n. 10, 81–83, 86–87, 89, 104, 133, 143–44, and 150; Doc. 17 ¶¶ 81, 83, 85, 88, 90, 94, 111, and 115; Doc. 18 at 5 and 22–23)

[14] That May 15, rather than April 29, is generally accepted as Nakba Day is confirmed by the United Nations, Amnesty International, *Al Jazeera*, and a *TIME* article the plaintiffs cite as an authority on Nakba Day. (Doc. 30 ¶ 92 n. 8) "The Question of Palestine," United Nations, https://www.un.org/unispal/about-the-nakba/; "Marking the 77th Anniversary of Nakba," Amnesty International, https://www.amnesty.org.au/nakba-day-77th-anniversary-we-must-listen-to-palestinian-voices-and-take-action/ (May 15, 2025); Ali Younes, "Nakba Day: For Palestinians, not just an historical event", *Al Jazeera*, https://www.aljazeera.com/news/2020/5/15/nakba-day-for-palestinians-not-just-an-historical-event (May 15, 2025); Juwayriah Wright, "The Solemn History Behind Nakba Day," *TIME*, https://time.com/6978612/nakba-day-history (May 16, 2024).

[15] USF Policy 6-028.VII.I.2 (Doc. 18-12 at 11) ("Non-University guests who wish to attend an Activity sponsored by a University Entity may be required to be accompanied by a USF representative (student, faculty, or staff member) with a valid USF identification card. Non-University guests must show a valid drivers' license or another form of picture ID upon request. Guests may be required to be registered for some Activities.").

[16] *See* USF Policy 6-028.III (Doc. 18-12 at 4) ("When circumstances permit, the University may attempt to mitigate disruptions caused by Activities by using reasonable alternative means before cancelling or stopping an Activity. For example, the University may direct groups or individuals engaged in an Activity away from an Academic Space to an adjacent Public Space, if such space is available, and subject to the discretion of the President, or designee.").

p.m., Dean McDonald ordered the demonstrators to remove the tents and disperse or face arrest.[17] (Doc. 30 ¶ 104) The police arrested the demonstrators who refused the order. (Doc. 22-2 ¶ B.22) That evening, Hinckley announced on Instagram that SDS would return to MLK Plaza the following day. (Doc. 22-2 ¶ B.24)

Demonstrators returned the following day to MLK Plaza, again with orange vests, umbrellas, and wooden shields distributed with instruction on their use against police. When demonstrators refused an order to disperse, police deployed tear gas, discharged rubber bullets, and arrested ten demonstrators. One arrestee, a USF student, carried a club; another, a person unaffiliated with USF, carried a firearm. (Doc. 22-2 ¶ 25)

### Hinckley and SDS Expelled

SCED placed Hinckley on interim suspension on the evening of April 30, 2024. After an "informational meeting" and an "administrative hearing," USF expelled Hinckley, effective June 14, 2024. (Doc. 22-2 ¶¶ C.4–5) The expulsion letter concludes:

> On April 29, 2024, [Hinckley] was responsible for leading a protest event for [SDS] after the organization, of which [Hinckley] is the President, was placed on an Interim Suspension on April 22, 2024. SDS received several warnings that the event could not occur. At the event, participants were told they could not put up tents but failed to comply with warnings from USF staff. The organization's failure to comply resulted in several arrests by UPD.

---

[17] USF policy provides, "Tents may be on campus only between the hours of 7:00 a.m. and 5:00 p.m. Tents may not be left out overnight." (Doc. 22-2 Ex. B) *See* USF Policy 6-028.VII.P.1 (Doc. 18-12 at 15); *see also* USF Policy 6-028.VII.L.3 (Doc. 18-12 at 11–12) ("A reservation through the Reserved Activity Request process is required" for the use of space by a student organization after 5:00 p.m.).

> On April 30, 2024, [SDS] held another protest event while still on interim suspension status. A cart was brought in by a participant that was covered by mats. Two USF staff members talked with leaders of SDS to find out what was in the cart, but the leaders failed to share. Around 1 p.m., the groups circled up and [Hinckley] led the event with speeches. Several individuals began putting on orange safety vests. The mats were removed from the carts and large wooden squares that appeared to have bolts sticking out of them were uncovered. Umbrellas were also handed out to participants and participants were directed on how to use them against police.

> SDS utilized its Instagram account to tell people to come to the MLK Plaza at USF because police intended to use force against them resulting in more people arriving on campus in an already dangerous environment.

> [Hinckley] approached the Dean of Students multiple times asking why SDS had to leave at 5 p.m. It was explained that the event was against policies and had to end at 5 p.m. [Hinckley] continued to argue with the Dean of Students. The 5 p.m. deadline was reiterated by Chief Daniel. The event resulted in several arrests and tear gas being used on participants and bystanders who did not leave when warnings were given. [Hinckley] created an unsafe environment for the USF community.

(Doc. 18-13 at 1)

The expulsion letter states that by a preponderance of the evidence SCED found Hinckley responsible for the following violations:

> Failure to comply with an official request or lawful directive of a law enforcement or a University Official acting within the scope of their assigned duties. This includes failing to comply with assigned sanctions and/or related University sanctions.

> Failure to adhere to or abide by policies, including but not limited to, local ordinance, state law or federal law. Adjudicating by an outside entity is not a prerequisite to a determination of responsibility by the University.

> The prompting, facilitating, or encouraging of others to violate standards of behavior.

- 10 -

> Actions and/or behaviors that disrupt, disturb, impair, or interfere with the processes and/or functions of the University or the rights of members of the University community.
>
> The illegal possession, storage, use, or sale of any weapon (lethal or non-lethal), firearm, ammunition, or any incendiary, explosive or destructive device. . . . This also covers any item used as a weapon to cause actual physical harm or threaten physical harm. Reference Policy 6-009 Weapons on USF Property.
>
> Conduct non-compliant with University policies, guidelines, or directives related to the health and safety of the University community.

(Doc. 18-13 at 2)

The expulsion letter conferred the right to appeal no later than June 19, 2024, five days after the effective date of Hinckley's expulsion and twelve days after the date of the letter. (Doc. 18-13 at 6) Hinckley appealed unsuccessfully. (Doc. 22-2 ¶ C.4)

On July 23, 2024, after finding SDS responsible for "aiding and abetting, disruptive conduct, failure to comply, policy violations, and weapons offenses," Dean Graham expelled SDS. (Doc. 30 ¶ 131; Doc. 22-2 ¶ B.29) Vice-Chancellor Jacob L. Diaz denied SDS's appeal on August 8, 2024. (Doc. 22-2 ¶ B.30; Doc. 24)

USF Policy 6-017.VI.C.1 defines expulsion of a student group as a "Permanent restriction that provides the organization may not access benefits, resources, nor organize due to violation of USF regulation or policy." USF Policy 6-017.VI.C.2 provides:

> Members of student organizations that are suspended or expelled may not continue to represent themselves as active members of the organization either under its original name or any new name. Efforts to suggest that a sanctioned organization is still active; to recruit new members to a sanctioned organization; or to attempt to continue to function

> at the university under a new name but with similar members and purpose will be considered a violation of the Student Code of Conduct and the individual student(s) conduct in that regard which could include permanent restriction from campus.

(Doc. 18-8 at 9)

On August 31, 2024, USF announced the expulsion:

> [SDS] is expelled from all USF campuses. Expulsion is the permanent termination of the student organization's status. The organization is permanently restricted from hosting any events or meetings, in-person, virtually, or by any other means, and cannot utilize university space or reserve space. The organization is not allowed to participate in any official University functions, programs, intercollegiate competitions, or other student activities. The organization is not permitted to participate in member recruitment.[18]

(Doc. 30 ¶¶ 136–137; Doc. 18-11)

USF's enforcement against SDS of the prohibition on an organization with "similar members and purpose" has not impaired the activity of any other student organization, including Students for Justice in Palestine, which espouses views similar or identical to the views of SDS. (Doc. 22-2 ¶ F.4)

**Post-Expulsion Activity of SDS**

On August 29, 2024, and accompanied by police, Dean McDonald shut down an SDS recruitment table on campus and reminded the participants that SDS activity on campus was prohibited.[19] (Doc. 30 ¶¶ 142–143) When asked whether

---

[18] Conduct History, University of South Florida, https://www.usf.edu/student-affairs/leadership-civic-engagement/student-organizations/student-org-conduct-history.aspx.

[19] USF Policy 6-028.VI.E.1 (Doc. 18-12 at 9) ("Displays, tables, and exhibits need prior approval using the Reserved Activity Request or Space Impact Process.").

SDS members could "assemble as individuals" to discuss "ongoing advocacy efforts," Dean McDonald responded, "if it walks like a duck and quacks like a duck, it is a duck." (Doc. 30 ¶ 144)

On September 3, 2024, as SDS prepared to hold an event titled "Stand with Palestine: Defend Student Protests," Dean McDonald approached and reminded the participants that the event would result in a conduct charge. (Doc. 30 ¶¶ 145–147) When asked how the event could occur without qualifying as an SDS activity, Dean McDonald responded that USF would consider the event an SDS activity in any case. (Doc. 30 ¶ 147)

On October 1, 2024, and accompanied by police and other USF staff, Dean McDonald stopped four SDS members, including Indawala and Tong, *en route* to a planned rally titled "Defend Free Speech on Campus," and stated, "I need your student IDs. This organization has been expelled. You are not allowed to be here having this rally. . . . If you do not give me your student IDs, then I will treat you as a community member who is not supposed to be here with this organization. The police will then trespass you, and if you do not leave then, you will be arrested." (Doc. 30 ¶¶ 148–150; Doc. 18-9)

After the participants declined to produce identification, a police officer stated, "You are engaging in conduct which is interfering with the normal orderly and peaceful . . . activities of this university. I am ordering you to leave this location and university grounds immediately. If you fail to leave immediately you will

be arrested for trespassing." (Doc. 30 ¶¶ 150–159; Doc. 18-9) After this warning and followed by police, the four SDS members departed the USF campus. (Doc. 18-9)

That evening, based on her continued affiliation with SDS and her involvement in the planned "Defend Free Speech on Campus" rally, Indawala was placed on interim suspension. (Doc. 30 ¶ 163) After an "informational meeting," Dean Graham modified the interim suspension to permit Indawala to attend classes. (Doc. 22-2 ¶ D.3) At a "formal hearing," Lauren Ready, USF's Student Programs Coordinator, found Indawala responsible for "disruptive conduct and failure to comply" but lifted the interim suspension and all related restrictions. (Doc. 22-2 ¶ D.4)

On February 10, 2025, two current USF students and Tong, a USF graduate, placed a table in front of an academic building and displayed a banner featuring the SDS logo, a Palestinian flag, a "queer liberation flag," and the phrases "Protect Immigrants" and "Defend LGBTQ Rights."[20] (Doc. 30 ¶ 169; Doc. 18-10) Following Dean McDonald's directive to identify students involved with SDS, a police officer approached the table and requested identification.[21] (Doc. 30 ¶¶ 170–171)

On March 3, 2025, SCED — mistakenly believing Tong remained a student — charged Tong with "failure to comply" and scheduled a "formal hearing,"

---

[20] During the "student conduct process" resulting from her participation in the planned October 1, 2024 rally, Tong was advised that any further participation in SDS activity at USF was prohibited. (Doc. 22-2 at ¶ E.1)

[21] *See* USF Policy 6-028.VI.E.1, *supra* note 19.

which Tong did not attend. (Doc. 30 ¶¶ 175 and 180; Doc. 22-2 ¶ E.2) Tong was served with a "Trespass Notice . . . bann[ing] Tong 'from the entire USF system' until December 12, 2025." (Doc. 30 ¶ 181) After Tong's lawyer challenged the then-pending "Trespass Notice" as unlawfully predicated on a student-conduct proceeding against a non-student, the notice was "cancelled." (Doc. 30 ¶¶ 182–185)

### Attempt to Reinstate SDS

In March 2025, Indawala e-mailed Dean McDonald to ask whether Indawala, together with other members of the expelled SDS, could reconstitute as the "South Florida Students for a Democratic Society." Indawala specified in the e-mail that SDS, under an altered name, would continue to advocate "Diversity, Equity, and Inclusion on campus"; continue to address "USF's role in the ongoing Genocide in Gaza"; and continue to "associate with national Students for a Democratic Society and our sister chapters on campuses across the country." Dean McDonald rejected the proposal because USF prohibits any expelled student organization from operating "under a new name but with similar members and purpose" as an expelled organization. (Doc. 18-7)

### Claims and Requested Relief

The plaintiffs sue former President Law, Dean Graham, and Dean McDonald for deprivation of a constitutional right (Counts I and II) and for civil conspiracy (Count III). In addition to damages and an attorney's fee, the plaintiffs request (1) reinstatement of SDS as a student organization in good standing at USF; (2) reinstatement of Hinckley as a student in good standing at USF; (3) expungement

- 15 -

from the USF record of any disciplinary sanction imposed against each plaintiff for SDS-related activity occurring after January 10, 2024; (4) an injunction prohibiting USF from "enforcing [unspecified] speech limitations in its public forums"; and (5) an injunction barring enforcement of the following USF policies:

> **Policy 6-028.VII.I.2 (Guest Policy)**: "Non-University guests who wish to attend an Activity sponsored by a University Entity may be required to be accompanied by a USF representative (student, faculty, or staff member) with a valid USF identification card. Non-University guests must show a valid drivers' license or another form of picture ID upon request. Guests may be required to be registered for some Activities."

> **Policy 6-028.VII.A.9 (Final-Exam-Week Policy)**: "To provide an environment conducive to preparation of final or cumulative exams, the final two weeks of any academic term, no Activities will be permitted in or near Academic Spaces on campus, without reservations."

> **Policy 6-028.VII.L.3 (Reservation Policy)**: "A reservation through the Reserved Activity Request process is required" for the use of space by a student organization after 5:00 p.m.

> **Policy 6-028.VI.E.1 (Tabling Policy)**: "Displays, tables, and exhibits need prior approval using the Reserved Activity Request or Space Impact Process."

> **Policy 6-017.VI.C.2 (Expulsion Policy)**: "Members of student organizations that are suspended or expelled may not . . . attempt to continue to function at the university under a new name but with similar members and purpose."

## DISCUSSION

### The Plaintiffs Fail to State a Claim Against Former President Law

Although the subject of each claim, former President Law appears in only six

(Doc. 30 ¶¶ 27, 34, 51, 64, and 113) of the complaint's one hundred eighty-seven

factual paragraphs:

> [Former President Law] was President of the University of South Florida. She was a final policymaker in the actions taken against Plaintiffs described in this Complaint, including the decision to order an investigation of Plaintiffs based on their pro-Palestinian posters.

> On May 5, 2024, the Tampa Jewish Community Centers & Federation (JCC) published a letter . . . thanking [President] Law for meeting with them on multiple occasions and "work[ing]" with them to address "anti-Israel activity on campus" by what it called "anti-Israel students and agitators."

> Defendant Law did indeed maintain "ongoing contact with several key stakeholder groups," meet with the Deputy Consul General for Florida at the request of the JCC, and take other measures to suppress "anti-Israel activity" on USF's campus upon the request of the JCC—including the campaign to silence and expel [SDS] for engaging in such "anti-Israel activity."

> DeLuca responded two hours later [to an email about the unapproved SDS flyers], directing an investigation and saying that the Defendant Law had ordered a "written explanation of this incident" and that it was "important for the President that this information is shared asap."

> Defendants Law, Graham, and McDonald conspired to rid USF and its forums of [SDS's] speech and viewpoint . . .

> Defendants USF, Law, and McDonald sent Tampa riot police to the MLK Plaza, and without any provocation from students or SDS members, the police shot tear gas and rubber bullets into the crowd of attendees, forcing them to disperse.

Neither "ordering" an explanatory report of unapproved flyers without dictating the terms of the report nor "sending" police to an unauthorized protest without directing how the police should act amounts to a constitutional violation. The plaintiffs allege no fact supporting the conclusion that former President Law directed any policy to apply selectively to the plaintiffs. By failing to plead facts showing that "through [her] own individual actions, [former President Law] has violated the Constitution," the plaintiffs fail to state a claim against former President Law under 42 U.S.C. § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The plaintiffs fail to state a claim for conspiracy for the same reason.

### Zheng Lacks Standing

Similarly, Zheng appears in only five (Doc. 30 ¶¶ 25, 125, and 166–168) factual paragraphs:

> At all relevant times, [Zheng] has been a resident of Hillsborough County, FL and a supporter of [SDS]. [Zheng has] never attended or been associated with USF, and ha[s] attended numerous [SDS] events outside of the USF campus. [Zheng] seek[s] to associate with [SDS] in the public forums on the USF campus, and to speak and organize in support of [SDS] and its causes, particularly in support of Palestinian rights, in those forums, but [is] barred from doing so by USF under threat of trespass charges.

> The April 30th event was the last time that [Zheng] associated and spoke in affiliation with [SDS] in the public forums on the USF campus. Since then, [Zheng] has been intimidated and chilled from attending [SDS]-related programming or participating in [SDS]-affiliated expressive conduct in those public forums due to threat of arrest and prosecution, and as a result has only been able to participate in [SDS] activities held off campus.

> [Zheng] desired to participate in [SDS] events on the USF campus in September and October of 2024, including the events identified above,

- 18 -

but was chilled from doing so by Defendants' unlawful persecution and prosecution of anyone found affiliating with [SDS] on campus.

[Zheng] was aware of the arrests on April 29th and 30th, 2024, and of the subsequent police and disciplinary action against people associated with [SDS] outdoors on the USF campus.

As a non-student and member of the general public, [Zheng] knew that [Zheng] would be especially subject to sanction and police action if she attempted to associate with and speak in support of [SDS] in the traditional public forums on the USF campus.

To establish Article III standing, "the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized … and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). The complaint alleges no disciplinary action and no threat of disciplinary action against Zheng, who "seek[s] to associate with [SDS] in the public forums of the USF campus" but felt "intimidated and chilled." Zheng's subjective "chill," not attributed to any citation, warning, trespass order, denial of entry, or any other concrete disciplinary action, is not an injury-in-fact.

Nor does the complaint allege a definite plan to engage in specific expressive activity at a fixed time and place, but only Zheng's generalized "desire" to participate in "SDS events on campus" and Zheng's speculative fear of "arrest and prosecution." "Such 'some day' intentions — without any description of concrete plans, or even any specification of when the some day will be — do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564. For these reasons, Zheng lacks Article III standing to sue.

- 19 -

**Counts I and II: First Amendment and the Campus Free Expression Act[22]**

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."[23] "Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. . . . There can be no doubt that denial of official recognition, without justification, to college organizations burdens or abridges that associational right." *Healy v. James*, 408 U.S. 169, 181 (1972). At the same time, "the Court has repeatedly emphasized the need for affirming the comprehensive authority . . . of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969). Accordingly, a public university may "regulate student expression when it substantially interferes with the work of the school or impinges upon the rights of other students." *Doe v. Valencia College*, 903 F.3d 1220, 1229 (11th Cir. 2018) (internal quotation marks omitted).

---

[22] Because the Campus Free Expression Act, Section 1004.097, Florida Statutes, affords substantive protection coextensive with the First Amendment, no separate analysis is needed.

[23] "Expressive activities protected under the First Amendment to the United States Constitution and Art. I of the State Constitution include, but are not limited to, any lawful oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions . . ." § 1004.097(3)(a), Fla. Stat.

**Each Challenged Policy Is a Reasonable Time, Place, and Manner Restriction or Is Otherwise Constitutional**

"[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."[24] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

"The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. . . . A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not on others." *Ward*, 491 U.S. at 791. "To determine whether an ordinance is content-neutral, a court generally looks to the terms of the ordinance to see if the ordinance 'distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed.'" *Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1330 (M.D. Fla. 2011) (Steele, J.) (quoting *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1259 and n. 4 (11th Cir. 2005); *See also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("This commonsense meaning of the

---

[24] "Outdoor areas of campus are considered traditional public forums for individuals, organizations, and guest speakers. . . . 'Outdoor areas of campus' means generally accessible areas of a public institution of higher education in which members of the campus community are commonly allowed, including grassy areas, walkways, or other similar common areas." §§ 1004.097(3)(c), (2)(d), Fla. Stat.

phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys.") (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011)).

If content-neutral, the policy "need not be the least restrictive or least intrusive means . . . Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 791, 798–99 (internal quotation marks omitted); *see also Cincinnati v. Discovery Network*, 507 U.S. 410, 416 (holding that narrow tailoring requires a "reasonable fit" between the government's asserted interest and the challenged ordinance). "To demonstrate the significance of its interest, the [university] is not required to present detailed evidence, but is entitled to advance its interest by arguments based on appeals to common sense and logic." *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1318 (11th Cir. 2000).

"Finally, a content-neutral restriction must allow ample alternative channels of communication. The [university] can satisfy this requirement even if the other channels may be less effective than plaintiffs would prefer." *Occupy Fort Myers*, 882 F. Supp. 2d at 1331 (citing *Coal. for the Abolition of Marijuana Prohibition*, 219 F.3d at 1319).

Guest Policy

The plaintiffs offer no argument as to why the Guest Policy, which regulates the access of non-students to the USF campus, violates the First Amendment. The claim fails.

Final-Exam-Week Policy

The Final-Exam-Week Policy states, "To provide an environment conducive to preparation of final or cumulative exams, the final two weeks of any academic term, no Activities will be permitted in or near Academic Spaces on campus, without reservations." Patently content-neutral and expressly and reasonably tied to a significant university interest, the Final-Exam-Week Policy allows ample alternative channels of communication both during the final two weeks of each academic term and during the other forty-eight weeks of the year, which include the week of May 15 (known among some as Nakba Day).[25]

To suggest that the Final-Exam-Week Policy was selectively enforced against SDS, the plaintiffs assert "[y]ou can bet the Girl Scouts or Jehovah's Witnesses would quickly get a permit to table the week before finals; Students for Justice in Palestine, or Jewish Voice for Peace, not so much." (Doc. 46 at 12 n. 5) This specu-

---

[25] Wright *supra* note 14 ("Every year on May 15, Palestinian people across the world observe what is known as Nakba Day.").

- 23 -

lative, hypothetical assertion is insufficient. The plaintiffs neither allege the existence of a valid comparator nor otherwise show that any policy, including the Final-Exam-Week Policy, was selectively enforced.

<u>Reservation Policy and Tabling Policy</u>

Mischaracterizing the Reservation Policy as a "blanket prohibition on tabling," the plaintiffs argue that the hours set by the Reservation Policy are "untenably early for speech and advocacy outdoors on a public university campus" and cite three inapposite cases: (1) *Watseka v. Illinois Pub. Action Council,* 796 F.2d 1547, 1556 (7th Cir. 1986), *affd.*, 479 U.S. 1048 (1987), (invalidating a 5 p.m. to 9 p.m. ban on solicitation); (2) *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 566 (6th Cir. 2012) (invalidating an ordinance banning all door-to-door canvassing and soliciting between 6 p.m. and 9 a.m.); and (3) *Aptive Env't*, *LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 966 (10th Cir. 2020) (invalidating a 7:00 p.m. curfew on commercial door-to-door solicitation). (Doc. 46 at 13) Neither a "ban," a "curfew," nor a "blanket prohibition," the Reservation Policy requires only an advance reservation for the use of university space during evening hours and constitutes a permissible time, place, and manner restriction by any standard. (Doc. 46 at 13)

- 24 -

The plaintiffs argue that the Reservation Policy, along with the Tabling Policy, afford USF "unbridled discretion" because "nowhere . . . are there any 'narrowly drawn, reasonable, and definite standards to guide' reservation approvals."[26] (Doc. 46 at 14–15); *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306 (11th Cir. 2024), *cert. denied sub nom. Moats v. Jarrard*, 145 S. Ct. 2702 (2025). Although USF Policy 6-028.III affords the university discretion to "take appropriate action if there are reasonable grounds to believe an Activity presents an imminent threat to the health, safety, welfare, or operation of campus," USF's discretion is subject to the "narrowly drawn, reasonable, and definite standards" set forth in Policy 6-028, which span twenty pages and incorporate seven additional USF policies,[27] four USF regulations,[28] and four Florida statutes.[29] (Doc. 18-12 at 3 and 20)

Finally, the plaintiffs argue that the absence of an explicit deadline for USF to respond to reservation requests renders the Reservation Policy unconstitutional

---

[26] *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1221 (11th Cir. 2017) ("[T]he plainest example of an unconstitutional grant of unbridled discretion is a law that gives a government official power to grant permits but that provides no standards by which the official's decision must be guided.").

[27] USF Policy 0-215 ("Use of USF Name and Symbols"); USF Policy 0-502 ("Appropriate Use of Information Technology Resources"); USF Policy 0-505 ("Use of University Space (All-Inclusive)"); USF Policy 6-012 ("Access Control to Buildings and Facilities"); USF Policy 6-022 ("Campus Design & Construction Program"); USF Policy 6-035 ("Abandoned Vehicles"); USF Policy 30-023 ("Alcohol Policy").

[28] USF Regulation 4.0010 ("Parking General Guidelines, Registration, Rates, and Penalties"); USF Regulation 4.0140 ("No Trespass and Loitering"); USF Regulation 6.017 ("Student Organizations"); USF Regulation 6.026 ("Distribution of Material and Solicitation on Campus").

[29] § 403.413, Fla. Stat. ("Florida Litter Law"); § 403.031, Fla. Stat. (regulating pollution); § 876.12, Fla. Stat. (prohibiting the wearing of masks in public places); § 877.03, Fla. Stat. ("Breach of the peace; disorderly conduct").

because "if the prior restraint is content based, then the lack of a time limit renders the prior restraint unconstitutional." *Barrett v. Walker County School District*, 872 F.3d 1209, 1222 (11th Cir. 2017). This argument assumes that the Reservation Policy constitutes a prior restraint and is content based. Because neither premise is supported in the record, the absence of an express deadline for USF to process a reservation request does not render the policy unconstitutional.

<u>Expulsion Policy</u>

The Expulsion Policy, which the plaintiffs describe as "an indiscriminate shotgun blast to disfavored speech and association," applies without regard to viewpoint and prevents an expelled student organization from evading expulsion through reconstitution under an alias — a tactic apparently contemplated by the plaintiffs. (Doc. 18-7; Doc. 46 at 8)

That the Expulsion Policy "incidental[ly]" affects SDS, "the most vocal and active anti-Zionists on campus," does not render the policy content based. (Doc. 46 at 18); *Ward*, 491 U.S. at 791. The dispositive inquiry is whether the Expulsion Policy "on its face" draws "distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163.

The plaintiffs ignore the underlying objective served by the Expulsion Policy's requirement of both "similar members" and a "similar purpose." The Expulsion Policy employs the two criteria conjunctively to ensure "narrow[] tailor[ing]." *Ward*, 491 U.S. at 791. Absent the "similar purpose" limitation, a former member of an expelled organization could face university discipline for participation in an

- 26 -

unrelated student organization. Absent the "similar members" limitation, a student organization sharing a purpose with an expelled organization but otherwise compliant with university policy could theoretically face university discipline for the conduct of a non-member. By requiring similarity in both membership and purpose, the Expulsion Policy limits enforcement to expulsion-evasion efforts and preserves "ample alternative channels" for expression. *Occupy Fort Myers*, 882 F. Supp. 2d at 1331 (M.D. Fla. 2011). If the members of an expelled organization re-assemble to form a new organization for the same purpose, the result is a mere name change, an evasion, a deception — permitted neither by USF disciplinary rules nor in many instances by the law in other circumstances.

Relying on *Healy*, the plaintiffs argue that "a heavy burden rests on the college to demonstrate the appropriateness" of SDS's expulsion because the "ban on future proposed organizations 'with similar members and purpose . . . is plainly a prior restraint." (Doc. 46 at 5 and 16–17) *Healy*, 408 U.S. at 184. But *Healy* concerned the expressly viewpoint-based denial of a student organization's initial application for "official campus recognition." *Healy*, 408 U.S. at 174. This action follows SDS's expulsion for a past, conduct-based violation of university policy — an ongoing punishment for prior misconduct, not a prior restraint.

Finally, the plaintiffs lift words from their proper context in *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982), to argue that "the First Amendment requires that, for access to a public forum to be denied 'by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals

and that the individual held a specific intent to further those illegal aims.'" (Doc. 46 at 17) The plaintiffs omit the immediately preceding, but necessary, words. Properly read, the passage states: "For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Claiborne* rejects the imposition of civil damages for mere membership in a union participating in a boycott and does not concern, as the plaintiffs assert, "access to a public forum."[30] *But see Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 697 (2010) (upholding the denial of recognition to a student organization that failed to comply with a reasonable, content-neutral university policy).

**Each Challenged Policy Long Predates the "Nakba Commemoration Event"**

Attempting to recast the facially content-neutral policies as content based, the plaintiffs assert that the policies were "adopted by the government because of disagreement with the message the speech conveys." (Doc. 46 at 12); *Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178, 1185 (11th Cir. 2025). In support of this theory, the plaintiffs characterize the policies as "frantic last-minute policy changes

---

[30] Similarly misplaced is the plaintiffs' reliance on the proposition of *Elfbrandt v. Russell*, 384 U.S. 11, 19 (1966) that "'[a] law which applies to membership without the 'specific intent' to further the illegal aims of the organization infringes unnecessarily on protected freedoms." The Expulsion Policy imposes no criminal penalty and does not prohibit membership or association as such but regulates access to university resources and recognition.

to bar protests in the lead-up to finals and graduation." (Doc. 46 at 18) For example, the plaintiffs describe the Final-Exam-Week Policy as an "unprecedented, weeklong, 'time, place, and manner restriction' . . . hurriedly adopted for fear of protests and demonstrations on this particular subject." Also, the plaintiffs allege that the Reservation Policy was "enact[ed]" in anticipation of the "Nakba Commemoration Event." (Doc. 30 ¶ 96; Doc. 46 at 12)

The plaintiffs cite no fact to support either conclusion but instead insist that the theory is "more than plausible," while ignoring that USF approved Policy 6-017, which includes the Expulsion Policy, on October 6, 1975, and that the last substantive amendment to the policy was March 26, 2008 — predating the "Nakba Commemoration Event" by more than sixteen years. (Doc. 46 at 12; Doc. 18-8 at 14) Likewise, USF approved Policy 6-028, which includes the remaining challenged policies, on February 13, 2017, and no substantive amendment predates the "Nakba Commemoration Event." (Doc. 18-12 at 20) Because they fail to plausibly allege that the challenged policies are content based, the plaintiffs' strict-scrutiny analysis — the crux of the plaintiffs' response — does not apply.

### The Plaintiffs' Remaining First Amendment Argument Is Unsupported by Any Authority

In their response to the motion to dismiss, the plaintiffs proclaim:

> Plaintiffs' primary First Amendment associational claims are simple and clear. [SDS] is banned from the public square. First Amendment jurisprudence can be esoteric. This point is not. It's not about a "time, place and manner restriction." It's not necessarily about a "policy." It doesn't turn on fine distinctions between "subject matter discrimina-

> tion" vs. "viewpoint-discrimination." . . . It is about a blanket prohibi-
> tion on a public interest group and anyone associating with that group,
> over every inch of Defendants' jurisdiction, for all time. It is independ-
> ent of Plaintiffs' status as USF students or alumn[i], or as an officially
> recognized student organization. This is about a citizen ban in the pub-
> lic square.

(Doc. 46 at 4)

Except in the plaintiffs' argument, no "ban in the public square" exists at USF, which long ago adopted each challenged time, place, and manner restriction on access to the common areas of campus. And although the plaintiffs dismiss as immaterial the "fine distinctions" of First Amendment doctrine, those distinctions govern the analysis. Notably, the plaintiffs frame the dispute as between "subject matter discrimination" and "viewpoint discrimination," but the analysis never reaches that question because each challenged policy, as discussed, is content-neutral. Notwithstanding the plaintiffs' adamant posture — for which the plaintiffs cite no supporting authority — the dispositive question remains whether the challenged restrictions satisfy the settled standard governing content-neutral, time, place, and manner regulation of speech and association on a public university campus.

## Count III: Civil Conspiracy

Under Section 768.28(9)(a), Florida Statutes, a governmental employee is liable for a tort committed within the scope of employment only if "act[ing] in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property." The plaintiffs allege in the conspiracy claim (and without factual support) (1) that each defendant acted "outside the

- 30 -

course and scope of . . . employment," (2) that "[e]ach individual defendant knew or should have known that their actions were in violation of Plaintiffs' constitutional rights," and "[i]n the alternative" (3) that "each Defendant acted with callous or reckless indifference [to] the Plaintiffs' rights." (Doc. 30 ¶¶ 248–50 and 252) These allegations are purely conclusory, and a "mere conclusory statement [does] not suffice to state a claim." *Iqbal*, 556 U.S. at 676; *see also O'Boyle v. Thrasher*, 638 F. Appx 873, 878 (11th Cir. 2016) ("Since [the plaintiff] pled nothing more than the 'bare elements' of malice, bad faith, and wanton and willful disregard, his state-law claims do not sufficiently overcome § 768.28(9)(a) immunity.").

Even apart from the defendants' state law immunity, the plaintiffs fail to state a conspiracy claim. "[T]he linchpin for conspiracy is agreement, which presupposes communication." *Bailey v. Bd. Of Com'ty Comm'rs of Alachua County*, 956 F.2d 1112, 1122 (11th Cir. 1992). "It is not enough to simply aver in the complaint that a communication existed." *Allen v. Sec'y Fla Dep't of Corr.*, 578 Fed. Appx. 836, 840 (11th Cir. 2014). In support of their conspiracy claim (or, absent sufficiently particularized facts, their conspiracy theory), the plaintiffs allege:

> On May 5, 2024, the Tampa Jewish Community Centers & Federation (JCC) published a letter commending the USF administration for its zero-tolerance approach to Palestinian and allied student organizing against Israel's actions in Gaza since October 2023, and thanking [President] Law for meeting with them on multiple occasions and "work[ing]" with them to address "anti-Israel activity on campus" by what it called "anti-Israel students and agitators."
>
> The JCC stated that the USF administration met with the Tampa Jewish Community Relations Council (JCRC) on multiple occasions since

- 31 -

October 7, 2023, had been in 'ongoing contact' (outside the sunshine) with 'several key stakeholder groups,' had met with the Deputy Consul General of Israel for Florida, had watched a 42-minute propaganda film about Hamas, and had been paying for around-the-clock police presence at . . . Hillel [another Jewish Organization].

Hillel at USF has conspired "behind the scenes" with members of the USF Foundation board to undermine student advocacy led by [SDS] and other groups in support of Palestinian rights.

Upon information and belief, the statement by the JCC states facts, and Defendant Law did indeed maintain "ongoing contact with several key stakeholder groups," meet with the Deputy Consul General for Florida at the request of the JCC, and take other measures to suppress "anti-Israel activity" on USF's campus upon the request of the JCC—including the campaign to silence and expel [SDS] for engaging in such "anti-Israel activity."

The JCC and USF have conspired for over a decade to target and silence pro-Palestinian speech, the Divestment movement, and any speech critical of the Israeli government or US institutions' complicity in Israel's crimes.

On or around January 29, 2016, for example, the JCC pledged $25,000 to assist USF Hillel members in opposing the Boycott, Divest and Sanction (BDS) movement on campus, led by [SDS], Students for Justice in Palestine (SJP), and their associates.

In 2023, USF Hillel raised a record breaking $157 million for USF.

(Doc. 30 ¶¶ 34–35 and 38–42)

The complaint names several Jewish and Jewish-aligned "co-conspirators" (as the plaintiffs label them) and obliquely suggests that their contributions to USF compel the "infer[ence]" of a conspiracy to "violat[e] Plaintiffs' expressive and associative rights." (Doc. 46 at 19; Doc. 30 ¶ 243) Apart from failing to allege any fact supporting the "inference" that any defendant "violat[ed] Plaintiffs' expressive and

- 32 -

associative rights," the complaint fails to allege an agreement either between the defendants or between any defendant and any so-called "co-conspirator."[31] *See C.H. by Hilligoss v. School Board of Okaloosa County, Florida*, 2019 U.S. Dist. LEXIS 169142, at *63 (N.D. Fla. Sept. 30, 2019) ("Conclusory allegations of an agreement, without any factual basis to make the allegation plausible, are insufficient to state a conspiracy claim.").

In essence, the plaintiffs argue that every time a Jew or Jewish organization contributes to (in this instance) a public university and that university, acting under established policy, disciplines a student who advocates for, in this instance, "particularly Palestinian" policies, the simultaneous presence of the contribution and the discipline creates a plausible inference of a conspiracy between the contributor and the university to punish the "particularly Palestinian" advocate. Whether properly characterized as paranoid, anti-Semitic, delusional, or merely fantastical, the suggested "inference" is illusory (and likely malignant) and warrants no consideration in a court of the United States.

---

[31] Notwithstanding, of course, the "agreement" to pay for "around-the-clock police presence" at the USF Hillel building. (Doc. 30 ¶ 35)

- 33 -

## CONCLUSION

The defendants' motion (Doc. 38) to dismiss is **GRANTED**. Because any

further amendment appears futile, the action is **DISMISSED WITH PREJUDICE**.

The clerk is **DIRECTED** to close the case.

**ORDERED** in Tampa, Florida, on April 10, 2026.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE